ADAM PAUL LAXALT
Nevada Attorney General
ANDREA R. BARRACLOUGH
Chief Deputy Attorney General
Nevada Bar No. 9158
Bureau of Litigation
Public Safety Division
100 N. Carson Street
Carson City, Nevada 89701-4717
Telephone:  (775) 684-1260
Email:  abarraclough@ag.nv.gov

*Attorneys for Defendants*
*James "Greg" Cox, Timothy Filson,*
*Dwight Neven and Ronald Oliver*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| VICTOR PEREZ, as Special Administrator of the Estate of CARLOS PEREZ, deceased; VICTOR PEREZ, as the Guardian Ad Litem for SOPHIA ELISE PEREZ, a minor; VICTOR PEREZ, as The Guardian Ad Litem for ALEXANDER IZRYAL PEREZ, a minor; and MYRA PEREZ, individually.<br><br>                  Plaintiff,<br><br>v.<br><br>STATE OF NEVADA; JAMES GREG COX, DWIGHT NEVEN, TIMOTHY FILSON, COT RAMOS, LIUETENANT OLIVER, CORECTIONS OFFICER CASTRO, CORRECTIONS OFFICER SMITH, ET AL.<br><br>                  Defendants. | Case No.   2:15-cv-01572-APG-CWH<br><br>**DEFENDANTS'<br>MOTION TO DISMISS AND<br>MOTION FOR SUMMARY JUDGMENT[1]** |

/ / /

/ / /

---

[1] *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982), allows for the filing of pre-discovery motions for summary judgment per Fed. R. Civ. P. 56 where qualified immunity is argued as a defense, since government officials should not be subjected to the discovery process where qualified immunity shields them from liability.  All claims relying on evidentiary support outside of the pleadings will similarly be subject to summary judgment review standards under Fed. R. Civ. P. 56.  However, the hybrid motion is appropriate on the standing arguments, which will be analyzed under a Fed. R. Civ. P. 12(b) standard.

1    Defendants, State of Nevada, James "Greg" Cox, Timothy Filson, Dwight Neven, and

2    Ronald Oliver, by and through counsel, Adam Paul Laxalt, Attorney General of the State of

3    Nevada, and Andrea Barraclough, Chief Deputy Attorney General, hereby file this Motion to

4    Dismiss and Motion for Summary Judgment.[2]

5                                   **PROCEDURAL HISTORY**

6    Plaintiffs filed their Complaint in State Court on April 7, 2015.   Defendant's filed an

7    unopposed Petition for Removal.   *See* (#1) and (#10).   After a mediation attempt was

8    unsuccessful, *see* (#20), the parties stipulated to February 26, 2016, as the responsive pleading

9    deadline.  *See* (#23) and (#25).

10    Plaintiffs' Complaint (#1-C) states an Eighth Amendment claim for excessive force (#1-C

11    at 7–9), an Eighth Amendment claim for medical deliberate indifference (#1-C at 7–9), a state

12    tort wrongful death claim under NRS 42.085 (#1-C at 9), a state tort claim for negligent

13    retention/training/supervision (#1-C at 9–10), and a state tort claim for Intentional Infliction of

14    Emotional Distress (IIED) (#1-C at 11).   All claims are against all Defendants in their individual

15    capacities.

16                                        **INTRODUCTION**

17    On November 12, 2014, Carlos Perez and Andrew Arevalo, two inmates housed at High

18    Desert State Prison (HDSP), were sent to the showers at the same time.   Arevalo was released

19    from his shower first.  Apparently, one of the non-moving Defendants (either Correctional Officer

20    (CO) Castro or CO Smith) released Perez from his shower stall before Arevalo was back in his

21    cell.  Perez than ran towards Arevalo and began attacking him.   The COs gave repeated verbal

22    commands over the course of several minutes ordering the two inmates to stop fighting.   Perez

23    and Arevalo, however, refused to stop.   At that point, non-moving Defendant Correctional

24    Officer Trainee (COT) Raynaldo-Ramos fired several rounds of 7.5 gauge birdshot towards

25    / / /

26

27    _____
     [2] This Motion is filed on behalf of Cox, Filson, Neven and Oliver, collectively known as the NDOC
28    Defendants.  Three other attorneys individually represent Defendants Reynaldo-Ramos, Smith and Castro, so this
     Motion does not include arguments seeking relief for them.  But for purposes of telling the complete story and
     fully supporting the arguments, some factual allegations against them are addressed herein.

1  Perez and Arevalo—interspersed with additional orders to stop fighting—to break up the fight.

2  Perez ultimately died.

3      By way of this suit, Plaintiffs not only seek damages against the officers involved in the

4  shooting, but also four individuals (James "Greg" Cox, Timothy Filson, Dwight Neven, and

5  Ronald Oliver) who had no involvement in the incident of November 12, 2014.  Plaintiffs have

6  alleged causes of action against those individuals for (1) excessive force and deliberate

7  indifference to a serious medical need; (2) wrongful death; (3) negligent training, supervision

8  and retention; and (4) intentional infliction of emotional distress.  Those claims all fail as those

9  individual Defendants.

10                          **STATEMENT OF UNDISPUTED FACTS**[3]

11      **A.  The Incident of November 12, 2014**

12      On November 12, 2014, shortly before 8:00 p.m., two inmates housed at High Desert

13  State Prison (HDSP), Carlos Perez and Andrew Arevalo were assigned to the showers at the

14  same time.  *See* Exhibit A, NDOC DOC 1664 Report; see also Complaint (#1-C) at ¶ 20.

15      When Perez and Arevalo were released from the showers simultaneously by CO

16  Castro, CO Smith, or both, Perez and Arevalo began fighting.  *See id.*  Several rounds of 7.5

17  gauge birdshot were fired by Correctional Officer Trainee (COT) Raynaldo-Ramos to break up

18  the fight.  *See id.*  This was done after several verbal commands went unheeded and blank

19  round failed to break up the altercation.  *See* Exhibit B, Spontaneous Use of Force Incident

20

21          [3] All prison records filed as Exhibits are authenticated per Fed. R. Evid. 901(b0(4).  Case law is in accord.

22  Personal knowledge testimony of authentication is not required of all documents; rather, the personal knowledge authentication is required only where those documents are attached to an affidavit.  *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532-33 (9th Cir. 2011).  "Where documents are otherwise submitted to the court, and

23  where personal knowledge is not relied upon to authenticate the document, the district court must consider alternative means of authentication under Federal Rules of Evidence 901(b)(4)."  *Id.* Under that evidentiary rule,

24  "documents could be authenticated by review of their contents if they appear to be sufficiently genuine".  *Id.* (internal citations omitted).  Prison records are generally viewed as authentic under this test. *See McMaster v.*

25  *Spearman*, No. 1:10-cv-01407-AWI-SKO, 2014 WL 4418104, at *3 (E.D. Cal. Sept. 5, 2014) (prison records meet authentication requirements under Fed. R. Evid. 901(b)(4) due to their characteristic appearance and contents).

26  By way of example, this court can look for persuasive guidance to *Davis v. Hedgpeth*, No:1:07-cv-00696-OWW-SKO, 2011 WL 3325890, at *3 (E.D. Cal. Aug. 2, 2011).  There, the court specifically examined the need to

27  authenticate prison medical records and found that the characteristics of prison medical records themselves in terms of appearance, contents, and substance, would lead to the conclusion that the documents were

28  authenticated pursuant to Fed. R. Evid. 901(b)(4).  Thus, there is a preference among Ninth Circuit courts to consider documents that are clearly prison records without the need for further authentication.

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1   Checklist.  Both Perez and Arevalo were wounded.  *See id.*  Perez was assessed by medical
2   staff at the scene and then transferred to the infirmary, but lengthy attempts at CPR failed and
3   Perez was pronounced dead at 8:38 p.m.  *See id.*  Arevalo was taken to the hospital
4   emergency room for assessment and treatment.  *See* Exhibit C, NDOC Transportation Order
5   Request.

