1   CAL J. POTTER, III, ESQ.
    Nevada Bar No. 1988
2   C. J. POTTER, IV, ESQ.
    Nevada Bar No. 13225
3   POTTER LAW OFFICES
    1125 Shadow Lane
4   Las Vegas, NV 89102
    Ph:   (702) 385-1954
5   Fax: (702) 385-9081
    cpotter@potterlawoffices.com
6   cj@potterlawoffices.com
    *Attorneys for Plaintiffs*

7

## UNITED STATES DISTRICT COURT

8

## DISTRICT OF NEVADA

9

10   VICTOR PEREZ, as Special Administrator    Case No. 2:15-cv-1572-ADG-CWH
    of the Estate of CARLOS PEREZ,
    deceased; VICTOR PEREZ, as the Guardian    **PLAINTIFF'S AMENDED**
11   Ad Litem for S.E.P., a minor; VICTOR PEREZ,    **COMPLAINT**
    as the Guardian Ad Litem for A.I.P, a minor;.
12                          **(Jury Trial Demanded)**
            Plaintiff,
13       -vs-

14   STATE OF NEVADA, ex.rel. NEVADA;
    DEPARTMENT OF CORRECTIONS;
15   DIRECTOR GREG COX, individually; WARDEN
    DWIGHT NEVEN, individually; ASSISTANT
16   WARDEN TIMOTHY FILSON, individually;
    COT. RAMOS, individually; LIEUTENANT
17   OLIVER, individually; CORRECTIONS
    OFFICER CASTRO, individually;
18   CORRECTIONS OFFICER
    SMITH, individually; and DOES I-X,
19   inclusive; and ROES I-X, inclusive,

20            Defendants.
    _____/
21

22        COMES NOW, Plaintiffs, VICTOR PEREZ, as Special Administrator of the Estate of

23   CARLOS PEREZ, deceased; VICTOR PEREZ, as the Guardian Ad Litem for S. E. P., a minor;

24   VICTOR PEREZ, as the Guardian Ad Litem for A. I. P., a minor; individually, by and through

25   their counsel, Cal J. Potter, III, Esq. and C. J. Potter, IV, Esq. of Potter Law Offices for his

26   Complaint against Defendants, allege as follows:

27   . . .

28   . . .

## JURISDICTION AND VENUE

1.      This is a civil rights action arising from Defendants Castro's, Smith's and Ramos' excessive use of force and wrongful shooting of Decedent Carlos Perez at High Desert State Prison, Clark County, Nevada; Defendants denial of medical care to Carlos Perez and the supervisory Defendants' creation of the practices which caused Carlos Perez's Death. This action is brought pursuant to 42 USC § 1983 and the Eight Amendment to the United States Constitution, as well as the Fourteenth Amendment right to association by the family member and heirs of Carlos Perez ("Decedent").

2.      A substantial part of the events and/or omissions complained of herein occurred in Indian Springs, Nevada, and this action is properly assigned to Nevada's Eighth Judicial District Court.

## PARTIES

3.      At all relevant times to these proceedings, Plaintiff Victor Perez, as Special Administrator of the Estate of Carlos Perez, deceased, and as the Guardian Ad Litem for S.E.P. a minor, and A.I. P. a minor was and is a resident of the State of Nevada and is the brother of the Decedent.

4.      At all relevant times to these proceedings, Defendant State of Nevada ex. rel. Nevada Department of Corrections promulgated the unconstitutional practices and maintained the pattern of behavior caused Carlos Perez's death, and operates High Desert State Prison and employs the individual defendants.

5.      Defendant Director Greg Cox was and is the Director of Nevada Department of Corrections at all times herein and promulgated the unconstitutional policies which caused Carlos Perez's death.  Defendant Cox has ratified the individual defendants unconstitutional conduct and his ratification demonstrates that the individual defendants actions were not inconsistent with NDOC's actual customs, even when they depart from generally accepted policies.  He is sued in his individual capacity. Defendant Cox was terminated in part for his part for his untimely review of this shooting.  The subsequent termination leads credence to Defendant Cox's systematic approach to hold subordinates accountable for their actions. Each

Supervisory  Defendant is liable for their role in the practices and policies that caused the death of Carlos Perez as a result of their inaction in the training, supervision, or control of their subordinates and conduct that showed a reckless or callous indifference to the rights of others. Specifically, the fact that the ASCA determined that "[k]ey elements of the Department's Use of Force Policy are not consistent with nationally accepted correctional standards and currently accepted best practices" which demonstrates that the supervisory level defendants are liable for their role in creating the policy and the HDSP operational procedure.

6.     Defendant Dwight Neven was and is the Warden of the High Desert State Prison and at all times relevant herein and promulgated the unconstitutional policies which caused Carlos Perez's death. Defendant Filson has ratified the individual defendants unconstitutional conduct and his ratification demonstrates that the individual defendants actions were not inconsistent with NDOC's actual customs, even when they depart from generally accepted policies.  He is sued in his individual capacity. Each Supervisory  Defendant is liable for their role in the practices and policies that caused the death of Carlos Perez as a result of their inaction in the training, supervision, or control of their subordinates and conduct that showed a reckless or callous indifference to the rights of others. Specifically, the fact that the ASCA determined that "[k]ey elements of the Department's Use of Force Policy are not consistent with nationally accepted correctional standards and currently accepted best practices" which demonstrates that the supervisory level defendants are liable for their role in creating the policy and the HDSP operational procedure.