6   **B.  Defendant Ronald Oliver**

7   Lieutenant Ronald Oliver was one of the Lieutenants on duty at the time, assigned as the
8   supervisor for units 9–12 at HDSP.  *See* Exhibit D, Incident/Staff Report of Ronald Oliver.  He
9   was not assigned to Unit 2 where the incident occurred and he was not present in the
10  segregated housing unit when COT Raynaldo-Ramos fired the birdshot; he first heard of shots
11  being fired over the radio.  *See id.  See also* Exhibit E, Declaration of Ronald Oliver, ¶ 5.  Oliver
12  had no part in drafting or implementing either Administrative Regulations (ARs) or Operational
13  Procedures (Ops), *see* Exhibit E, ¶ 6; he did not take part in the creation of AR 405 as it regards
14  the NDOC's use of force policy or HDSP's OP 405 regarding use of force at that institution.

15  **C.  Defendant Timothy Filson**

16  Associate Warden (AW) Filson was the AW of Programs at the time this incident
17  occurred.  *See* Exhibit F, Declaration of Timothy Filson, ¶ 6.  As with Oliver, he was assigned to
18  the 9–12 quad, not Unit 2 where Perez was shot.  *See id.*  Additionally, AW Filson's shift was
19  8:30 a.m. to 4:30 p.m.  *See id.*, ¶ 4.  He was not present at HDSP when the incident occurred.
20  *See id.*  He did not observe, direct, or condone the acts of Castro, Smith, and Raynaldo-
21  Ramos.  *See id.*  Filson had no role in drafting or implementing AR 405.  *See id.*, ¶ 7.  As one of
22  his duties as an Associate Warden, he signed off on HDSP OP 405, the facility-specific
23  corollary to AR 405, but this policy was drafted by the Warden.  *See id.*, ¶ 8.  *See also* Exhibit
24  G, OP 405.

25  **D.  Defendant Dwight Neven**

26  Warden Neven was the Warden of HDSP at the time this incident occurred.  *See* Exhibit
27  H, Declaration of Dwight Neven, ¶ 5.  As Warden, he was generally charged with oversight over
28  all HDSP operations and programs, though he delegated as appropriate and relied on staff to

follow ARs and OPs in performing their duties.  *See id.*, ¶¶ 5–6.  Warden Neven's shift was generally 8:00 a.m. to 5:00 p.m., Monday through Friday.  *See id.*, ¶ 4.  He was not present at HDSP when the incident occurred, and thus he was not around to observe, direct, or condone the acts of Castro, Smith, and Raynaldo-Ramos.  *See id.*  Warden Neven does not draft or adopt ARs, including AR 405, but his job is to ensure that policy is being followed and to take remedial steps when it is revealed staff have not followed policy.  *See id.*, ¶ 7.  Warden Neven did draft and implement OP 405, effective October 14, 2014.  *See id.*, ¶ 8.  *See also* Exhibit G.

### E.  Defendant Former Director James Cox

On November 12, 2014, Cox worked from 8:00 a.m. to 5:00 p.m. at the Case Grande Transitional Facility in Las Vegas, Nevada.  *See* Exhibit I, Declaration of James Cox, ¶ 4.  Cox did not have an office at HDSP and did not routinely travel there.  *See id.*  He was not physically present at HDSP at 8:00 p.m. on November 12, 2014.  *See id.*  He was not around to observe, direct, or condone the acts of Castro, Smith, and Raynaldo-Ramos.  *See id.*  The Director's duties included overseeing the safety, security and management of every facility in the NDOC system.  *See id.*, ¶ 5.  It was also Cox's job, in conjunction with the Board of Prison Commissioners, to set policy (including ARs) for the running of the NDOC system.  *See id.*  He did not draft the OPs for the individual institutions, as that was a task delegated to each facility's Warden.  *See id.*  Staff were expected to follow ARs and OPs, and in the event they did not, their conduct was investigated and dealt with appropriately.  *See id.*, ¶ 4.

### F.  AR 405 and OP 405

AR 405, entitled Use of Force, sets forth the tenets of how force should be applied towards NDOC inmates system-wide.  *See* Exhibit J, AR 405, effective 01/05/12 and readopted 10/20/14.  AR 405.01(2) states that force may be used to "protect persons from imminent death or serious bodily harm."  Exhibit J at 1.  AR 405.02(1) states that the "[l]evel of force used and type of equipment used is dictated by the assessed risk presented and the severity of the conditions of the situation."  Exhibit J at 2.  AR 450.02(3) states that two types of non-deadly force can be used as the situation dictates.  One type of force is with use of authorized equipment, i.e., "the use of any physical force utilizing a device designed for

defensive purposes or to temporarily incapacitate, immobilize or disorient a person." Exhibit J at 2. Under AR 405.03(6), a 12-gauge shotgun loaded with 7.5 birdshot designed to be skip-shot is considered non-deadly force.[4] Exhibit J at 3. The birdshot equipment is not listed under the options for deadly force equipment, and is not considered same. Exhibit J at 3. AR 405.05(1) further states that preapproval is not required to deploy force to protect self or others. Exhibit J at 4.

AR 405.08(1) also mandates that medical examinations and treatment will be conducted when a use of force incident occurs. Exhibit J at 4. Finally, AR 405.09 requires that all use of force must be reported to a shift supervisor as soon as order has been restored. Exhibit J at 5.

OP 405 details HDSP's use of force policy for that institution. *See* Exhibit G. The policy itself states the following:

1) If a staff member witnesses an excessive or unnecessary use of force, that staff member is required to halt the conduct and report it, Exhibit G at 1;

2) Non-deadly force includes the 7.5 birdshot when skipped, Exhibit G at 2;

3) "The degree of force should be determined by the circumstances surrounding the incident and should be restricted to the minimum degree necessary to regain control of the inmate, as outlined in this procedure and as a last resort," OP 405.01(5), Exhibit G at 2;

4) A verbal warning or other show of force should be used before non-deadly force is deployed, OP 405.04(1), Exhibit G at 5;

5) A warning shot from a shotgun can be deployed to disperse brawling inmates, 450.04(7), Exhibit G at 8;

6) "If the initial warning shot fails to stop the prohibited activity, then 7.5 birdshot rounds may be fired into the ground (skip shot) near the problem inmates or disturbance," AR 450.04(7), Exhibit G at 8; and

/ / /

---

[4] Skip-shooting is aiming for the floor by the inmates with the intent that the pellets will strike the floor, ricochet up, and only hit the inmates in their lower extremities. *See* Exhibit J at 3.

7)     For any use of force with a firearm, the propriety of the discharge of the firearm is reviewed by a committee, OP 405.06, Exhibit G at 9.

### G.  OP 710.15(3)

HDSP OP 710 governs the operations of the segregated housing unit, which contains inmates in protective segregation, administrative segregation, and disciplinary segregation. *See* Exhibit S, HDSP OP 710.  Section 15, subsection 3, requires that all inmates be moved one cell at a time and that a specific procedure be followed as to each individual inmate as they are escorted to the showers.  *See id.* at 20–21.

### H.  Castro, Smith, and Raynaldo-Ramos

At the time of the incident COT Ramos was on probationary status.  *See* Exhibit H, ¶ 9. Immediately after the incident, he was placed on administrative leave pending investigation. *See id.*  He was ultimately dismissed by the NDOC, who opted to not advance him off of probation.  *See id.*  *See also* Exhibit K, Raynaldo-Ramos personnel documents, filed under seal.