7.     Defendant Assistant Warden Timothy Filson was and is the Assistant Warden of the High Desert State Prison at all times herein and promulgated the unconstitutional policies which caused Carlos Perez's death. Defendant Filson has ratified the individual defendants unconstitutional conduct and his ratification demonstrates that the individual defendants actions were not inconsistent with NDOC's actual customs, even when they depart from generally accepted policies.  He is sued in his individual capacity. Each Supervisory  Defendant is liable for their role in the practices and policies that caused the death of Carlos Perez as a result of their inaction in the training, supervision, or control of their subordinates and conduct that showed a

1   reckless or callous indifference to the rights of others. Specifically, the fact that the ASCA

2   determined that "[k]ey elements of the Department's Use of Force Policy are not consistent with

3   nationally accepted correctional standards and currently accepted best practices" which

4   demonstrates that the supervisory level defendants are liable for their role in creating the policy

5   and the HDSP operational procedure.

6          8.      Defendant COT. Ramos was a Corrections Officer at High Desert State Prison

7   and was acting within the course and scope of that employment.  He fired four times with live

8   rounds at Carlos Perez with intent to harm Mr. Perez and if fact killed Carlos Perez. He is sued in

9   his individual capacity. Ramos use of force was excessive and not a good faith effort to maintain

10  order as demonstrated by the facts that Ramos did not use the lesser means of force available to

11  him, which included physically separating the unarmed, handcuffed inmates. Furthermore, the

12  fact that Ramos reloaded his shotgun and shot Carlos as he lay bleeding demonstrates that

13  Ramos' use of force was excessive and that he was deliberately indifferent to Carlos' serious

14  medical needs.

15         9.      Defendant Lieutenant Oliver was a Corrections Officer at High Desert State

16  Prison and was acting within the course and scope of that employment. Defendant Oliver was

17  deliberately indifferent to Carlos Perez constitutional rights as well as his serious medical needs.

18  He is sued in his individual capacity. Defendant Oliver has ratified the individual defendants

19  unconstitutional conduct and his ratification demonstrates that the individual defendants actions

20  were not inconsistent with NDOC's actual customs, even when they depart from generally

21  accepted policies.  He is sued in his individual capacity. As a Lieutenant, Defendant Oliver  is

22  responsible for supervising Defendants Castro and Smith, who were using Defendant State of

23  Nevada's widespread practice of allowing two protective custody inmates out at the same time,

24  and supervising Defendant Trainee Ramos who was shooting inmates, in conformance with The

25  Sate of Nevada's actual practice.  Each Supervisory  Defendant is liable for their role in the

26  practices and policies that caused the death of Carlos Perez as a result of their inaction in the

27  training, supervision, or control of their subordinates and conduct that showed a reckless or

28  callous indifference to the rights of others. Specifically, the fact that the ASCA determined that

"[k]ey elements of the Department's Use of Force Policy are not consistent with nationally accepted correctional standards and currently accepted best practices" which demonstrates that the supervisory level defendants are liable for their role in creating the policy and the HDSP operational procedure.

10.     Defendant Corrections Officer Castro was a Corrections Officer at High Desert State Prison and was acting within the course and scope of that employment. Defendant Castro was deliberately indifferent to Carlos Perez constitutional rights as well as his serious medical needs. Defendant Castro chose not to intervene and prevent two handcuffed individuals from kicking one another. On the Contrary, Defendant Castro ordered that Carlos Perez be shot. Thereafter he refused to provide medical attention to Carlos Perez. He is sued in his individual capacity.

11.     Defendant Corrections Officer Smith was a Corrections Officer at High Desert State Prison and was acting within the course and scope of that employment. Defendant Smith was deliberately indifferent to Carlos Perez constitutional rights as well as his serious medical needs. chose not to intervene and prevent two handcuffed individuals from kicking one another. On the Contrary, Smith walked around the inmates. Thereafter he refused to provide medical attention to Carlos Perez. He is sued in his individual capacity.

12.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants herein designated as Does I-X are presently unknown to Plaintiffs because the NDOC has chosen to cover-up their violations of civil rights rather than be transparent and accountable for their actions, therefore, sue Defendants by such fictitious names; when their true names and capacities are ascertained, Plaintiffs will amend the Complaint accordingly to insert the same herein. In fact, the family of Carlos Perez has repeatedly attempted to obtain information concerning NDOC's murder of their brother, however NDOC has refused to be transparent or accountable. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiffs. Among the Doe defendants are back-up officers and medical personnel

whom refused to respond to the scene in a expedient fashion and once upon the scene refused to provide Carlos Perez with medical care with intentional, deliberate indifference to his serious medical needs.

13.    Plaintiffs are informed and believe, and thereon allege, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged. At all material times, each Defendant was jointly engaged in tortious activity, resulting in the deprivation of Plaintiffs and Decedent of constitutional rights and other harm.

14.    The acts and omissions of all Defendants as set forth herein were at all material times pursuant to the actual customs, policies, practices and procedures of the State of Nevada.

15.    At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of Nevada.

16.    This is a civil rights action, brought under § 1983 and state tort actions for the wrongful death of inmate Carlos Perez ("Carlos"). Carlos was shot by a Defendant Ramos, multiple times, by a 12 gauge shotgun while Carlos was handcuffed behind his back, unarmed, and wearing nothing but underwear. Carlos was not a threat to anyone at the time he was shot.

17 .    This lawsuit arises from the homicidal death of Carlos Perez ("Carlos") while he was in protective custody at High Desert State Prison. The Clark County Coroner determined that Carlos Perez died from multiple gunshot wounds to the head, neck, chest, and arms.

18 .    The Coroner determined that the manner of death was "homicide".