Castro was also placed on administrative leave pending investigation.  *See* Exhibit H, ¶ 10.  *See id.*  Prior to the conclusion of the investigation and institution of any disciplinary proceedings, Castro resigned from the NDOC.  *See id.*  *See also* Exhibit L, Castro personnel documents, filed under seal.  This exact same scenario is also true as to Smith.  *See* Exhibit H, ¶ 11.  *See also* Exhibit M, Smith personnel documents, filed under seal.

### I.  Medical Treatment of Perez

At 7:55 p.m., a radio call went out from Unit 2 indicating that shots had been fired in Unit 2 A/B.  *See* Exhibit N, Incident/Staff Report of J. Dugan.  Senior CO Dugan, who was assigned to the infirmary, heard the call and dispatched three nurses to Unit 2.  *See id.*  Dugan remained at the infirmary and saw Perez brought in at about 8:10 p.m.  *See id.*  Lifesaving treatments had already begun at that time and continued, with Dugan pitching in to assist.  *See id.*

While awaiting the nurses' arrival from the infirmary, COs Satterly and Senior CO Mumpower arrived on scene to Unit 2.  *See* Exhibit O, Incident/Staff Report of J. Satterly. Mumpower evaluated Perez and rolled him to his side to help gravity expel blood from this

mouth.  *See id.*  Satterly then observed three nurses arrive, take vitals, and start CPR.  *See id.*  Satterly accompanied Perez to the infirmary trauma room and witnessed CPR continue until the time of death was called at 8:38 p.m. *See id.*  CO Matthew Eskridge was also part of the team taking turns trying to resuscitate Perez.  He too confirms that CPR efforts were continuous and ongoing.  *See* Exhibit P, Incident/Staff Report of M. Eskridge.

Nurse Annen Ames was one of the attending nurses.  She confirms that CPR was started at Unit 2 and continued until Dr. Holmes gave the order to call time of death.  *See* Exhibit Q, Incident/Staff Report of Annen Ames.  She also notes that an ambulance was called for Perez at 8:10 p.m., right after the team and Perez arrived from Unit 2 to the infirmary.  *See id.*  In short, lifesaving measures were taken to save Perez's life from the moment "shots fired" came through the radio at about 7:55 p.m. until time of death was called at 8:38 p.m., with CPR occurring on Perez for approximately 38 straight minutes.  *See* Exhibits O, P and Q.

<u>**ARGUMENT**</u>

**I**

**STANDARD OF REVIEW**

**A.  Dismissal Under Fed. R. Civ. P. 12(b)(6)**

"To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a formulaic recitation of the elements of a cause of action; specifically, it must contain factual allegations sufficient to raise a right to relief above the speculative level."  *Bates v. Bankers Life & Cas. Co.*, 993 F. Supp. 2d 1318, 1327 (D. Or. 2014) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted)).  "To raise a right to relief above the speculative level, '[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action."  *Id.*; *see also* Fed. R. Civ. P. 8(a).  "Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Bates*, 993 F.2d at 1327 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

/ / /

1       "Lack of statutory standing is properly considered as grounds for dismissal pursuant to"

2 Fed. R. Civ. P. 12(b)(6).   *Lema v. Courtyard Marriott Merced*, 873 F. Supp. 2d 1264, 1267

3 (E.D. Cal. 2012) (citing *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir.2011)).

4       **B.  Summary Judgment Under Fed. R. Civ. P 56.[5]**

5       Summary judgment is appropriate where there are no genuine issues of material fact

6 and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).

7 Summary judgment should be granted where a party fails "to make a showing sufficient to

8 establish the existence of an element essential to that party's case, and on which that party

9 will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The

10 court shall consider all admissible affidavits and supplemental documents attached to a

11 motion for summary judgment.   *See Connick v. Teachers Ins. & Annuity Ass'n,* 784 F.2d

12 1018, 1020 (9th Cir. 1986).   The moving party has the initial burden of demonstrating that

13 summary judgment is proper, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970), and

14 factual inferences should be drawn viewed in the light most favorable to the nonmoving party.

15 *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

16       To defeat summary judgment, the nonmoving party cannot rely on conclusory

17 allegations.  *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir. 1986).  Rather, the nonmovant

18 must present "specific facts showing there is a genuine issue for trial."  *Anderson*, 477 U.S. at

19 256.  The nonmovant's evidence should be such that a "fair minded jury could return a verdict

20 for [him or her] on the evidence presented."  *Id.* at 255.   In attempting to establish the

21 existence of this factual dispute, the opposing party may not rely on the allegations or denials

22 of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

23 admissible discovery materials, in support of its contention that the dispute exists.  *See* Fed.

24 R. Civ. P. 56(c)(1).

25 / / /

26 / / /

27

28     [5] Due to the dispositive nature of this responsive pleading, the Defendants respectfully request that this court issue to the Plaintiff an order advising him of his rights and obligations pursuant to *Klingele v. Eikenberry,* 849 F.2d 409 (9th Cir. 1988), and *Rand v. Rowland,* 154 F.3d 952 (9th Cir. 1998) (en banc).

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

II
POINTS AND AUTHORITIES

### A. Plaintiff Myra Perez Lacks Standing to Bring an Individual Claim for Wrongful Death

Under Nevada law, only "heirs" may assert an action for wrongful death damages. Plaintiff Myra Perez does not plead herself as an heir of Perez. *See* (#1-C) at 2. But even if given the opportunity to amend, she would not be able to do so.

NRS 41.085 states, in pertinent part:

> 1.    As used in this section, "heir" means a person who, under the laws of this State, would be entitled to succeed to the separate property of the decedent if he had died intestate.
>
> 2.    When the death of any person, whether or not a minor, is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death, or if the wrongdoer is dead, against his personal representatives, whether the wrongdoer died before or after the death of the person he injured. If any other person is responsible for the wrongful act or neglect, or if the wrongdoer is employed by another person who is responsible for his conduct, the action may be maintained against that other person, or if he is dead against his personal representatives.

Thus, only heirs can obtain relief on a wrongful death claim.

Nevada law defines "heir" to mean "persons, including the surviving spouse and the estate, who are entitled by intestate succession to the property of a decedent." N.R.S. 132.165. Where there is no surviving spouse, N.R.S. 134.090 requires that "[i]f there is more than one child [of decedent], the estate goes to all the children of the decedent, to share and share alike." "Children" are defined under Nevada law to exclude "a person who is a stepchild, a foster child, a grandchild or any more remote descendant." NRS 132.055. Accordingly, and in the absence of adoption or another operation of law, the definition of "child" presumes paternity, which can be established under Nevada law in accordance with NRS 126.051.[6]

Plaintiff Myra Perez has failed to plead that she is an heir in accordance with NRS 41.085, and she will not be able to produce evidence that she meets this definition even if

---

[6] *See also Reynolds v. County of San Diego*, 858 F.Supp. 1064, 1069 (S.D. Cal. 1994) (mother was not an heir to her son for purposes of wrongful death claim).

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1  allowed to amend.  As a result, Plaintiff Myra Perez does not have statutory standing to pursue

2  the wrongful death action under Nevada law.  Accordingly, Defendants' motion for summary

3  judgment should be granted as to her claims.