19 .    Carlos was in protective custody because he had dropped out of a gang in order to prepare for a successful reentry into society. At the time he was killed, Carlos only had approximately three months left on his sentence.

20.    Carlos Perez was shot and killed by a trainee officer Defendant Ramos, Carlos

Perez was handcuffed, unarmed, and not posing a threat or danger.

21.   The Nevada Attorney General, who is defending this suit, is also criminally prosecuting Defendant Ramos for manslaughter as a result of the wrongful death of Carlos Perez.

22.   The shooting of Carlos Perez occurred on November 12, 2014, when Defendant Ramos was assigned as a floor officer for Unit 2 AB at High Desert State Prison. At the same time and place, Decedent Carlos Perez was an inmate in protective custody under administrative segregation.

23.   At approximately 8:00 p.m., Defendants Cox, Neven, Filson, Oliver, Ramos, Castro and Smith violated polices and procedures and had inmate Andrew Arevalo out of his cell at the same time as Carlos Perez.

24.   Defendants Castro and Smith released restrained inmate Perez from his shower at the same time inmate Arevalo was out of his cell on his way to the shower.

25.   At the time the Defendant officers engaged in what is referred to as "pitch and catch" rather than hands-on escort of the inmates.

26.   Eventually, the two inmates started yelling and kicking each other.

27.   Rather than separating the inmates, who were each handcuffed behind their backs and wearing nothing but underwear and shower shoes, Defendants Castro and Smith refused to intervene.

28.   On the contrary, Defendants Smith and Castro created a gladiator-like scenario and allowed the inmates to fight.

29.   Additionally, Defendants Smith and Castro affirmatively avoided separating the inmates.

30.    Eventually, Defendant Castro maliciously and sadistically ordered Defendant Ramos to deploy lethal force against Carlos Perez. Castro's intent is demonstrated by the fact that Carlos and Arevalo were handcuffed behind their backs, wearing nothing but underwear and merely kicking at each other's shins. Castro could have chosen to use a lesser means of force to temper the situation such as merely walking between the handcuffed inmates and physically separating them. However, rather than temper the situation he ordered the trainee officer to use

7

deadly force.

31.     Defendant Ramos grabbed his shotgun and maliciously and sadistically shot Carlos Perez multiple times with a shotgun and killed him. Ramos' intent is demonstrated by the fact that Carlos and Arevalo were handcuffed behind their backs, wearing nothing but underwear and merely kicking at each other's shins. Castro could have chosen to use a lesser means of force to temper the situation such as merely walking between the handcuffed inmates and physically separating them. Ramos malicious intent is firther demonstrated by the fact that eyewitness observed him reload his shotgun approximately 1 to 2 minutes after he initially shot Carols and fired at Carlos again.

32.     Defendants' actions violated their policies and practices by having inmate Arevalo out of his cell at the same time as inmate Carlos Perez.

33.     This action was against policy and Defendants should have been trained and supervised so that the inmates were not out of their cells at the same time.

34.     The supervisory Defendants allowed the "pitch and catch" procedure to become a *de facto* policy.

35.     Defendant State of Nevada promulgated the unconstitutional policies which caused Carlos Perez's death.

36.     Those policies include the State of Nevada's policy to deploy deadly force in situations that do not require such force; and, needlessly shooting inmates with shotguns. Nevada's policies encouraging the use of deadly force, in non deadly force situations, lead to the intent to harm Carlos Perez and lead to his homicide.

37.     Following the homicide of Carlos Perez, the Association for State Correctional Administrators ("ASCA") authored a report concerning Defendant State of Nevada's use of shotguns in its prisons and its unconstitutional practice to needlessly shoot inmates.

38.     ASCA analyzed Defendant State of Nevada's use of force policy, Administrative Regulation ("AR") 405. Notably, ASCA concluded that "[k]ey elements of the Department's Use of Force Policy are not consistent with nationally accepted correctional standards."

. . .

39.   The Association made that determination, in part, because "AR 405's content is not clear" and "[a] clear articulation of when deadly force may/should be used is also missing from AR 405."

40.   The ASCA also concluded that " use of force reports written by staff members frequently lack substance." The ASCA likewise determined that Defendant State of Nevada's "prison-based in-service training is minimal, varying between 16 and 24 hours per person, as opposed to nationally accepted standards for 40 hours of training per person. Further, annual ongoing firearms training does not meet widely accepted best practices nor the Department's own policy mandate."

41.   Yet most significantly, ASCA reported that during 2012, 2013, and 2014, Defendant State of Nevada discharged a shotgun in its prisons 208 times. While approximately two-thirds of those discharges were a blank "popper" round, 71 shootings included the use of bird shot. Of the 71 shooting with live rounds, 48 occurred at High Desert State prison. In contrast, other corrections institutions in this and other developed countries do not employ the use of shotguns in housing units.

42.   Under department policy, officers are allowed to pull a shotgun to get inmates merely  to behave, and this is not considered physical force. They must give multiple verbal warnings and fire a warning shot in the air before they can shoot a live round. But if there's a fight that could cause serious injury—an inmate doesn't necessarily have to have a weapon—officers are allowed to skip birdshot off the ground, on the logic that a violent prisoner might stop hurting someone if he's hit in the legs. The State defines this method as a "non-deadly" use of force, but a shotgun loaded with pellets can easily draw blood from as far as 50 yards away and when guards skip bird shot off the floor, the pellets "can be very unpredictable in their trajectory," the ASCA found. Before officers start shooting, they may order prisoners to hit the ground—even though the shots travel parallel to the floor.