**B.  Cause of Action I for Excessive Force and Medical Deliberate Indifference is Subject to Dismissal and/or Summary Judgment Because the NDOC Defendants Are Not Vicariously Liable for the Acts of Castro, Smith, and Ramos as to the Excessive Force Claims and Because Allegations of Medical Deliberate Indifference are Belied by Medical Documentation[7]**

**1.    There is no vicarious liability for the force used.**

There is no *respondeat superior* liability under 42 U.S.C. §1983.  *Taylor v. List*, 880

F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding

that because vicarious liability is inapplicable to §1983 suits, a plaintiff must plead that each

government-official defendant, through their own individual actions, has violated the

Constitution.)  A government official may only be held liable if he engages in affirmative acts,

participates in affirmative acts committed by others, or omits to perform acts that he is legally

required to perform, that cause the alleged violation.  *Johnson v. Duffy*, 588 F.2d 740, 743-44

(9th Cir. 1978).  A plaintiff, in short, must allege facts that show the government official was

personally involved in the alleged deprivation of the plaintiff's civil rights, or that the

government official set into motion the acts of others which he knows or reasonably should

know would violate the law.  *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1980); *Gini v. Las*

*Vegas Metro Police Dep't,* 40 F.3d 1041, 1044 (9th Cir. 1994) (citing *Merritt v. Mackey,* 827

F.2d 1368, 1371 (9th Cir. 1987)).  For supervisory liability to attach in the absence of direct

participation, a plaintiff must plead a sufficient causal connection between the supervisor's

wrongful conduct and the constitutional violation.  *Hansen v. Black*, 885 F.2d 642, 646 (9th

Cir. 1989).  Even knowledge of a subordinate's unlawful conduct, by itself, is not sufficient.

*Ashcroft,* 556 U.S. at 677.

---

[7] To the extent the Complaint makes § 1983 claims "against all Defendants," *see* Complaint (#1-C at 7), and the State of Nevada is one of the named Defendants, *see* Complaint (#1-C at 2, ¶ 5), a constitutional cause of action under 42 U.S.C. § 1983 cannot lie against a governmental entity, but only against individual state actors operating under the color of state law.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997) (holding that states are not "persons" for the purposes of section 1983).  Thus, any action against the State of Nevada for excessive force of medical deliberate indifference must be dismissed.

Here, the Complaint accuses Cox, Neven, Filson, and Oliver of excessive force and medical deliberate indifference, *see* (#1-C) at 7; but, it is undisputed that none of these four persons were present for the incident.  *See* Exhibits E, F, H, and I.  Thus, none of the NDOC Defendants personally engaged in the affirmative acts alleged in Unit 2 or participated in the affirmative acts of Smith, Castro and Raynaldo-Ramos in Unit 2.

Plaintiffs' Complaint accuses the NDOC Defendants of "ratifying" Castro's, Smith's and Raynaldo-Ramos' conduct by promulgating policies (i.e. ARs and/or OPs) that ultimately lead to Perez's death, *see* Complaint (#1-C) at 2 and 6–7.  While "a supervisor's subsequent 'ratification' of another's conduct can form the basis for liability under § 1983[, t]he decision to ratify specific conduct . . . must approve both the subordinate's decision and the basis for it, and the ratification decision must be the product of a conscious, affirmative, choice to ratify the conduct in question."  *Shafer v. City of Boulder*, 896 F. Supp. 2d 915, 935 (D. Nev. 2012) (citing *Peschel v. City of Missoula*, 686 F.Supp.2d 1092, 1102 (D. Mont. 2009).  There is no allegation in the Complaint that Cox, Neven, Filson, and Oliver affirmatively and consciously chose to accept the conduct of Castro, Smith and Raynaldo-Ramos once it occurred.  *See* (#1-C).  Indeed, to the contrary, all three officers involved were investigated.  Rather, the inference of ratification is alleged solely based upon the NDOC Defendants' roles in the <u>creation</u> and <u>enforcement</u> of AR and OP 405 before the incident.  *See* (#1-C) at 8.  This is not enough.   No allegation contains even a modicum of factual support that the NDOC Defendants foresaw that three members of their correctional staff were going to engage in acts that led to Perez's death. *See* Complaint (#1-C at 2–3).

But even if amendment was allowed and Plaintiffs corrected these allegations, the undisputed evidence would render such allegations futile where Smith, Castro, and Rayaldo-Ramos were all placed on administrative leave immediately after the incident.  *See* Exhibits H, ¶ 9-11, K, L and M.  Ramos was dismissed while Castro and Smith resigned before disciplinary proceedings could commence.  *See id.*  Had Cox, Filson, Neven, and Oliver been ratifying, or choosing to accept and adopt the conduct of Raynaldo-Ramos, Castro and Smith, none of them would have faced such consequences, which ultimately led to a loss of their employment.

1    Therefore, no vicarious liability extends to the NDOC Defendants as a matter of law on

2    the Section 1983 claims, and those claims must be dismissed against Cox, Neven, Filson,

3    and Oliver.

4         **2.   There is no vicarious liability for the medical treatment given.**

5    The evidence demonstrates that: 1) as soon as a call of "shots fired" was heard by CO

6    Dugan, the assigned infirmary officer, three nurses were sent to Unit 2 A/B to attend to Perez

7    and Arevalo, *see* Exhibit N, Incident/Staff Report of J. Dugan; 2) CPR commenced in Unit 2

8    upon the nurses' evaluation, *see* Exhibit Q, Incident/Staff Report of Annen Ames; 3) within 15

9    minutes of the initial call at 7:55 p.m., Perez arrived to the HDSP Infirmary at 8:10 p.m., *see id.*;

10   4) an ambulance was called for Perez at 8:10 p.m., *see id.*; 5) while waiting for the ambulance,

11   many staff members continuously took turns performing CPR on Perez, *see id.*; and 6) it was

12   only after an extended period of continuous CPR had failed to revive Perez that he was

13   pronounced dead, *see id.   See also* Exhibit R, Perez Medical Records from November 12,

14   2014, filed under seal.

15   There was no personal participation in Perez's medical treatment by Cox, Neven,

16   Filson or Oliver, none of whom was present that evening for the treatment.  *See* Exhibits E, F,

17   H, and I.  Accordingly, there is no supervisory liability based on an actual link to their conduct.

18   *See* e.g. *Taylor,* 880 F.2d at 1045.   Further, AR 405.08(1) mandates that medical

19   examinations and treatment will be conducted when a use of force incident occurs.  Exhibit J

20   at 4.  Thus, the policy promulgated or enforced by all NDOC Defendants is to provide medical

21   treatment after the use of force.   Therefore, the NDOC Defendants, notwithstanding their

22   various levels of involvement with creating AR 405, cannot be affirmative linked to the

23   unconstitutional conduct alleged here.  *See Hansen*, 885 F.2d at 646.  Further, given the

24   continuous medical treatment provided to Perez without delay, *see* Exhibits N and Q, there is

25   no evidence of the underlying allegation of medical deliberate indifference that can serve as

26   the basis for imposing vicarious liability.  *See Carlson v. San Mateo Cty.*, 103 F.3d 137 (9th

27   Cir. 1996) (where there is no evidence supporting the imposition of vicarious liability on the

28   Defendant, summary judgment is proper).   Accordingly, the motion for summary judgment

should be granted to the NDOC Defendants regarding the medical deliberate indifference claims.

**C. Summary Judgment on Cause of Action II, for Wrongful Death, and Cause of Action IV, for Intentional Infliction of Emotional Distress, Is Warranted In Favor of the NDOC Defendants Because Individuals Are Not "Employers" Within the Meaning of *Respondeat Superior* Liability and Because There is No Evidence of Personal Participation**

Employer liability for intentional torts committed by an employee is governed by NRS 41.745. Importantly, "employer" is defined as "any public or private employer in this State, including, without limitation, the State of Nevada, a university school for profoundly gifted pupils described in chapter 392A of NRS, any agency of this State and any political subdivision of the State." NRS 41.745(3)(b). Meanwhile, the definition of "employee" includes "officers," defined in NRS 41.0307 as including members of a board, commission, or body of the State or a political subdivision. NRS 41.745(3)(a). Thus, the employer of Raynaldo-Ramos, Castro, and Smith, for purposes of vicarious employer liability, is the Nevada Department of Corrections. It is not Cox, Neven, Filson or Oliver, as individuals, who are considered employees. Since the Complaint only alleges liability against the NDOC Defendants in their individual capacities, *see* (#1-C) at 2–3, *respondeat superior* liability for Wrongful Death or IIED cannot lie as a matter of law against these men as individuals. Liability as to them can only be measured by evaluating their personal participation in the alleged conduct.[8]

### 1.    The Wrongful Death Claim

Count II alleges Wrongful Death, accusing Cox, Neven, Filson and Oliver (in addition to the other Defendants) of shooting and killing Perez. *See* Complaint (#1-C at 9).[9] Generally, NRS 41.085 allows for a claim of wrongful death "[w]hen the death of any person . . . is caused by the wrongful act or neglect of another." NRS 41.085(2). An action for damages

---

[8] Though tried as pendant state law claims with this federal action, state law is applied since the federal court is bound to analyze the state tort claims under Nevada state law. *See e.g. United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

[9] Though Plaintiff's authority for this claim is listed on the Complaint as NRS 42.085, it is assumed this is a typographical error and Plaintiffs meant to type NRS 41.085.