43.   ASCA's independent corrections experts urged Nevada to phase out the use of birdshot. The ASCA explained that since "1994, there have been several less than lethal and non-lethal technological improvements along with policy and procedure advances."

44.     However, Defendant State of Nevada has flatly refused. In a response, the department wrote that firing bird shot at prisoners has "stopped countless incidents that would have resulted in serious injury or death." Despite the homicide of Carlos Perez by lethal force, Defendant State of Nevada continues to insist that the method is "less than lethal."

45.     Brandon Castner is an inmate in the Nevada Department of Corrections, during approximately 18 months that Mr. Castner was housed in general population at High Desert State Prision, he witnessed 19 inmates get shot. Mr. Castner explained: "A person wearing a white T-Shirt being shot with a 12 gauge shotgun is a gruesome sight sound and smell. The White T-Shirt instantly changes to red. The sound from the gun is deafening and causes your ears to ring until the next morning. The sound the victim makes is unique to the person being shot, but all are equally terrifying. The smell of the gun smoke mixed with the copper scent (of a lot) of blood makes me retch even as I write this today."

46.     On the night that Carlos Perez was killed, Mr. Castner was performing janitorial duties in the unit where Carlos Perez was killed. Mr. Castner described the shooting of Carlos Perez in haunting detail:

> On November 12, 2014, I personally witnessed two inmates wearing handcuffs being shot multiple times (the gun was even reloaded a full minute later to continue the shooting) by a Correction Officer with a 12 gauge shotgun.
>
> In 'The Hole' you are kept in total isolation. The only time you leave the cell is to shower for five minutes, once every three days. The only other time you leave the cell is for 'yard time' that is offered twice a week, for 45 minutes to an hour. Going to 'yard time' means being escorted [sic] from the single isolation cell in handcuffs to an outside 15x10 chain link cage that resembles a kennel. Full strip searches are done both before and after yard time.
>
> In 'The Hole' you are always in handcuffs whenever you are going to either the yard cage or the shower cage. Even before the cell door or cage doors open you are first handcuffed through a 'handcuff slot' that opens and closes and is kept locked. (The food is also delivered through the 'handcuff slot.'). Once you are handcuffed behind your back, the Correction Officer (C/O) will signal another C/O in the Bubble. As soon as the door is open the C/O grips and holds on to your upper arm. You are told this is being done for your safety, because if you were to fall with your hands cuffed behind your back, you would have no way to protect yourself and that could result in serious injury or death.
>
> During these formal escorts [sic] 'per operating procedure' there is never to be more than one person in handcuffs outside of the cell or cages. During shower day, once a person is escorted [sic]  and locked in an individual shower cage, the person is unhandcuffed through the "handcuff slot" and allowed to take a shower,

while others are being escourted [sic] in handcuffs to other shower cages - always one at a time.

Also per operating procedure it is required to have two C/Os on the floor during any movements (escourts) [sic]. The person being escourted [sic] to take a shower is to be dressed in underwear (boxer shorts), shoes (plastic flip flops sandals) and is to carry a towel around their neck. The shooting on 11-12-14 that resulted in serious injury and death took place during the showers from 7:58 p.m. to 8:01 p.m. I was working as porter/trustee on the night of the homicide. As a trustee you are the only person allowed out of the cell without having to wear handcuffs. Trustee work duties include janitorial-type cleaning. The cleaning supplies are kept in the security office that separates the A and B side in unit 2 A-B. The office has two doors. One door is to the A side and one door is to the B side. The office has wrap around windows with windows in both doors. This is so the C/Os can see all of both A and B sides from sitting in the office. The bubble is directly above the office and has even more floor to ceiling windows that are reinforced by security bars. Per operating procedure the office doors are to remain closed and locked. This, however, rarely happens because of C/Os going in and out of the office or back and forth between the A and B side. Both doors are most often propped wide open as was the case on the night of 11-12-14.

On 11-12-14 there were three C/Os in unit 2 A-B as usual. One C/O up in the control bubble overlooking the floor and working the remote controlled cell doors, his name was C/O Romo, or Ramos, or Ramo – I am unsure how is name is spelled.

The two C/Os down on the floor were C/O Smith and C/O Castro.

At around 7:55 p.m. I was cleaning the A side of unit 2 A-B. The two C/Os, Castro and Smith, were on the B side of unit 2 A-B. They were conducting the inmate shower procedure. At this time both office doors were propped wide open, allowing me clear passage and an unobstructed line of sight into the B side. What I observed while cleaning was both C/Os on the upstairs tier. One was handcuffing people in the shower cage and then unlocking the shower cage door. Then, rather than hold on to and escourt [sic] each person back to their cell, they would let them walk by themselves into their cells. Once inside the cell, the C/O in the bubble would close the cell door. The person inside the cell would then wait for the other C/O to unhandcuff him though the handcuff slot. This is not standard operating procedure. Each person is to be escorted individually by the arm. It is referred to as "single man movement". It is not uncommon for C/Os to follow their own rules.

Minutes before the shooting started, I was watching the two floor C/Os with hope to get their attention. So to ask permission to enter the office and get a trash bag out of the cabinet. I finally asked the C/O who was up on the bubble. I was granted permission.

From inside the downstairs security office with the B side door propped wide open, I witnessed C/O Castro let inmate Carlos (I only know his first name) walk out of the shower cage I handcuffs to return to his cell unescourted. [sic]. Carlos entered the cell, but C/O Romo in the bubble did not close the cell door. At the same time C/O Castro let another inmate named "Silent" (I only know him by his gang name) out of his shower cage. Silent also had his hands handcuffed behind his back.