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1  can be brought by a Perez's heirs against any person responsible for the wrongful act or

2  neglect, or if the wrongdoer is employed by another person who is responsible for the

3  wrongdoer's conduct, the action may be maintained against that other person as well.  *Id.*

4  There must be causation evidence to show that the NDOC Defendants are the actual and

5  proximate cause of Perez's death.  *See Schmutz v. Bradford*, No. 58612, 2013 WL 7156301,

6  at *3 (Nev. Dec. 19, 2013).

7        "To demonstrate actual cause . . . , the [plaintiff must] prove that, but for the

8  [Defendant's conduct] the [plaintiff's damages] would not have occurred.  The second

9  component, proximate cause, is essentially a policy consideration that limits a defendant's

10  liability to foreseeable consequences that have a reasonably close connection with both the

11  defendant's conduct and the harm which that conduct created."  *Goodrich & Pennington*

12  *Mortgage Fund, Inc. v. J.R. Woolard, Inc.*, 120 Nev. 777, 784, 101 P.3d 792, 797 (2004)

13  (citing Restatement (Second) of Torts § 549 cmt. d (1977)).

14        Here, it is undisputed that no NDOC Defendant was present in Unit 2 during the

15  incident in question or had any control over the situation as it unfolded; they all learned of the

16  incident after the fact.  *See* Exhibits E, F, H, and I.  There is no possibility that any of them

17  could have been the actual cause of Perez's death.  Further, these NDOC Defendants cannot

18  be the proximate cause of Perez's death where the death was brought about by

19  unforeseeable breaches of clearly established policy by Castro and Smith when they released

20  Perez and Arevalo from the showers simultaneously.  *See* Exhibits A and S.  But for Arevalo

21  and Perez being released from showers at the same time, which should not have occurred

22  and which violated administrative regulations regarded inmates in segregated housing, *see*

23  Exhibit S at 20, Perez could not have chased down Arevalo and they could not have engaged

24  in the fight that COT Raynaldo-Ramos felt had to be broken up with use of birdshot.

25  / / /

26  / / /

27  / / /

28  / / /

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

15

Thus, given the lack of personal participation and the lack of proximate causation, the Count II wrongful death claim should be adjudicated in favor of the NDOC Defendants.[10]

### 2.  The Intentional Infliction of Emotional Distress Claim

As discussed, Cox, Neven, Filson and Oliver cannot be personally liable as an "employer" for the intentional torts that may have been committed by another employee under NRS 41.745.  Nonetheless, they are not liable on the merits should this Court elect to address that.  "To recover on a claim for IIED, a plaintiff must prove '(1) extreme and outrageous conduct on the part of the defendant; (2) intent to cause emotional distress or reckless disregard for causing emotional distress; (3) that the plaintiff actually suffered extreme or severe emotional distress; and (4) causation.'"  *Franchise Tax Bd. of Cal. v. Hyatt*, 130 Nev. ___,___, 335 P.3d 125, 147 (2014), *reh'g denied* (Nov. 25, 2014), *cert. granted in part on other grounds sub nom. California Franchise Tax Bd. v. Hyatt*, 135 S. Ct. 2940, 192 L. Ed. 2d 975 (2015) (citing *Miller v. Jones*, 114 Nev. 1291, 1299–1300, 970 P.2d 571, 577 (1998)).

None of the NDOC Defendants were present for the incident on the evening of November 12, 2014, *see* Exhibits E, F, H, and I, so neither Cox, Neven, Filson nor Oliver engaged in conduct directly related to the shooting.  None of them gave specific orders or instructions to Castro, Smith or Raynaldo-Ramos beforehand specific to Perez.  *See id.* Therefore, none could have had the intent required to prove the claim.  And since none of them were the actual or proximate cause of the shooting, no actions of Cox, Neven, Filson or Oliver meet IIED's causation element.  Accordingly, none of them are personally liable on a claim for IIED.

/ / /

---

[10]  To the extent the Complaint also alleges that the NDOC Defendants are liable for Perez's wrongful death on a theory of gross negligence, *see* Complaint (#1-C at 9, ¶48), that claim fails since Cox, Neven, Filson and Oliver would be shielded from liability per NRS 41.0336, entitled "Acts of Omissions of Firefighters or Law Enforcement Officers."  Under that statute, neither a law enforcement agency or its individual officers or employees are liable for the negligent acts of omissions of other law enforcement personnel unless that person made a specific promise to a plaintiff or that person affirmatively caused the conduct.  NRS 41.0336 (1) and (2). Correctional employees are considered members of law enforcement.  *See Am. Fed'n of Gov't Employees, AFL-CIO v. Roberts*, 9 F.3d 1464, 1468 (9th Cir. 1993) (correctional officers are primary law enforcement employees)).  Here, the Complaint does not allege that Cox, Neven, Filson, or Oliver specifically promised Perez anything, nor could it even on amendment since the evidence is undisputed that they were not even present for the events.  Further, the evidence belies that any NDOC Defendant affirmatively caused Perez's death.

1    Because both the Count II Wrongful Death claim and the Count IV IIED claim fail as a matter

2    of law as to the individually named NDOC Defendants, summary judgment and/or dismissal

3    should be granted as to them on these claims.

4            **D.  Cause of Action III for Negligent Training, Supervision, and Retention Is Subject**

5                **to Dismissal and/or Summary Judgment Against the NDOC Defendants**
                 **Because There Was No Way for the NDOC Defendants to Know that Its**

6                **Employees Would Act Negligently**

7          "The tort of negligent training and supervision imposes direct liability on the employer if

8    (1) the employer knew that the employee acted in a negligent manner, (2) the employer failed

9    to train or supervise the employee adequately, <u>and</u> (3) the employer's negligence proximately

10   caused the plaintiffs injuries." *Latcheran v. Primecare Nevada, Inc.*, No. 2:11-CV-1590 JCM

11   PAL, 2012 WL 984075, at *5 (D. Nev. Mar. 22, 2012) (citing *Hall v. SSF, Inc.*, 112 Nev. 1384,

12   1393 (1996) (emphasis added)); *see also Helle v. Core Home Health Servs., of Nevada*, No.

13   48427, 2008 WL 6101984, at *3 (Nev. Nov. 20, 2008).  When liability is based on negligent

14   supervision instead of *respondeat superior*, whether the employee acted within the course

15   and scope of employment is immaterial.  *Helle* at *3 (citing *Rockwell v. Sun Harbor Budget

16   Suites*, 112 Nev. 1217, 1226 n. 5, 925 P.2d 1175, 1181 n. 5 (1996)).  In order to prevail on a

17   negligent training or supervision claim, a plaintiff must allege facts specifically indicating how

18   the employer violated its duty of reasonable care to train and supervise employees.  *Reece v.