Inmate Carlos stepped back out of his cell and walked towards inmate Silent. I stood in the B side office doorway watching intently because both Carlos and Silent were exchanging loud angry words and walking towards each other.

C/O Romo was in the bubble window, directly above my head, watching what I was watching.

C/O Castro and C/O Smith were both standing less than thirty feet away from the two people wearing their underwear with their hands handcuffed behind their backs.

The upstairs "top tier" is no more than four feet wide. Eventually Carlos and Silent met and began tentatively kicking at each others shins and then backing away to yell at each other before kicking again. Both were being very careful, so not to be the first one to fall down. Being that they were handcuffed behind their backs, the first one to fall would be vulnerable to being stomped on.

During this little shin kicking and screaming match, both C/O Castro and C/O Smith had ample time and opportunity to stop or separate the handcuffed inmates. The floor C/Os instead of correcting their mistake, to have let two inmates on the floor at the same time, both backed away from the inmates. The two floor C/Os then signaled and screamed for the C/O in the bubble to get the shotgun. During the time it took for C/O Romo to get the shotgun, the inmates could have easily been separated, pushed over, or tackled. Instead both of the floor C/Os moved further away from the inmates, who were unable to even harm each other. Neither inmate was even slightly hurt by the little off balance kicks to each others shin. The majority of the time both inmates were backing away from each other and just yelling. The inmates were not even looking or yelling at the C/Os (nor did they ever).

I heard the window (gun port) being opened wider. I look up directly above my head to see the black barrel of the shotgun. The shotgun was being aimed at the people in handcuffs. I was underneath the shotgun barrel, less than eight feet away. I looked back up at C/O Castro and C/O Smith who are now both up against the upstairs door that separates the A and B sides top tier. The two floor C/Os had moved as far away as possible. C/O Castro was now plugging his ears with his two pointer fingers and screaming "Shoot! Shoot!"

Two or three seconds later the shotgun exploded over my head. It was loud, but it was a blank round. Just a warning shot. It startles everyone. Both Carlos and Silent freeze, but stayed focus on each other. So not to give the other an opportunity to get a good kick or leg sweep in. Instantly after the blank had been fired I heard the "Clack, clack!" as C/O Romo pumped another round into the chamber of the shotgun. Both C/Os Smith and Castro are plugging their ears and yelling for C/O Romo to "Shoot'em!"

At this time Carlos and Silent are not engaged in shin kicking each other and are no more than 40 feet away from the barrel of the shotgun when the second shot went off. A live 12 gauge round exploded and was a direct hit into the upper chest of Carlos. Because Carlos had his arms pulled back by the handcuffs behind his back his heart was a clear target for C/O Romo. The white T-shirt that Carlos was wearing instantly saturated to red. And then without even buckling his knees, or even a slight collapse of his legs, Carlos falls forward like a fallen tree. – Many eyewitnesses would later describe Carlos falling after the first live round as: "He

just went 'Timber!' like a tree." – Carlos, with both hands handcuffed behind his back, fell lifeless head first onto the concrete floor and never moved again.

I will again note: I was on the floor under the shotgun and had a direct line of sight. The moment Carlos was shot he never showed any signs of life. He just fell head first and never moved again.

Silent seeing Carlos on the ground and advanced towards him and was preparing to stomp on Carlos. Before Silent was able to make any contact with Carlos the shotgun went off again. The third shot, and second live round was fired into the lower half of Silent's body. The blast was so close that it violently knocked his legs out from under him. Silent fell fast and landed on top of Carlos. Carlos did not move. There was a lot of blood.

Silent's legs had been blown away from Carlos. Silent's upper body was on top of Carlos. Once Silent recovered from the shot and fall, he began to flop with little bounces on top of the lifeless body of Carlos.

Both inmates are on the ground, with their hand handcuffed behind their backs, and are in desperate need of emergency medical attention. They were literally laying in a pond of blood. The two C/Os, Castro and Smith, did not intervene or even call for medical. They instead told C/O Romo to "Shoot'em again!"

C/O Romo shoots again. This shot hit Silent, who was in a semi-sitting position with his back to the shotgun. The bullets from the shot hit Silent's neck, head, and upper back. Blood sprayed and flowed out of his back. The blast hit him so hard and direct that it blasted him forward to where he was in a slumped over position with his head in his own lap. Silent stayed in this awkward position because he was clearly unconscious.

The two C/Os Castro and Smith did not go near the two unmoving, bleeding profusely, handcuffed people. Instead, the two C/Os ran down the stairs to where I was standing in the doorway of the office. At this time Carlos and Silent were seemingly unconscious and laying in the biggest pool of blood I have ever seen; far worse than any horror film. I never could have imagined an experience so horrific. Even with having been exposed to the 19 shootings in the general population area, did nothing to prepare me for watching two young men handcuffed behind their backs and wearing only their underwear as they were being shot to unconsciousness and death by a 12 gauge shotgun at very close range.

By the time C/O Castro and C/O Smith calmed down enough to be able to formulate words I still remained on the scene for at least another 20 seconds. Finally one of the C/Os mumbled "Castner go lockdown." Before I went to my cell on the A side I took a good long look hoping to see any signs of life – I did not. – What I saw was both people as still as death and covered in blood and both Silent and Carlos still had their hands handcuffed behind their backs.

I walked to my cell pausing to yell out what was happening to all the people on the A side who could all see and hear the C/O in the bubble shooting the shotgun.