19   Republic Servs., Inc.*, No. 2:10-CV-00114, 2011 WL 868386, at *11 (D. Nev. Mar. 10, 2011)

20   (citing *Colquhoun v. BHC Montevista Hospital, Inc.*, 2010 WL 2346607, at *3 (D. Nev. June 9,

21   2010)).

22         Initially, a review of the Complaint (#1-C at 9–10) reveals that Plaintiffs failed to plead

23   specific facts indicating how Cox, Neven and the State of Nevada breached any duty to

24   Perez.  *See id*.  Thus, Count III should be dismissed.

25         And if dismissed, this Court may also do so with prejudice, as amendment would be

26   futile.  *See Saul*, 928 F.2d at 843.  Use of the conjunction "and" requires that all three

27   elements of negligent training and supervision must be met in order to find the employer

28   liable.  *See Latcheran*, at *5, *Hall*, at *3.  Even if this Court were to allow Plaintiffs to amend,

and even if amendment yielded a potential question of fact on the actual mechanisms on how Castro, Smith, and Raynaldo-Ramos were trained or supervised, no amount of discovery is going to change the undisputed fact that neither Cox nor Neven could possibly meet the first prong of *Latcheran and Hall*.  Under that prong, each of these men would have to have known that Castro, Smith and Raynaldo-Ramos were acting negligently on November 12, 2014.  *See id*.  But they couldn't have, since neither man was present for the incident and only had knowledge of it afterwards.  *See* Exhibits E, F, H, and I.  It is undisputed that both Cox and Neven only learned of the shooting and the dual release from the showers after the fact.  *See id*.  And examining the employee files for Castro, Smith and Raynaldo-Ramos, there are no write-ups, no grievances, and no investigations ever alleging that Castro, Smith, or Raynaldo-Ramos had violated the shower movement or use of force rules before, thus neither Cox nor Neven could have been on notice that this breach of policy was likely to occur by Castro and Smith.  *See* Exhibit T, Declaration of Sharlet Gabriel.

Plaintiffs' assertion that Director Cox and Warden Neven negligently trained Lieutenant Oliver and Associate Warden Filson fails to state a claim, as they are not the persons whose training is at issue.  Neither Oliver nor Filson were present in Unit 2 at the time of the incident, neither used a weapon that day, and neither let inmates out of the showers.  Indeed, the Complaint fails to allege what specific training of an Associate Warden and Correctional Lieutenant would have caused Plaintiff's injuries.  Since "[a]n employer can only be held liable for negligent supervision or training when the employee committed an actionable tort," *Husk v. Clark Cty. Sch. Dist*., 125 Nev. 1046, 281 P.3d 1183 (2009) (citing *Schoff v. Combined Ins. Co. of America*, 604 N.W.2d 43, 53 (Iowa 1999), and neither Oliver or Filson committed a tort, no liability for negligent training, supervision or retention can exist against Cox and Neven based on Filson and Oliver's conduct.

/ / /

/ / /

/ / /

/ / /

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

In sum, Plaintiff's Count III fails against Cox and Neven because there can never be a showing that they knew of Castro, Smith's and Raynaldo-Ramos conduct prior to or contemporaneous with the Perez's death.[11]

### E.   Cause of Action I for Excessive Force and Medical Deliberate Indifference Can Also Be Dismissed Because Cox, Neven, Filson and Oliver Have Qualified Immunity

In 42 U.S.C. § 1983 actions, qualified immunity protects state officials from civil liability for damages resulting from discretionary acts, as long as those acts do not violate clearly established statutory or constitutional rights that would be known to a reasonable person. *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982).   The qualified immunity standard "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  If it was well established on November 12, 2014, that use of force by deployment of weapons was an allowable option for NDOC administration to implement and enforce, then the NDOC Defendants are entitled to qualified immunity for promulgating and allowing such use of force policies.

A qualified immunity defense can only be defeated if the Court determines that: (1) the facts as pled point to a constitutional violation, and (2) the constitutional right allegedly violated was clearly established at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  A court can address either element first and end its inquiry if the first element is not met.  *Pearson v. Callahan*, 555 U.S. 233, 240–42 (2009).  Thus, this Court may first determine whether Cox, Neven, Filson and Oliver knew that their roles in creating or following AR and OP 405 were unconstitutional, and if it finds these men were not on such notice, it may end its inquiry without reaching the question of whether the policy itself violated Perez's constitutional rights.

---

[11]  The State of Nevada as an entity employer should also be dismissed from Count III because the employee records of Smith, Castro and Raynaldo-Ramos are devoid of any forewarning that one of these persons was likely to commit an act of negligence or an intentional tort.  *See* Exhibits K, L and M.  With no obvious signs of notice that any supervisor could have gleaned, this evidence will always be overwhelmingly on the side of the Defendants.  When there is overwhelming evidence favoring the defense, "it may be unreasonable to draw an inference contrary to the movant's interpretation of the facts" and summary judgment would be appropriate.  *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985) (citing *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 277-279, 285-86) (internal quotations omitted).

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

Even if a prison official makes a reasonable mistake, he is still entitled to immunity and the courts should not examine the incident in hindsight. *Saucier*, 533 U.S. at 205. Thus, even if the NDOC Defendants were wrong in their interpretation of what the law allowed them to do regarding the use of force in prisons or the kind of medical care to afford an injured person, they are still entitled to qualified immunity.

### 1. The Law on Use of Deadly and Non-deadly Force

As of November 12, 2014, and as of the dates the most recent versions of AR 405 and OP 405 were enacted before that date, the law held that it was not a constitutional violation of inmates' rights to fire shots in a prison setting when the shooting was for the purpose of restoring order and not for the purpose of punishment or acting with malice. This was true even in bystander cases as opposed to cases where an inmate was the target of the shooting.

The Ninth Circuit has regularly examined qualified immunity when invoked by prisons and prison staff over use of weapons against inmates in a prison setting. These cases interpret the seminal case of use of force, *Whitley v. Albers*, 475 U.S. 312, 320 (1986), decided by the Unites States Supreme Court. In *Whitley*, the Court examined whether the prison could invoke qualified immunity in a situation where a prisoner was shot in the leg during a prison riot. 475 U.S. at 312. The Court held that a prison guard is permitted to use <u>deadly</u> force in a "good faith effort to maintain or restore discipline" but not "maliciously and sadistically for the very purpose of causing harm. *Id.* at 320-21.[12]

*Whitley* was discussed by the Ninth Circuit in *Jeffers v. Gomez*, 267 F.3d 895, 912 (9th Cir. 2001), where an inmate was struck by a bullet intended for the person attacking him. *Id.* at 912. The Ninth Circuit held that because the shooting was done in an effort to maintain and restore discipline and not for a sadistic reason, qualified immunity applied to the act of the officer's shooting. *See id.*

/ / /

---

[12] Though Defendants maintain that the skip-shooting of birdshot is considered non-lethal force, taking Plaintiffs' allegations as true that use of bird shot is deadly force, the NDOC Defendants are still entitled to qualified immunity because *Whitley* extended protections to deadly force.

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1     The Ninth Circuit also analyzed *Whitley* in the context of a prison fight where a bystander who appeared to be involved in the fight but was merely watching was shot by prison guards. *Marquez v. Gutierrez*, 322 F.3d 689, 693 (9th Cir. 2003). There, the court found that while there was a triable issue of fact as to the constitutional question of whether the Eighth Amendment was violated, the qualified immunity inquiry was separate from the constitutional inquiry and the guard's "qualified immunity is not defeated simply because a triable issue of fact exists as to whether his decision to shoot Marquez was malicious." *See id.* (citations omitted). The court then found that, because *Whitley*'s allowance of the use of deadly force to maintain and restore order in prisons became the rule of law as of 1986, a reasonable prison guard would not have been on notice that his conduct violated clearly established constitutional standards. *Id.* at 693–94. And in *Marquez*, the court was careful to observe that "the Ninth Circuit views the incident from the perspective of a reasonable official on the scene, irrespective of a plaintiff's allegations of malicious intent." *See id.* at 692–93.