I finally made it to my cell and C/O Romo closed my cell door from the bubble. From my cell window I can see directly into the bubble. There is a large clock on the wall and I can see that it is one minute after 8:00 p.m. (8:01 p.m.). I then notice C/O Romo moving frantically toward the same window that he had been

shooting out of.  He looks to be picking up something from off the ground I then see that he is reloading the shotgun.  All of the A side inmates are watching out their cell windows into the bubble when C/O Romo points the shotgun out the window as before and shoots again. He then attempts to rapidly chamber another round and fire again but it was apparent that the gun had jammed or needed to again be reloaded. C/O Romo continued to fumble with the pump action of the shotgun and was unable to shoot again.

I could not see the affect [sic] the last shot had or who he was shooting at. I have no idea why he would need to reload and shoot again a full minute and a half after I left the immediate scene. As mentioned, both people were on the ground, in handcuffs, and neither of them was moving. Just bleeding a lot.

Once I was certain that C/O Romo could not get the shotgun to work, I began watching out of my outside cell window. I knew from the many prior shootings that there would soon be a fast stampede of C/Os and medical staff. To my surprise, there was not. It took more than five minutes after the last shot for the medical staff to arrive with the emergency equipment. I could not see what the medical staff did while they were on the B side. However, I was able to see Carlos being carried out on a stretcher at exactly 8:15 p.m.

Carlos was still handcuffed and covered in blood. The nurse had a manual breathing apparatus attached to Carlos and connected to a hand pump that the nurse was squeezing rapidly. I believe the nurse was attempting to use the squeezy breathing apparatus in place of C.P.R. As the nurse is squeezing the C/Os are pushing the stretcher too fast for the nurse to keep up. The nurse is short and slow and I notice that the mouth piece for Carlos has been pulled down around his neck and one ear. The mouth piece was not even partially on his mouth. I saw the face of Carlos and he already looked dead. Five minutes after Carlos was taken away, Silent was taken out. Silent was still in handcuffs and covered in blood.

Two days after Carlos was killed the Attorney General came to interview me. They told me I was the "star witness" and that "you seem like a smart guy." The A.G. then asked "how much longer is your sentence?" and "Do you want to do all of your time in the hole?" the A.G. then went on and on with false statements and asked if I agreed. I told him that I did not agree. The A.G. insinuated that it would be in my best interest to agree with the blatant lies as to what happened. The A.G. even went so far as to say an inmate 'slipped out of the cuffs' and then killed the other inmate. This couldn't be further from the truth.

Both inmates were handcuffed behind their backs the entire time. Carlos never moved again after the first live round hit him directly in the upper chest.

No one was ever 'kicked in the head' or 'stomped out.'

None of the C/Os were ever threatened by any of the inmates.

47.    Adjudication Reports created by Defendant State of Nevada, corroborate Mr. Castner's account that Defendant State of Nevada's actual practice and pattern of behavior is to allow Corrections Officers to fail to perform "hands-on escorts" of restrained inmates. Specifically, Defendant Castro explained "pitch and catch, that's the norm at HDSP."

48.     Similarly, inmate Devin Campbell described that: "The C.O. in the bubble fired the warning shot. As they were getting down he proceeded to shoot live rounds at both Carlos' and Andrew's face and upper body. When both of them were on the ground there was no fighting. There was a lot of yelling and screaming but no physical contact between them. I saw Carlos was trying to get up from the ground and a moment later Andrew started to get up as well. Before they got to their feet the C.O. in the bubble fired a third shot directly at both of their faces and upper bodies. Carlos fell to the ground and Andrew got down as well. They were both bleeding really bad at this point. It took medial and C.E.RT. A long time to show up."

49.     Consistent with Mr. Castner's statement that representatives from the State of Nevada attempted to "say an inmate 'slipped out of the cuffs' and then killed the other inmate," the State of Nevada initially charged inmate Andrew Arevalo with the murder of Carlos Perez in internal prison disciplinary proceedings.

50.     This matter was originally filed in State Court. Thereafter, the State affirmatively removed the case from state to federal court. (ECF No. 1). The State's act of removal was an affirmative act by which the state waived its Eleventh Amendment immunity. Consequently, the State of Nevada waived its immunity when it removed this suit to federal court.

51.     Defendants actions that resulted in the death of Carlos Perez violated Plaintiffs' clearly-established and well-settled constitutional rights secured by the Fourteenth Amendment. Consequently, Plaintiffs have *personal* standing to bring suit for the deprivation of her fundamental constitutional right of familial companionship under 42 U.S. C. § 1983 arising out of the loss of the relationship with their father, Carlos Perez.

52.     The State of Nevada's actual practice, custom and *de facto* policy is to rely "heavily and  almost exclusively to the use of weapons to maintain order." Additionally, the fact that "during 2012, 2013, and 2014, Defendant State of Nevada discharged a bird shot from a shotgun in its prisons 71 times; and that of the 71 shooting with live rounds, 48 occurred at High Desert State prison demonstrates that the actual customs and *de facto* policies created by the supervisory level defendants demonstrates a reckless or callous indifference to the rights of the inmates each is charged to administer. In short, the fact that a practice, custom, or policy is not

officially drafted does not mean that it does not exist.

## FIRST CAUSE OF ACTION

### 42 USC §1983 - Excessive Force; Deliberate Indifference to a Serious Medical Need; and

### Loss of familial association

### (against all Defendants)

53.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

54.     By the actions and omissions of Defendants in unlawfully killing Carlos Perez described above, violated 42 USC § 1983, depriving Decedent of the clearly-established and well-settled constitutional right to be free from cruel and unusual punishment as secured by the Eight and Fourteenth Amendments to the United States Constitution.