Application of qualified immunity does not hinge on whether or not, retrospectively, there were less extreme alternatives to the act used to gain compliance. While the Court does need to address the relationship between the amount of force actually used and the need for that force for Eighth Amendment purposes, the Court must "hesitate to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley*, 475 U.S. 312, 320. With open prison unrest and conflict, "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 14 (1981). "'Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Whitley*, 475 U.S. 312, 320 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (citations omitted)). Deference applies to both the preventive steps a prison chooses to take to limit <u>potential</u> prison unrest and to measures taken while responding to an <u>actual</u> confrontation that can lead to a riot situation. *See id.*

/ / /

1    Thus, courts or juries are not allowed to "freely substitute their judgment for that of officials
2    who have made a considered choice." *Id.*

3           In short, these cases predated the shooting of Perez and the NDOC administrative
4    rules that Defendants were promulgating and overseeing allowed for the same use of force
5    approved in these cases.  As noted in *Marquez*, 322 F.3d at 693–94, it became the law at
6    least as of 1986 that deadly force can be used in prison to break up disturbances.  The
7    NDOC Defendants adhered to the law, and they are entitled to qualified immunity.

8           The Court can stop its qualified immunity analysis on this prong, but even if it does not,
9    there are still no plausibly alleged constitutional violations committed by Cox, Neven, Filson or
10   Oliver.  A review of AR 405 and OP 405 reveal that steps were taken within the policies
11   themselves to comply with *Whitley*.  OP 405.01(2) and (4), Exhibit G at 2, specifically
12   mandate that HDSP staff will only use force to gain compliance with prison safety needs and
13   will not be used as a form of punishment.  OP 405.04(7), Exhibit G at 8, specifically states
14   that the use of birdshot will only be used to stop threatening behavior for control purposes, i.e.
15   internal security.  Thus, OP 405, as promulgated by Neven, signed off by Filson, and followed
16   by Oliver, is a constitutional policy under *Whitley* and its progeny.  AR 405.01(3) also mirrors
17   *Whitley*'s proscriptions against the malicious use of force as punishment and allows for use of
18   force only to prevent safety issues.  *See* Exhibit J at 2.  Thus, Cox, the drafter of AR 405,
19   likewise committed no constitutional violation.  Accordingly, none of the NDOC Defendants
20   would have known their policies as of November 12, 2014, were unconstitutional.  Thus,
21   qualified immunity applies to Cox, Neven, Filson and Oliver as policy makers and enforcers.[13]

22          **2.  The Law on Medical Deliberate Indifference**

23          "[A] prison official cannot be found liable under the Eighth Amendment for denying an
24   inmate humane conditions of confinement unless the official knows of and disregards an
25   excessive risk to inmate health or safety . . . " *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)
26   (emphasis added).  Thus, a correctional staff member may not be deliberately indifferent to

27

28          [13] Because it is undisputed that none of the NDOC Defendants actually shot Perez or were present for
     the shooting, immunity for the act of shooting itself need not be addressed.

the medical needs of an inmate where he does not even know about those medical needs. Accordingly, the immunity analysis ends for Cox, Neven, and Filson, who did not even know about the medical treatment provided or the medical treatment Perez received until afterwards and who did not concurrently have contact with the staff members who were present.  *See* Exhibits E, F, H, and I.

Further, AR 405.08(1) states that medical examinations and treatment must be conducted when a use of force incident occurs.  Exhibit J at 4.  The policy thus serves to protect constitutional rights.  Accordingly, there was no disregard to Perez's health in NDOC policies.

And third, the medical records and statements indicated constant medical care was being provided to the Perez.  *See e.g.* Exhibits R and Q.  To the extent Oliver was present and observing or directing that care, he committed no constitutional violations, since extensive medical attention provided to Perez without delay.  Thus, the NDOC Defendants are also entitled to qualified immunity on the Count I Medical Deliberate Indifference claims.

**F.      Cause of Action II, for Wrongful Death, Cause of Action III, for Negligent Training, Supervision, and Retention, and Cause of Action IV, for Intentional Infliction of Emotional Distress, Can Also Be Dismissed Because the NDOC Defendants Have Discretionary Act Immunity**

Even if the state tort claims alleging wrongful death, negligent retention/training/supervision, and IIED were not summarily adjudicated in favor of the NDOC Defendants as outlined above, the NDOC Defendants would nonetheless be shielded from liability under discretionary act immunity.

NRS 41.032(2) provides that no action may be brought against the state or its agents if the action is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions."

In 2007, the Nevada Supreme Court adopted the United States Supreme Court's *Berkovitz–Gaubert* two-part test regarding discretionary immunity.  *See Martinez v. Maruszczak*, 123 Nev. 433, 435–36, 445–47, 168 P.3d 720, 722, 728–29 (2007) (citing

1   *Berkovitz v. U.S.*, 486 U.S. 531, 536–37 (1988); *U.S. v. Gaubert*, 499 U.S. 315, 322 (1991)).

2   Under this test, a decision-maker is entitled to discretionary immunity under NRS 41.032 if the

3   decision "(1) involve[s] an element of individual judgment or choice and (2)[is] based on

4   considerations of social, economic, or political policy." *Maruszczak*, 123 Nev. at 446–47, 168

5   P.3d at 729. "[D]ecisions at all levels of government, including frequent or routine decisions,

6   may be protected by discretionary-act immunity." *Id.* at 447, 168 P.3d at 729.

7        Nevada looks to federal decisional law on the Federal Tort Claims Act for guidance on

8   what type of conduct discretionary immunity protects. *Neal-Lomax v. Las Vegas Metro.*

9   *Police Dep't*, 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008), *aff'd*, 371 F. App'x 752 (9th Cir.

10  2010) (citing *Maruszczak*, 168 P.3d at 727–28)). *See also Scott v. Dep't of Commerce*, 104

11  Nev. 580, 583-84, 763 P.2d 341, 343 (1988) (federal precedents are relevant to the Nevada

12  Supreme Court's interpretation of NRS 41.032(2)).

13        **1.   The Wrongful Death and Intentional Infliction of Emotional Distress Claims**

14        The evidence demonstrates that the NDOC Defendants did not personally participate

15  in Perez's death or the events immediately leading to it.  Thus, since the pleadings in Counts

16  II and IV attempt to impart personal liability on the NDOC Defendants, and no such personal

17  involvement exists, the inquiry ends.  But, to the extent that Plaintiffs' incorporation of prior

18  paragraphs, *see* Complaint (#1-C at 9, ¶ 46 and 11, ¶ 61), attempts to impute liability on the

19  NDOC Defendants for the Perez's death and emotional distress based on the policies that

20  ultimately allowed that death to occur, discretionary act immunity would apply to the creation

21  and allowance of such policies.

22        The Nevada Supreme Court has defined a discretionary act as "an act that requires a

23  decision requiring personal deliberation and judgment." *Stratosphere Gaming Corp. v. City of*

24  *Las Vegas*, 120 Nev. 523, 527, 96 P.3d 756, 759 (2004).  The Ninth Circuit has found that

25  "the existence of a range of options . . . gives rise to discretionary function immunity." *Alfrey*

26  *v. United States*, 276 F.3d 557, 567 (9th Cir. 2002).