55.     At the time that Defendants shot and killed Carlos Perez, Defendants were acting under the color of law.

56.     Defendants subjected Carlos Perez to their wrongful conduct, depriving Decedent Carlos Perez of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of the Decedent and others would be violated by their acts and/or omissions.

57.     Defendants, and each of them, subjected Decedent to excessive use of  force, in violation of the Eighth Amendment's guarantee against cruel and unusual punishment by maliciously and sadistically shooting Mr. Perez with the intent to cause him harm.

58.     Defendants' use of force was not a good-faith effort to maintain discipline, but rather was done with the malicious and sadistic intent to harm the Decedent because the Defendants could have merely separated the inmates, but rather the Defendants maliciously and sadistically deployed deadly force. Defendants decision was made pursuant to NDOC's and the supervisory level defendants' unconstitutional policies to deploy deadly force in situations that do not require such force.

59.     Defendants, and each of them, were deliberately indifferent to Mr. Perez's constitutional rights by shooting Mr. Perez and killing him.

60.    Defendants knowingly made, modified and carried out policies of the State of Nevada and its correctional department regarding being deliberately indifferent to the constitutional rights of inmates by having a policy to needlessly shoot inmates with shotguns.

61.    At all times material hereto, Defendants pursuant to patterns, practices, policies, and/or customs,  were deliberately indifferent to Mr. Perez's constitutional rights

62.    Defendant's, and each of them, were deliberately indifferent to Decedent's serious medical needs by denying Decedent treatment for the injuries caused by Defendants' excessive use of force.

63.    Mr. Perez's injuries were objectively serious because he was dying as a result of being shot with shotgun pellets.

64.    Despite the fact that Mr. Perez was dying, and Defendants'  actual knowledge of his worsening condition, the Defendants refused to provide Mr. Perezwith timely medical care.

65.    As a direct and proximate result of denying Decedent treatment for the shotgun blasts, Decedent suffered further injuries and damages, including, death, excruciating pain, and extreme mental and emotional shock.

66.    Andrew Arevalo's Notice of Charges demonstrates that Defendant Oliver responded to the scene after Carlos was shot, but rather than ensure that Carlos received adequate medical attention, Defendant Oliver spoke with the trainee officer, Defendant Ramos.

67.    Moreover, eyewitness Brandon Castner described his shock from the fact that there was not a quick response of medical personnel following the shooting of Carlos Perez. (Exhibit 6). Similarly, Devin Campbell described that "it took medial and C.E.R.T. A long time to show up."   Morever, based upon recent media reports inmates who have been injured at HDSP have been flown by helicopter, or "life flight" to a hospital. However, no such flight occurred in this instance.

68.    These facts demonstrate Defendant Oliver and other individual defendants were deliberately indifferent to Carlos Perez's serious medical needs by delaying treatment to his urgent shotgun wounds which resulted the unnecessary and wanton infliction of pain and the further injury of bleeding out and dying.

69.     Defendants implemented  policies and practices concerning the use of shotguns that violated the constitution because the policies are "not consistent with nationally accepted correctional standards." Moreover, the Defendants allowed "pitch and catch" to be the "norm of HDSP."  Those unconstitutional *de facto* policies, actual practices, and organizational customs were personally implemented by the "NDOC Defendants." Moreover, those unconstitutional polices caused the death of Carlos Perez and the attendant violation of his civil rights.

70.     As a direct and proximate result of Defendants act and/or omissions as set forth above, Decedent Carlos Perez suffered a violent death and Decedent sustained violation of his constitutional rights, emotional injuries and damages as set forth herein in a sum in excess of Seventy Five Thousand Dollars ($75,000.00).

71.     The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 USC §1983 and N.R.S.§ 42.005 in a sum in excess of Seventy Five Thousand Dollars ($75,000.00) as to the individual defendants.

72.     Plaintiffs are also entitled to costs and attorneys fees under 42 USC § 1988 and applicable Nevada statutes in a sum in excess of Seventy Five Thousand Dollars ($75,000.00).

## SECOND CAUSE OF ACTION

### NRS 42.085; Claims for Wrongful Death

### (against all Defendants)

73.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

74.     Defendants acted with willful misconduct and/or gross negligence, which was the direct and proximate cause of Mr. Carlos Perez's untimely death on November 12, 2014.

75.     Defendants purposely, knowingly, willfully and maliciously shot and killed Carlos Perez.

76.     Defendants are liable to Mr. Carlos Perez's estate and heirs pursuant to NRS § 41.085 for his pain and suffering as well as the loss of association, for loss of society and companionship and income and funeral expenses.

. . .

77.     Plaintiffs are entitled to general and special damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00). and other statutory damages.

78.     It has become necessary for Plaintiffs to retain the services of an attorney to pursue this action and Plaintiffs are entitled to an award of reasonable attorney's fees and costs in prosecuting this action.

## THIRD CAUSE OF ACTION

### Negligent Training, Supervision, and Retention

### (against the State of Nevada, Director Greg Cox, and Warden Dwight Neven)

79.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

80.     Defendants had a duty to use reasonable care in the training, supervision, and retention of its employees to ensure that those employees are fit for their positions.

81.     The State of Nevada owed a duty to its inmate and the general public to adequately train and supervise staff at correctional centers so that they take reasonable precautions to safeguard the physical welfare of inmates by instituting safe procedures for control and handling violent inmates.