27        Here, prison administration had a range of options in how they instruct their

28  subordinates to use force to break up disturbances.  The use of force policy in AR 405 begins

by stating that staff members "may exercise the use of verbal orders, physical contact, or, as a last resort deadly force." *See* Exhibit J, 405.01(2). The AR states that a staff member must assess the risk posed by the threat and react accordingly. *See id.*, 405.02(1). COs have a range of options in deciding which type of non-deadly or deadly equipment to use and when to use it. *See id.* In this respect, those who implemented and oversaw AR 405 had a choice of how much discretion to give individual COs. *See id.*, 405.03.[14]

Further, there is no directive in AR 405 requiring the use of birdshot as the only possible response to a disturbance, nor does a decision to use necessary force require prior approval. *See id.*, 405.05. Thus, because Raynaldo-Ramos had options as to type of force to use under AR 405 and had to make that decision based on his individual assessment of the risks immediately presented by the two inmates fighting in the tier who continued to fight despite verbal commands and a blank-round warning shot, and because Cox, Neven, Filson, and Oliver gave him that discretion, there exists the element of deliberation and judgment that meets the first *Berkovitz–Gaubert* prong.

The focus of the second part of the inquiry is not on the employee's "subjective intent in exercising the discretion conferred . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Butler ex rel. Biller v. Bayer*, 123 Nev. 450, 466, 168 P.3d 1055, 1066 (2007) (quotations omitted).

When making its factual determination of whether policy is implicated, a court must "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Maruszczak*, 123 Nev. at 446, 168 P.3d at 729 (citing *U.S. v. Varig Airlines*, 467 U.S. 797, 814 (1984)). "Thus, if the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped, immunity

_____

[14] That COs are instructed to use non-deadly force before resorting to deadly force as a last resort does not detract from the discretion required to invoke discretionary act immunity, since the individual CO still must assess the severity of the situation and decide whether it call for an escalation from non-lethal to lethal force.

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1   will likely attach under the second criterion."  *Id.* (citing *Horta v. Sullivan*, 4 F.3d 2, 19 (1st Cir.

2   1993).

3       The Nevada legislature created the Board of Prison Commissioners (the Board) to

4   govern the NDOC.   Under NRS. 209.211, the Board prescribes regulations for NDOC

5   operations.   NRS 209.131(6) states that it shall be the Director of Prisons appointed by the

6   Governor who establishes the regulations, which are approved by the Board.   Thus, the

7   totality of these statutes demonstrate that AR 405's authorization of COs to assess risk and

8   use force accordingly without the need for prior approval or micromanagement is a function

9   delegated both to the Director of Prisons and the Board of Prison Commissioners.  Should a

10  court second guess that policy, it risks intruding on the powers of the Director and the Board

11  who oversee the unique and dangerous prison environment and impose judicial restraint on

12  what is an executive function specifically delegated to a legislatively created Board.

13      Further, it is black letter law that the operation of a prison implicates policy

14  considerations outside the judicial purview.   "Running a prison is an inordinately difficult

15  undertaking that requires expertise, planning, and the commitment of resources, all of which

16  are peculiarly within the province of the legislative and executive branches of government."

17  *Turner v. Safley*, 482 U.S. 78, 84–85 (1987).   For this reason, prison administrators are

18  "accorded wide-ranging deference in the adoption and execution of policies and practices that

19  in their judgment are needed to preserve internal order and discipline and maintain

20  institutional security."  *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  *See also Sandin v. Conner*,

21  515 U.S. 472, 482 (1995).  Denying the NDOC Defendants discretionary act immunity would

22  jeopardize this deference.

23      The Ninth Circuit, in a negligence case where it was alleged that the prison staff's act

24  of poorly searching a cell led to a prisoner's death, stated:

25          [T]o decide what steps to take in response to a reported threat, an
            officer must set priorities among all extant risks: the risk presented
26          by the reported threat, along with the other risks that inevitably
            arise in a prison. Those types of decisions implicate social and
27          public-policy considerations.

28  *Alfrey*, 276 F.3d at 560.

Creating rules that allow for engaging in risk assessment implicates a policy consideration. Accordingly, the second *Berkovitz–Gaubert* prong is met. And since both *Berkovitz–Gaubert* prongs are met, discretionary act immunity applies to the creation and implementation of policies that allowed the use of force that led to Perez's death and alleged distress. Thus, the NDOC Defendants should be immune as to Counts II and IV.

### 2.  The Negligent Training/Supervision/Retention Claim

As noted, Nevada looks to Federal Tort Claims Act law for guidance on discretionary immunity applications. *Neal-Lomax*, 574 F. Supp. 2d at 1192. "Federal case law consistently holds training and supervision are acts entitled to such [discretionary] immunity." *Nelson v. Willden*, No. 2:13-CV-00050-GMN, 2015 WL 628133, at *6 (D. Nev. Feb. 12, 2015) (citing *Neal–Lomax at* 1192)). *See also Vickers v. United States,* 228 F.3d 944, 950 (9th Cir. 2000).

Still further, law-enforcement decisions of which officers to hire, and how to train and supervise them, are an integral part of governmental policy-making or planning. *See Beckwith v. Pool*, No. 2:13-CV-125 JCM NJK, 2013 WL 3049070, at *6 (D. Nev. June 17, 2013).

Thus, the Count III claims against the State of Nevada, Cox and Neven, as government entities must be dismissed.

Accordingly, the NDOC Defendants are entitled to discretionary act immunity on the three pendant state claims.

### G. Defendant State of Nevada Must Be Dismissed, As Plaintiffs Have Failed to Invoke Waiver of Sovereign Immunity

NRS 41.031 establishes that the State of Nevada, which would ordinarily be exempt from lawsuits as a state sovereign, will allow itself to be sued as a party under certain circumstances so long as certain requirements are met. NRS 41.031(2) states: "[i]n any action against the State of Nevada, the action must be brought in the name of the State of Nevada on relation of the particular department, commission, board or other agency of the State whose actions are the basis for the suit." Failure to properly name the State of Nevada and invoke the waiver of sovereign immunity deprives the court of subject matter jurisdiction. *See*

*Kille v. Jenkins*, 2015 WL 4068438 at *1 (Nev. Ct. App. June 24, 2015) (unpublished).  Here, Plaintiff failed to name the Defendant party as "State of Nevada ex. rel. Nevada Department of Corrections."  Thus, there is no subject matter jurisdiction allowing this court to hear claims against "the State of Nevada" and dismissal of that entity Defendant is appropriate.

And, this Court can dismiss with prejudice since amendment to include the appropriate party name would be futile.  *See Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991). Amending the § 1983 claims would make no difference to the fact that the State is excluded from § 1983 suits as a non-person.  Amending the Count II and Count IV claims alleging intentional conduct would also be futile under NRS 41.745, since to prevail, Plaintiff's would have to prove that Castro and Smith's conduct of violating the segregated housing movement policy and releasing two persons from the shower at the same time was reasonably foreseeable, which they cannot do given the existence of the policy.  The Count III claims cannot be proved for the reasons set forth in B above.  Thus, the State of Nevada (even considering additions to include the Nevada Department of Corrections) should be dismissed with prejudice.

## CONCLUSION

The Defendants State of Nevada, Cox, Neven, Filson, and Oliver request dismissals with prejudice on that state tort claims and grants of summary judgments on the remaining claims.

DATED this 26th day of February, 2016.

ADAM PAUL LAXALT
Attorney General


By: _____
ANDREA R. BARRACLOUGH
Chief Deputy Attorney General
Bureau of Litigation
Public Safety Division

*Attorneys for Defendants*

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1

## **CERTIFICATE OF SERVICE**

2     I certify that I am an employee of the Office of the Attorney General, State of Nevada,

3   and that on this 26th day of February, 2016, I caused a copy of the foregoing, **DEFENDANTS'**

4   **MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**, to be served, by U.S.

5   District Court CM/ECF Electronic Filing on the following:

6
    Cal J. Potter
7   Potter Law Offices
    1125 Shadow Ln.
8   Las Vegas, NV 89102
    Email: cj@potterlawoffices.com
9

10

11

12                                                    _____

13                                                    An employee of the
                                                      Office of the Attorney General
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717