82.     The said Defendants breached their duty by failing to use reasonable care and by the negligent and careless training and supervision of Defendants Oliver, Ramos, Filson, Smith and  Castro and other DOE Defendants, including DOES 1-10, such that said Defendants failed to take reasonable measures to safeguard the physical welfare of inmates by instituting safe procedures for control of violent inmates and by placing correctional trainees to use deadly force where deadly force should not have been used.

83.     The State of Nevada breached its duty by failing to use reasonable care and by the negligent and careless training and supervision of Defendants Oliver, Ramos, Filson, Smith and Castro and other DOE Defendants, including DOES 1-10, with regard to the policy of single celling inmates from confrontation of other inmates at the time of the showering based upon sentence structure, institutional behavior, and disciplinary records.

84.     The State of Nevada breached its duty by failing to use reasonable care and by the

negligent and careless training and supervision of Defendants Oliver, Ramos, Filson, Smith and Castro and other DOE Defendants, including DOES 1-10 with regard to the policy of placing a violent inmate, exposing him to violent attack from an inmate while he was in protective custody, and failing to use and provide less than lethal force such as batons, tasers, and pepper spray.

85.     Upon information and belief Defendants Oliver, Ramos, Filson, Smith and Castro and other DOE Defendants, including DOES 1-10, were unfit and unqualified to be employed by NDOC.

86.     The Defendants were negligent in their training and supervision of their corrections officers. Specifically, The ASCA determined that the State of Nevada's "prison-based in-service training is minimal, varying between 16 and 24 hours per person, as opposed to nationally accepted standards for 40 hours of training per person. Further, annual ongoing firearms training does not meet widely accepted best practices nor the Department's own policy mandate."

87.     Likewise, the fact that "since 1994, there have been several less than lethal and non-lethal technological improvements along with policy and procedure advances."

88.     However, despite this fact, the State of Nevada has relied "heavily and almost exclusively" on using deadly shotguns on unarmed inmates. Based upon these facts a reasonable juror could determine that The State of Nevada knew its employees were shooting unarmed inmates, the State of Nevada chose not to retrain or adequately supervise its corrections officers AND as a result of the endemic use of shotguns in Nevada's prisons, particularly HDSP, Carlos Perez was killed because despite lethal and non-lethal technological improvements over the past 20 years, Nevada continued to train and allow its officers to use shotguns to shoot unarmed inmates.

89.     Plaintiffs herein are entitled to general and special damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

90.     It has become necessary for Plaintiffs to retain the services of an attorney to pursue this action and Plaintiffs are entitled to an award of reasonable attorney's fees and costs in

1    prosecuting this action.

2    ## FOURTH CAUSE OF ACTION

3    ### Intentional Infliction of Emotional Distress

4    ### (against all Defendants)

5    91.    Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth

6    here.

7    92.    Defendant's intentional murder of Carlos Perez, was extreme and outrageous and

8    was intentionally committed to cause Decedent to suffer emotional distress.

9    93.    Murdering an inmate who was handcuffed, unarmed, and not posing a threat or

10   danger when he was shot by Defendant Ramos transcends all bounds of decency tolerated in a

11   civilized society.

12   94.    Defendants promulgation of organizational customs and *de facto* policies that

13   caused Defendants Smith and Castro, to put two protective custody inmates together and then

14   order Defendant Ramos to shoot Carlos Perez. Allowing such behavior to exist as well as

15   allowing the endemic use of shotguns to shoot unarmed inmates is extreme and outrageous

16   conduct with the  reckless disregard for causing emotional distress. As a result of the Defendants

17   choice to allow their officers to use shotguns to shoot unarmed inmates and then deny those

18   individuals timely medical care, the Plaintiffs have suffered severe or extreme emotional distress

19   arising out of the death of Carlos Perez. Consequently, Plaintiffs should be permitted to proceed

20   to discovery and to trial to prove their claims against Defendants.

21   95.    As a direct and proximate result of Defendants' intentional infliction of emotional

22   distress upon Decedent, Plaintiffs have incurred special and general damages in an amount in

23   excess of Seventy Five Thousand Dollars ($75,000.00).

24   96.    That as a direct result of the intentional acts of the Defendants, and each of them,

25   Decedent was caused to suffer pain and suffering, and severe emotional distress and other related

26   costs, in excess of Seventy Five Thousand Dollars ($75,000.00).

27   97.    That as a direct result of the intentional acts of the Defendants, and each of them,

28   Plaintiffs are entitled to punitive damages in excess of Seventy Five Thousand Dollars

1   ($75,000.00).

2         98.    Plaintiffs are also entitled to costs and attorneys fees under applicable Nevada

3   statutes in a sum in excess of Seventy Five Thousand Dollars ($75,000.00).

4         99.    At all times Defendants were acting within the course and scope of their

5   employment as corrections officers of the State of Nevada and, therefore is responsible for the

6   Defendants' state torts under a theory of *Respondeat Superior.*

7         DATED this 3rd day of October, 2016

POTTER LAW OFFICES

By____/s/ C. J. Potter, IV, Esq.____
CAL J. POTTER, III, ESQ.
Nevada Bar No. 1988
C.J. POTTER, IV, ESQ.
Nevada Bar No. 13225
1125 Shadow Lane
Las Vegas, Nevada 89102
*Attorneys for Plaintiffs*

1

## CERTIFICATE OF SERVICE

2       The undersigned hereby certifies that on the 3rd day of October, 2016, the foregoing was

3 electronically filed with the Clerk of the Court using the CM/ECF system which sent notification

4 of such filing to all counsel of record.

5

6                         By: /s/ C. J. Potter

                           Employee of Potter Law Offices

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28