ROBERT W. FREEMAN
Nevada Bar No. 3062
robert.freeman@lewisbrisbois.com
E. MATTHEW FREEMAN
Nevada Bar No. 14198
matt.freeman@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
6385 S. Rainbow Boulevard, Suite 600
Las Vegas, Nevada 89118
702.893.3383
FAX: 702.893.3789
Attorneys for Defendant
Corrections Officer Trainee
Raynaldo-John Ramos

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

***

| | |
|---|---|
| VICTOR PEREZ, as Special Administrator of the Estate of CARLOS PEREZ, deceased; VICTOR PEREZ, as the Guardian Ad Litem for S.E.P, a minor; VICTOR PEREZ, as the Guardian Ad Litem for A.I.P., a minor; and MYRA PEREZ, individually,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF NEVADA, DIRECTOR GREG COX, individually; WARDEN DWIGHT NEVEN, individually; ASSISTANT WARDER TIMOTHY FILSON, individually; COT RAMOS, individually; LIEUTENANT OLIVER, individually; CORRECTIONS OFFICER CASTRO, individually; CORRECTIONS OFFICER SMITH, individually; and DOES I-X, inclusive; and ROES I-X, inclusive;<br><br>Defendants. | CASE NO. 2:15-cv-1572-APG-DJA<br><br>**DEFENDANT CORRECTIONS OFFICER TRAINEE RAYNALDO-JOHN RAMOS'S MOTION FOR SUMMARY JUDGMENT** |

COMES NOW Defendant CORRECTIONS OFFICER TRAINEE RAYNALDO-JOHN RAMOS (hereinafter "Trainee Ramos" or "Defendant Ramos"), by and through his attorneys, Robert W. Freeman, Esq., and E. Matthew Freeman, Esq., of LEWIS BRISBOIS BISGAARD & SMITH, LLP, and hereby submits his Motion for Summary Judgment as to each of Plaintiff's causes of action relevant to Trainee Ramos. This motion is made and based upon the following

memorandum of points and authorities as well as the papers and pleadings on file herein.

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. **INTRODUCTION**

This matter arises out of the death of Inmate Carlos Perez ("Inmate Perez") during his incarceration at High Desert State Prison on or about November 12, 2014. As will be discussed in greater detail below, on November 12, 2014 while Inmate Andrew Arevalo was being escorted to his cell from the shower area, Inmate Perez was let out of his shower at the same time and against prison policy. Inmate Perez charged at Inmate Arevalo and a violent fight ensued. Inmates Perez and Arevalo were cuffed behind their backs, but both used kicks, headbutts and shoves to try to gain a potentially deadly advantage. In the moment, it was clear to Trainee Ramos that the inmate fight was serious and the first inmate to fall to the ground faced deadly peril as the other would kick and stomp the other to death.

At the time of the fight, Defendant Corrections Officers Jeff Castro and Isaiah Smith were on duty in the Inmates' module along with Corrections Trainee Ramos. Officer Castro was handling the upper tier showers and was close to the position of the inmates when the fight began. Officer Smith was on the bottom floor of the module but was able to see the fight as it progressed on the tier above him. Trainee Ramos was positioned inside the module "bubble"[1]. When the fight between Perez and Arevalo broke out, Corrections Officers Smith and Castro did not attempt to physically intervene in the fight although both gave verbal commands. Trainee Ramos – also in compliance with High Desert prison standard operating procedures – equipped himself with a shotgun loaded with non-lethal birdshot. Following High Desert standard operating procedures, Ramos provided several verbal warnings as well as a warning shot in the form of a blank round[2]. Despite Ramos' the verbal warnings and warning shot, Perez and Arevalo continued to fight

---

[1] Modules in High Desert contain a room situated on the top floor that is not accessible to the inmates in the module, where officers can view the entirety of the inmates in any given module. The room contains equipment and material to be used in the event of a riot, or in this case, an inmate-inmate fight. *See Diagram Depicting Pod 2B*, attached hereto as **Exhibit A**.

[2] blank rounds do not contain any projectiles and are used as a warning.



without respite. Ramos then fired four (4) birdshot rounds into the area between the fighting inmates in an attempt to get them to stop. Between each shot, Trainee Ramos shouted verbal commands to stop fighting and waited to see if the inmates would comply. They did not stop fighting until after the last shot.

Pursuant to High Desert policy, in the event a birdshot shotgun cartridge is required, corrections officers are instructed to fire towards the ground in front of their target so as to cause the pellets contained in the cartridges to skip across the ground. The Nevada Department of Corrections calls this a "skip shot". In this instance, however, due to the position of the fighting inmates on the upper tier, Trainee Ramos was unable to skip the pellets towards the inmates. Unfortunately, and unforeseeably, Inmate Perez succumbed to the injuries caused by the bird shot and died shortly after the incident.

Plaintiffs filed suit alleging four (4) causes of action with three (3) of the four (4) addressing Trainee Ramos. Specifically, Plaintiffs claim that Trainee Ramos used excessive force and sued him for (1) excessive force and associated deliberate indifference to a serious medical need, (2) wrongful death, and (3) intentional infliction of emotional distress. While Defendant Ramos does not contest the fact that this incident ended in tragedy, Trainee Ramos used that amount of force that he was trained to use; he *did not* use excessive force, he *did not* act with deliberate indifference to a serious medical need, and he *did not* act in an outrageous manner so as to intentionally cause emotional distress to Mr. Perez's family. As will be illustrated below, Trainee Ramos is entitled to summary judgment as to each of Plaintiffs' causes of action.

## II. STATEMENT OF FACTS

### A. Nevada Department of Corrections policies relevant to the subject incident

To adequately describe the incident that took place on November 12, 2014, it is necessary to describe some of the relevant policies and procedures in place at High Desert State Prison at the time of the incident which informed the behavior of all three Corrections Officers, including Trainee Ramos.

#### 1. NDoC's Segregated Unit Operation policy(ies)

On November 12, 2014, Inmate Perez and Arevalo were housed in the High Desert State

Prison in Segregated Unit Housing which operates under more specialized procedures due to the high-risk nature of the inmates held therein. Relevant to this matter, inmate movements throughout the module are more strictly monitored:

> **Inmate Movement**
>
> 3. Escort Staffing:
>
> All inmate movement leaving or within a segregation unit will be done one cell at a time and will consist of at least:
>
> - one (1) correctional staff to every two (2) inmate (s) (cell mates only)
> - two (2) correctional staff for one (1) HRP inmate
>
> 7. Movement to Shower
>
> The inmate will receive an unclothed body search. All clothing will be handed through the food slot door to the officer;
>
> . . .
>
> The inmate will be handcuffed through the food slot door with his hand behind his back
>
> The officer will signal the control room officer to open the door to the cell
>
> The inmate will be placed in the shower. The door will be secured and the inmate will place his hands out through the restraint slot ot have the handcuffs removed.
>
> The escorting officer will return the inmate's personal hygiene items. The inmate will be allowed eight (8) minutes to shower
>
> When returning the inmate to his cell, this procedure shall be followed in reverse order.

*See NDoC's Segregated Housing Policy*, attached hereto as **Exhibit B**.

**2. NDoC's Use of Force policy(ies)**

On November 12, 2014, High Desert State Prison provided the following policies with regard to the use of deadly and non-deadly force:

> **Use of Force**
>
> 1. Staff may exercise the use of verbal orders, physical contact or, as a last resort deadly force in instances of justifiable self-defense to:
>
> A. Protect persons from imminent death or serious bodily harm;
> B. Protect state property; or
> C. Prevent escapes and/or capture escapees,
>
> Under no circumstances is physical force justifiable as punishment of an offender.
>
> **Types of Non-Deadly Force Equipment**

> 6. 12-gauge shotguns loaded with a blank-round or 7.5 birdshot designed to skip or shoot the birdshot into the offender(s) and striking the offender(s) in their lower extremities to temporarily incapacitate or immobilize the offender(s).

*See NDoC Use of Force Policy*, attached hereto as **Exhibit C**.

B. **The November 12, 2014 Incident**

According to the Inspector General's Investigative Report, on November 12, 2014, Corrections Officer Trainee Ramos was assigned as the floor officer for Unit 2 AB at High Desert State Prison. *See Investigation Detail Report*, attached hereto as **Exhibit D**. At approximately 6:30 pm, the officers in Module 2 AB were in the process of giving the inmates showers. At approximately 8:00 pm, Corrections Officer Castro arrived in the module, returning from the shooting range, and Trainee Ramos briefed him of the on-going activities in the module.

Shortly thereafter, Officer Castro released Inmate Arevalo from his shower cell and allowed Arevalo to return to his cell, unaccompanied and against High Desert State Prison policy and procedure. *See Officer Castro's Deposition, at p. 59, l. 5 – p. 60, l. 13*, attached hereto as **Exhibit E**. Likely because Castro did not escort Inmate Arevalo back to his cell, Inmate Arevalo did not immediately return to his cell, but rather stopped and spoke with several inmates along the way. **Exhibit D**. Officer Castro then allowed Inmate Perez out of his shower cell to allow the inmate to return to his cell. Unfortunately, rather than returning to their cells, inmate Perez charged Arevalo and started to attack with his legs.[3] [4] According to Officer Castro, he did not intervene in the inmate fight because he was required by High Desert State policy to await back-up before intervening in an inmate fight. Instead, Officer Castro ordered the inmates to step away from one another and return to their cells, an order the inmates ignored. *See Corrections Officer*

---

[3] Corrections Officers Smith and Castro corroborated the investigative report during their individual depositions. Specifically, Officer Smith testified that he heard shouting followed by the inmates attempting to kick and even tackle each other. *See Officer Smith's Deposition*, *at p. 70, l. 19 – p. 73, l.14*, attached hereto as **Exhibit F**. Officer Castro offered similar testimony, indicating that the two inmates charged and started kicking each other in the lower extremities. *See Officer Castro's Deposition, at p. 65, ll. 9-18*, attached hereto as **Exhibit E**.

[4] When outside their cells for shower time, inmates at High Desert were handcuffed behind their backs.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Castro's Incident Statement*, attached hereto as **Exhibit G**. At this point, Officer Ramos had armed himself with the module's shotgun. **Exhibit D**. As noted above, High Desert module shotguns are pre-loaded with cartridges loaded with birdshot with an extra blank round loaded into the chamber for use as a warning shot. *See Corrections Trainee Ramos's Deposition, at p. 87, ll. 16*-22, attached hereto as **Exhibit H**. Officer Ramos provided several verbal warnings for the inmates to stop and get on the ground or be shot. **Exhibit D**. Ramos also fired a single warning blank shot as an attempt to deter the inmates from their fight. Despite the verbal warnings and warning shot, the inmates continued to fight. Officer Ramos then fired an additional four (4) live rounds with verbal commands issued in between each and every shot. While Ramos used the shotgun to gain compliance, Officer Castro attempted to call for back-up from surrounding modules. **Exhibit G**. After three (3) shots, both inmates ended up on the ground. Despite the several shots fired, Inmate Arevalo continued to attack Perez with his feet and elbows while on the ground. Ramos fired a final time, at which point, Inmate Arevalo stopped attacking Perez. **Exhibit D**.

Immediately after the altercation, several other corrections officers from surrounding modules, medical staff and CERT officers responded to the scene. Despite medical staff's life saving efforts, Inmate Perez succumbed to his injuries.

## III. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "where the record before the Court on the motion reveals the absence of any material facts and [where] the moving party is entitled to prevail as a matter of law." *Zoslaw v. MCA Distributing Corp*., 693 F.2d 870, 883 (9th Cir. 1982), cert. denied, 460 U.S. 1085 (1983) (quoting *Portland Retail Druggists Association v. Kaiser Foundation Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981), cert. denied, 460 U.S. 1085 (1983). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties differing versions of the truth." *Securities and Exchange Commission v. Seaboard Corporation*, 677 F.2d 1289, 1293 (9th Cir. 1982); United States v. First National Bank of Circle, 652 F.2d 882, 887 (9th Cir. 1981).

The party moving for summary judgment has the burden of showing the absence of a

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

genuine issue of material fact, and the court must view all facts and inferences in the light most favorable to the responding party. *See Adickes v. S.H. Dress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) (footnote omitted). *See also, Zoslaw, supra*, 693 F.2d at 883; *Lessard v. Applied Risk Management*, 2002 U.S. App Lexis 20810 (9th Cir. October 3, 2002); *Warren v. City of Carlsbad*, 58 F.3d 439 (9th Cir. 1995). Once this burden has been met, "[t]he opposing party must then present specific facts demonstrating that there is a factual dispute about a material issue." *Zoslaw, supra*, 693 F.2d at 883. The movant is entitled to summary judgment if the non-moving party, who bears the burden of persuasion, fails to designate "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986). Thus, in order to preclude a grant of summary judgment, the non-moving party must set forth "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indust. Co., Ltd. V. Zenith Radio Corp*., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S.Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56 (e)).

An issue is "genuine" is the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Miling v. Las Vegas Metropolitan Police Department*, 1995 U.S. App. LEXIS 27698, at *7 (9th Cir. 1995) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 91 L .Ed. 2d 202, 106 S. Ct. 2505 (1986) (quoting Fed. R. Civ. P. 56(c)); *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). However, if the evidence is "merely colorable" or "not significantly probative," summary judgment should be granted. *Anderson*, 477 U.S. at 249-50.

Although the nonmoving party "is entitled to all favorable inferences, he is not entitled to build a case on the gossamer threads of whimsy, speculation, and conjecture." *Hahn v. Sargent*, 523 F.2d 461, 467 (9th Cir. 1975) (quoting *Manganaro v. Delaval Separator Co.,* 309 F.2d 389, 393 (1st Cir. 1962)), *cert. denied*, 425 U.S. 904, 96 S. Ct. 1495, 47 L. Ed. 2d 754 (1976). As the courts have emphasized over and over again, only genuine issues of material fact will defeat summary judgment. In *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), the Supreme Court spoke directly to the respective summary judgment burdens in a civil rights case where the plaintiff denies any wrongdoing,

> "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." [citation omitted] When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Given these statements regarding summary judgment and based on the facts and law discussed herein, Plaintiffs cannot prevail on the claims included in their Complaint as a matter of law.

## IV. LEGAL ARGUMENT

### A. Federal Causes of Action

This suit is brought pursuant to 42 U.S.C. §1983 including both individual and official capacity claims. The claims are brought pursuant to 42 U.S.C. §1983, which reads in relevant part:

> Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any State or Territory or of the District of Colombia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 is not itself a source of substantive rights, but only a method for vindicating federal rights elsewhere conferred. *See Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994). Pursuant to the statute, in order to prevail in a "section 1983" case a plaintiff must prove two elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States.

The doctrine of respondeat superior or vicarious liability does not apply to claims brought pursuant to 42 U.S.C. §1983. *See Shaw .v State of Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 610 (9th Cir. 1986). Thus, in order to pursue a civil rights individual capacity action, the plaintiff must show that the official was personally involved in the alleged constitutional violation. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979) (dismissing Director of State Health Department in individual capacity because of lack of involvement); *see also Jones v.*

*Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (holding that officers cannot be liable for an allegedly unlawful search when there is no direct evidence of their individual participation).

**1. Corrections Officer Ramos's Use of Force was within High Desert State Prison policy and was not excessive given the totality of the circumstances.**

The treatment a convicted person receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Todd v. Lamarque*, 2008 U.S. Dist. LEXIS 6545, at *15 (N.D. Cal. Jan 14, 2008) (quoting *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)). "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (ellipsis in original) (internal quotation and citation omitted). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be objectively, sufficiently serious, *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)), and (2) the prison official must possess a sufficiently culpable state of mind, i.e.., the offending conduct was wanton, *Id*. (citing *Wilson*, 501 U.S. at 297); *LeMaire v. Maass*, 12 F.3d 1444, 1451 (9th Cir. 1993).

What is required to establish an unnecessary and wanton infliction of pain varies according to the nature of the alleged constitutional violation. *Whitley*, 475 U.S. at 320. Whenever prison officials stand accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7, 112 S> Ct. 995, 117 L. Ed. 2d 156 (1992). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate: (1) the need for application of force, (2) the relationship between that need

and the amount of force used[5], (3) the extent of any injury inflicted, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7.

While the extent of injury suffered by an inmate is one of the factors to be considered in determining whether the use of force is wanton and unnecessary, the absence of serious injury does not end the Eighth Amendment inquiry. *Id*. Whether the alleged wrongdoing is objectively "harmful enough" to establish a constitutional violation is contextual and responsive to contemporary standards of decency. *Id*. at 8 (citing *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). Such standards are always violated when prison officials maliciously and sadistically use force to cause harm, whether or not significant injury is evident. *Id*; *see also Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000) (no lasting injury required for sexual assault because sexual assault was deeply offensive to human dignity); *Felix v. McCarthy*, 939 F.2d 699, 701-02 (9th Cir. 1991) (it is not degree of injury which makes out violation of Eighth Amendment but use of official force or authority that is intentional, unjustified, brutal and offensive to human dignity). That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action; the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force. *Hudson*, 503 U.S. at 9-10 (blows directed at inmate which caused bruises, swelling, loosened teeth and cracked dental plater were not de minimis).

Here, Plaintiffs allege that Trainee Ramos acted with malicious, sadistic, and unnecessary force in utilizing the shotgun loaded with birdshot. Plaintiffs contend that Ramos, Smith, and Castro had options other than the use of birdshot to stop the inmate fight between Perez and

---

[5] It should be noted that Defendant Ramos did not have other force options available to use in response to the inmates' fight. As already stated, he was located in the module "bubble" when the fight broke out and according to his deposition testimony, he *did not* have access to pepper spray, a taser, or a baton. The only force options available to Defendant Ramos was his physical and verbal presence, as well as the shotgun loaded with a blank round and birdshot. Even had Defendant Ramos been equipped with other lesser force options such as pepper spray and/or a baton, he was located in the "bubble" out of arms reach of the two inmates. *See Ramos's Deposition at p. 72, l. 8 – p. 73, l. 22*, attached hereto as **Exhibit H**.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Arevalo. However, when considering both Ramos's testimony as well as Defendants' expert John Peters' each of the five (5) factors described above fall in favor of the Trainee Ramos and his use of met the Eighth Amendment standard.

(a) **Ramos's justification for the use of force.**

Defendant Trainee Ramos was asked to describe the incident pursuant to Plaintiffs' Interrogatory requests and did so as follows:

> On November 12, 2014, Officer Smith and I were monitoring inmates during their shower time. I was in the control bubble, while Officer Smith was on floor level. I was in the control bubble taking over the responsibilities of Officer Castro, as he was out on the range at the time. When the inmates were finishing their showers, Officer Castro re-entered the module and went to handcuff and release the inmates from their shower cells. Officer Castro first released Inmate Arevalo, but did not escort him from the area before releasing Inmate Perez. As soon as the two inmates were released from their shower cells, they charged each other and started fighting with hicks. The inmates could not use their fists as their hands were still restrained with handcuffs. The fight was very violent. I immediately yelled commands to the two inmates to stop fighting, as did other officers in the area. When the inmates refused to obey our lawful commands, I ran to the back of the control bubble to retrieve one of the 12-guage shotguns armed with birdshot shells.
>
> I came back to the observation window and saw that the two inmates were still fighting. I placed the barrel of the shotgun out of the window and yelled additional commands and warnings that if the inmates refused to comply with our orders that I would open fire on their position. The inmates did not comply, and I fired the first shot which was a warning, blank shot. The inmates appeared to notice the shot and, briefly discontinued their combat, but as soon as they realized that the first shot was a blank, they continued fighting. Again, I ordered them to stop and warned that I would continue to fire if they did not obey. Again, the inmates did not comply with the orders. I fired the first shell of birdshot at the two inmates, but it did not appear to have any effect. I ordered them to stop and offered another verbal warning, but the inmates continued fighting. I fired a second shot, which also appeared to have no effect. Again, I warned the inmates that continued violence would result in additional gunfire. The inmates continued to ignore all commands and warnings and I fired the final shot in the shotgun to no effect. Because my shotgun was out of ammunition, I went to retrieve additional shells.
>
> When I came back to the observation window, I saw inmate Perez leaning against the wall with inmate Arevalo continuing to kick and beat him. I fired one additional shot to get Inmate Arevalo off of inmate Perez and thereafter, the fighting ended. Other prison personnel quickly responded to the module, separated the two inmates and started chest compressions on Inmate Perez. No emergency airway procedures were performed. Prison personnel arrived in the control bubble and removed my shotgun, I prepared an incident report, which may be used to supplement this response, and I was sent home. The next day I was placed on administrative leave until April 2014 [sic]. I was informed by the module Lieutenant and one of the medics that arrived to the scene that Inmate Perez died from blunt force trauma. However, days later I was informed that the official cause of death was changed to birdshot in Perez's lungs.

*See Defendant Ramos's Answers to Interrogatories,* attached hereto as **Exhibit I.**

Trainee Ramos was deposed on December 4, 2020 and provided more detail as well as his justification for the use of the birdshot shotgun in response to the inmates' fight. Specifically, Officer Ramos provided the following testimony regarding the events leading up to and including the start of the fight between Inmates Arevalo and Perez:

> Q: Okay. So when Mr. Castro got there, what did he do? Just to be clear, when Mr. Castro showed up in the pod, you were in the bubble already; right?
>
> A: Yes.
>
> Q: So what did Mr. Castro do when he arrived at unit 2A/B?
>
> A: He came and knocked on the door. Then I went to the window to see who it was. He said, hey, let me in; this is my unit. Then I said who are you? He said this is my unit; I just came from the range. Then I let him up, and he came to the bubble. Then he grabbed his gear, his handcuffs or whatever. And then he went down the stairs and onto the floor, and then he went upstairs to the upper tier.
>
> . . . .
>
> A: Then he goes up to the showers. He puts handcuffs on Arevalo, and then he lets him – pardon?
>
> Q: How did you know it was Arevalo that he put handcuffs on?
>
> A: By where he was in the showers. There's, I believe, five showers on the upper floor, and he went and – I didn't know who they were until after the incident. But he went, and he started talking to him. And then he put the handcuffs on him, and then he opened the cell, the shower door.
>
> And then that's when Arevalo started walking down towards his unit, but he never went all the way. He stopped and was saying stuff to others outside of their doors.
>
> Q: Okay. Let me ask you, did anybody tell him to keep moving?
>
> A: I did not. I was inside on the control panel.
>
> Q: Did you hear Castro tell him to keep moving?
>
> A: I did not hear him say anything to him, because he was –
>
> Q: Did you hear –
>
> A: -- moved over to the next cell, and he was talking to Perez inside of his shower cell.
>
> . . . .

Q: So you were just getting done telling me that Mr. Castro was in the process of opening Mr. Perez's shower door?

A: Yes.

Q: What happened?

A: And then Perez was handcuffed, and then the shower door was opened, and Perez ran over to Arevalo and jumped at him and started kicking him.

. . . .

Q: You said he started kicking. So what do you mean when you said he started kicking?

A: He ran over towards him and jumped up and kicked Arevalo. That's when the fight started.

Q: Where did he kick him at?

A: His leg or his chest possibly.

. . . .

A: He ran at him, and he jumped and kicked him, yes.

. . . .

A: I'm going to say [Perez kicked Arevalo in] his waist area.

Q: Then what happened?

. . . .

A: [Arevalo] was still standing.

Q: Okay.

A: And they just started kicking at each other.

**Exhibit H,** at p. 80, l. 24 – p. 85, l. 17.

Defendant Ramos provided additional detail concerning the actions he took in response to the inmates' fight:

Q: And Mr. Arevalo – all right. Go ahead. So this kick happens, and then what?

A: And then I yelled, you know, 'Stop. Get on the ground.' And they continued to kick at each other.

Q: How were they kicking at each other?
A: And then – Hands behind their back, and they were just kicking.

Q: So Mr. Perez is kicking at Mr. Arevalo's legs?

A: Yes, and his stomach area.

Q: Where is Mr. Arevalo kicking Mr. Perez?

A: He's standing there getting kicked. He's also kicking back in his stomach, his arms. I don't know how he was able to get his legs up, but I think he kicked him in the chest maybe.

. . . .

Q: Go ahead. So they're kicking at each other, and then what?

A: And then I'm yelling from the bubble, 'Stop. Get on the ground.' Nobody is listening to anything that anyone was saying, because now they're screaming at each other.

Q: What are they saying?

A: 'Fuck you.'

. . . .

Q: So then what did you do?

A: Then I left the control panel, and I went and retrieved the shotgun.

Q: Where was the shotgun located?

A: There's two shotguns in the bubble. There's one in the front of the bubble and one in the back. I retrieved the shotgun from the back of the room, and then I pointed it out the window. And I gave my verbal, 'Stop or I'll shoot.' Nobody listened. They kept kicking at each other, and then I fired the popper.[6]

Q: Okay. And then when –

A: They stopped for a second and then they just continued to kick each other. Then I yelled out another verbal, 'Get on the ground. Stop or I'll shoot.' They did not comply, and I fired my first round.

They did not comply still. I gave my verbals [sic], 'Stop or I'll shoot.' I fired my second round.

I fired a third round after giving my verbal commands, and then, at this time, they're – I believe they're leaning against each other, still kicking and kneeing each other. I hear, 'I can't breathe' come from Perez. Arevalo said, 'I don't care if you can't breathe.' And then I realized my shotgun was empty because I had spent all four rounds that were chambered inside the shotgun.

And I went to the back of the bubble. I grabbed some more shotgun rounds. As I was loading one of the rounds, it fell to the floor. And I'm looking, and Perez

---

[6] "Popper" refers to the blank round.

> is leaning on his head, and he's propped up on his knees. Arevalo is sitting with his back facing me on the handrails, and he's still kicking Perez.
>
> And then I loaded the shotgun. I gave my commands, 'Stop or I'll shoot.' He's still kicking Perez in the face, and I fired my last round. And then it stopped – Arevalo stopped kicking Perez. I fired because I'm supposed to stop them from hurting or killing each other.

*Id*. at p. 85, l. 23 – p. 88, l. 24.

Given Trainee Ramos's testimony, all factors described above, apart from the extent of the injury inflicted, fall in his favor. First and foremost, as described by Trainee Ramos, some application of force was necessary to end the fight between the inmates. Following therefrom to the fifth factor, Trainee Ramos provided several commands for the inmates to stop their fight, fired a warning blank round, and before and after each and every single shot from his shotgun Ramos continued to warn the two inmates. Despite the warnings and gunshots from Trainee Ramos, as well as the warnings offered by Officers Smith and Castro, the two inmates continued to fight. With respect to factor two and factor four, Officer Ramos perceived two inmates who posed a threat of death or serious bodily injury to each other and who doggedly continued to fight despite warnings. Trainee Ramos was aware that, because the inmates were unable to use their arms to maintain balance, that if either inmate fell to the ground they would be at a significant disadvantage that could easily lead to serious bodily injury or even death; the fallen inmate would have difficulty getting back up and the upright inmate would have free reign to stomp the fallen inmate until he got tired or was stopped. In light of this, Trainee Ramos used the force he had available to him to restore order.

The Ninth Circuit – in a similar case – held that an officer who shot and killed an inmate involved in a prison gang fight was entitled to qualified immunity where the inmates continued to fight, despite several officers, including the officer who shot, ordering the inmates to cease their fight. Specifically, in *Torres v. Runyon*, 80 Fed. Appx. 594 (9th Cir. 2003), Correctional Officer Lawrence Runyon shot and killed inmate Solomon Eli Torres from an observation tower during a prison yard melee between two prison gangs involving eighteen inmates of California's High Desert State Prison. In coming to the conclusion that Officer Runyon was entitled to qualified immunity, that Court stated:

> We apply the reasonableness standard to Runyon's actions in the actual moment 'based upon the information the officer[] had when the conduct occurred' and not in perfect hindsight. *Saucier*, 553 U.S. at 207. Runyon and other corrections officers yelled repeated verbal warnings to 'Get down!' Corrections officers in the prison yard deployed pepper spray. Runyon fired three warning shots from the observation tower and another officer fired once to little avail as the two prison gangs continued fighting in groups of three to five inmates. From his viewpoint in the observation tower, Runyon believed that the inmates on the ground were defenseless as they received kicks and blows from other inmates. And the evidence is uncontradicted that Runyon aimed at and intended to shoot the inmate whom he saw kicking an unconscious inmate to death, whether or not he hit the wrong person or was mistaken about which person was hit. Runyon fired one shot each at two groups and hit two inmates, including Torres. The melee ended soon thereafter.
>
> Given that the violent assaults in the prison yard continued unabated despite non-deadly force tactics, Runyon used deadly force to secure the safety of the inmates he believed to be defenseless and at the risk of serious bodily injury. The State Department Shooting Review Board found that Runyon acted within established guidelines. We cannot say that Runyon's conduct was unreasonable under the circumstances. Therefore, Runyon is entitled to qualified immunity from the Torres estate's claims arising out of the prison yard shooting.

*Torres v. Runyon*, 80 Fed. Appx. 594, 596-97 (9th Cir. 2003)

Much like CO Runyon, Defendant Trainee Ramos provided multiple verbal warnings to inmates Arevalo and Perez before using the prison issued shotgun. Trainee Ramos did not have access to a taser, pepper spray or baton prior to the shotgun rounds, but even had he been in possession of other force tools he would not have been able to use them from his distance. Further, prior to firing live birdshot rounds, Ramos fired a warning, blank shot to get the attention of the two inmates. Unfortunately, just like the inmates in *Torres*, inmates Arevalo and Perez were unwavering in their intent to harm each other and they continued to fight both before and during the shots. Much like Officer Runyon, Trainee Ramos believed his actions were the only thing keeping the two inmates from seriously injuring or even killing each other.

Defendant Ramos's actions are far removed from the clear instance of excessive deadly force employed by a corrections officer as was the case in *Anderson v. Virga*, 2017 U.S. Dist. LEXIS 118130 (E.D. Cal. July 27, 2017). There, Corrections Officer Villasenor was assigned to the gun tower at California State Prison where he witnessed plaintiff Anderson being attacked by a group of inmates who stabbed Anderson at least fifteen (15) times. Despite inmate Anderson being the victim, not showing any aggressive tendencies, and the fact that the disruption was

ended, Officer Villasenor aimed and shot towards Anderson's head with a 40 mm sponge round. Fortunately, Anderson was able to avoid a headshot and the round struck him in the upper shoulder. In coming to the conclusion that Officer Villasenor's actions were excessive and unreasonable, the Court stated:

> In this case, plaintiff has stated a cognizable claim that Villasenor maliciously and sadistically shot him for the very purpose of harming him. Under factor one, plaintiff has adequately alleged that Villasenor did not need to shoot him with the block gun. While it is undisputed that two inmates stabbed him, he alleges that he was the victim of the assault and did not fight back. Likewise, he alleges that he had broken free from the inmates and the assault was over when Villasenor shot him . . . .
>
> Under factor two, he has adequately alleged that the severity of the fight did not warrant the magnitude of the force. Again, he alleges that he did not fight back and that the assault had ended when Villasenor shot him. Furthermore, he alleges that a block gun is the second highest level of force after a firearm at SAC and that Villasenor had less drastic options at his disposal, such as pepper spray . . . .
>
> Here, it was clearly established by November 11, 2013 that Villasenor's force was excessive. For starters, taking plaintiff's factual allegations in the most favorable light, common sense says that Villasenor used excessive force. After all, plaintiff alleges that Villasenor harbored animosity towards him, taunted and swore at him, stood by idly when other inmates stabbed him, and shot him after the attack was over 'for good measure,' aiming for his head.
>
> Furthermore, it was clearly established by the date of the incident that a prison guard may not deliberately shoot an inmate with a block gun for the purported purpose of suppressing a prison disturbance when it had already ended and the inmate did not participate in it or otherwise act aggressively. The Supreme Court established in *Hudson* that 'malicious and sadistic use of deadly force by a prison official against a prisoner constitutes cruel and unusual punishment under the Eighth Amendment.' *Estate of Adams v. Gomez*, No. 96-16423, 1998 U.S. App. LEXIS 297, 1998 WL 4079, at *3 (9th Cir. Jan. 7, 1998) (unpublished memorandum) (citing *Hudson*, 503 U.S. at 9). Applying this holding, the *Gomez* court held that it was unreasonable for a prison guard to 'purposefully shoot a prisoner engaged in a fist fight, aiming at his head, after giving a verbal warning to stop fighting, even when the fight did not pose a significant danger to either prisoner.' *Id*.
>
> Here, like in *Gomez*, plaintiff alleges that Villasenor deliberately shot him, aiming for his head. Furthermore, as in *Gomez*, he alleges that the altercation did not pose a danger to him or the other inmates on the yard because it had already ended when Villasenor shot him. Additionally, whereas the guard in *Gomez* verbally warned the inmates to stop fighting, there is no indication that Villasenor gave such a warning. Thus, based on the alleged facts, Villasenor had even less of a need to resort to force that the guard in *Gomez*. Accordingly, Villasenor's conduct was unreasonable under the alleged circumstances.

*Anderson v. Virga*, 2017 U.S. LEXIS 118130, at *9-15 (E.D. Cal. July 27, 2017).

In this case, Trainee Ramos did not shoot at either inmate for the sole purpose of harming

them. Rather, Ramos observed both inmates attempting to seriously injure each other and acted so as to end the threat the two inmates posed one another. Importantly, (1) the fight was ongoing, (2) both prisoners failed to comply with any of the several orders to stop, (3) Defendant Ramos *did not* aim for either inmates' head, (4) despite being hit with several rounds of birdshot as well as a blank round, the inmates continued to fight through four (4) individual live shots, and (5) Defendant Ramos did not know either inmate and there is no evidence Defendant Ramos bore any ill will for them. *See* **Exhibit _**, at p. 67, ll. 15-23.

Plaintiffs will surely focus their argument on factor three (3) pertaining to the extent of the injury inflicted by Trainee Ramos's use of force, but as explicitly stated above, the extent of the injury inflicted is but one of five factors to be analyzed when determining whether a use of force violates the Eighth Amendment. Certainly, it is tragic that Officer Ramos's use of force resulted in the death of Inmate Perez, if had he not acted, it is more than likely that either Inmate Perez or Inmate Arevalo would have fallen to the ground and been seriously or even mortally wounded by the other inmate. Given the totality of the circumstances, Officer Ramos acted reasonably in his use of force.

(b) **Expert John Peters' opinion concerning reasonableness of force.**

On August 18, 2021, Defendant Ramos retained the services of police and correctional officer expert, John Peters. Dr. Peters prepared a detailed report containing various expert opinions on a wide range of topics, including the following:

(1) Trainee Ramos followed nationally recognized threat assessment guidelines prior to discharging his shotgun, which is consistent with generally accepted officer safety practices.

(2) Inmates Perez and Arevalo used deadly force options against one another, which had to be stopped by correctional officers.

(3) Trainee Ramos intentionally aimed and discharged his shotgun at the middle of Inmates Perez and Arevalo who were aggressively fighting but did not intentionally mean to strike Inmate Perez and nothing in the documents indicated Trainee Ramos used force maliciously or sadistically.

(4) Trainee Ramos used many force options that were consistent with national training

standards, national guidelines, national force standards, Nevada force guidelines, and NDOC *Use of Force* policy given the totality of the circumstances created by Inmates Perez and Arevalo.

With regard to the first opinion described above, Mr. Peters provided the following analysis:

> In the widely-adopted and widely-accepted law enforcement officer safety textbook, **The Tactical Edge: Surviving High Risk Patrol**, it instructs officers 'when you answer any call or approach any street situation, three terms – *the triad of Tactical Thinking* – should be at the forefront of your conscious thought: problem area; area of responsibility; and focus point' (Remsberg, 1986, p. 55), Remsberg defined *problem area* as 'any *PERSON, OBJECT,* or *SITE that may produce a HAZARD to you'* (p. 55). Based upon my education, training, and experience, Inmates Perez and Arevalo met the criterion of being a problem area that Trainee Ramos quickly identified as potential threats in his initial assessment of the situation . . . .

*See John Peters' Expert Rebuttal Opinion*, attached hereto as **Exhibit _**.

With regard to the second opinion described above, Mr. Peters provided further detail:

> After Corrections Officer Castro had opened the shower door, Inmate Perez ran to Inmate Arevalo, jumped at him, and began kicking him (Ramos deposition, 84: 9-11; 85: 1; 94: 24). Per Trainee Ramos, both inmates were kicking each other while they remained handcuffed (86: 17). Even after Inmate Perez told Inmate Arevalo, 'I can't breathe.' Inmate Arevalo replied, 'I don't care if you can't breathe,' and continued kicking Inmate Perez (88: 8-10, 18; 94: 24; 99: 6-7). 'I [Trainee Ramos] fired because I'm supposed to stop them from hurting or killing each other' (88: 22-24).
>
> Based upon my education, training, and experience, Inmates Perez and Arevalo began kicking one another, and even after Inmate Perez was physically incapacitated, Inmate Arevalo continued to kick him. The way kicks were described appear to be the use of deadly force, which is supported by Trainee Ramos's testimony.

*Id.*

With regard to the third opinion described above, Mr. Peters provided further detail:

> Trainee Ramos followed NDOC protocol when he fired a 'popper' round [blank] at Inmates Perez and Arevalo after yelling at them to stop fighting (Ramos deposition, 87: 22). When he discharged the 'blank' round, Trainee Ramos, 'aimed out at an angle away from then [sic]' before pulling the trigger of the shotgun (91: 10-11). When the two inmates continued their aggressive assault on one another, Trainee Ramos testified, 'I aimed center mass **in between both** of the inmates' [emphasis added] (92: 21-22; 95: 17-18; 98: 23-24; 99: 12-16). Per Correctional Officer Castro, Inmates Perez and Arevalo continued their fighting and kicking after Trainee Ramos had discharged his shotgun (Castro deposition, 71: 23; 72: 6, 8; 73: 13, 17-18) . . . .
>
> A content analysis of Trainee Ramos' testimony, investigation report, training documents, and other testimony from officers, nowhere is there an

> indication that Trainee Ramos fired his shotgun maliciously or sadistically. Rather, he fired to cause Inmates Perez and Arevalo to stop their violent assaultive behaviors on one another.

*Id*.

Finally, with regard to the fourth opinion described above, Dr. Peters determined that the inmates posed a substantial threat to the operational security of the prison, they posed a deadly threat to one another as well as to Officers Smith and Castro, Officer Ramos correctly concluded that intervention was necessary to stop the inmate fight, and Officer Ramos utilized several methods to de-escalate the situation up to and through each of the shots he fired, including, (1) officer presence, (2)verbal commands, and (3) discharge of blank rounds. Based on Dr. Peters' training and experience, Officer Ramos complied with national training standards, guidelines, Nevada force guidelines, and NDOC policy. *Id*.

Given Trainee Ramos's answers to Interrogatory requests and his deposition testimony, as well as expert Peters' opinions and analysis of the totality of the circumstances, there is simply no evidence to indicate that Officer Ramos acted with malicious or sadistic intent. Trainee Ramos witnessed two inmates who – based their response to warnings, lawful commands, warning shot, and even the firing of live ammunition – were unwilling to stop, unwilling to accede to the Officers' attempts to peacefully de-escalate the situation, and were bent on maiming or killing each other. Neither of the inmates could use their arms, but that made the situation more dangerous as their balance was precarious and any fall to the ground was likely to result in grievous injury or death. Even then, Trainee Ramos only used force after the inmates refused to heed the multiple verbal commands offered by Officers Ramos, Smith, and Castro and only after first firing the popper round. There can be no doubt as to the Inmate Arevalo and Inmate Perez' intent because they continued their violent fight even in the midst of the birdshot rounds. Finally, Trainee Ramos continued to fire only because the inmates continued to fight. Considering the totality of the circumstances, in contrast to Plaintiffs' claims, Trainee Ramos was working to de-escalate the inmates' fight, and was attempting to protect the inmates from each other. Without evidence to show that Officer Ramos acted with malicious or sadistic intent, he is entitled to summary judgment.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**2. Defendant Ramos is entitled to Qualified Immunity.**

Individuals sued for a violation of civil rights pursuant to 42 U.S.C. §1983 are entitled to "qualified immunity." Qualified immunity protects all government officials and employees who are being sued in their individual capacities for actions taken within the scope of their discretionary authority while acting under color of state law. Discretionary authority includes all acts undertaken pursuant to the performance of the official's duties that are within the scope of his or her authority. The qualified immunity defense applies to monetary damages, including claims for costs and expenses, and equitable relief. Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits. *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

Government actors performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011); see also *Mullenix v. Luna*, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015). Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). A defendant is entitled to immunity under this objective reasonableness standard if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). If it is at least arguable, for qualified immunity purposes, that the officers' actions were within the law, then the officers are entitled to qualified immunity. *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2096, 182 L. Ed. 2d 985 (2012).

Qualified immunity serves important policy purposes: First, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and protects "all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S.

Ct. 3, 4 (2013)(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Secondly, it enables courts to avoid deciding constitutional questions unnecessarily – if a right was not clearly established, a court need not determine whether the officers' actions were objectively reasonable. *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012).

Twenty (20) years ago, in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), the Supreme Court cautioned that the qualified immunity analysis should not be addressed at a high level of generality, but instead should focus on the "specific context" of the case. See also *Sheehan v. Cnty. of San Francisco*, 135 S. Ct. 1765, 1775-76, 191 L. Ed. 2d 856 (2015) (Supreme Court repeatedly told reviewing courts not to define clearly established law at a high level of generality). Recently, the Supreme Court again warned about too generally evaluating qualified immunity,

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases, See, e.g., City and County of San Francisco v. Sheehan, 575 U.S. ___, ___, n. 3, 135 S. Ct. 1765; 191 L. Ed. 2d 856, 866 (2015) (collecting cases). The Court has found this necessary both because qualified immunity is important to "'society as a whole,'" ibid., and because as "'an immunity from suit,'" qualified immunity "'is effectively lost if a case is erroneously permitted to go to trial,'" Pearson v. Callahan, 555 U. S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

*White v. Pauly*, 137 S. Ct. 548, 551-52,196 L. Ed 2d 463 (2017).

To overcome a claim of qualified immunity, the plaintiff must allege facts showing that the official's conduct violated a constitutional right and must also demonstrate that the right violated was clearly established. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). The plaintiff bears the burden of proof on both points. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Cruz v. Kauai County*, 279 F.3d 1064, 1069 (9th Cir. 2002).

For a right to be clearly established, its contours "must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In the context of a qualified immunity analysis, it is not enough that there is a generally established prohibition against the conduct identified. Instead, the right must be "clearly established" in a more particularized sense. *Saucier*, supra, 533 U.S. at 202; *San Jose Charter of the Hells Angels*

*Motorcycle Club v. City of San Jose*, 402 F. 3d 962 (9th Cir. 2003). In other words, the "right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012); see also *Plumhoff v. Rickart*, 134 S. Ct. 2012 (2014) ("A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violated it.") "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate'". *Plumhoff*, 134 S. Ct. at 2023.

The "clearly established" approach is designed to "to ensure that officers are given fair notice of the law that they are required to uphold." *Rosenbaum v. Washoe Cnty*., 663 F.3d 1071, 1078 (9th Cir. 2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Defendant officers do not get fair notice if their qualified immunity defense is evaluated too generally. The danger of general evaluation has been discussed time and time again by the Supreme Court,

> As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case. Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed 2d 523 (1987). Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violations of extremely abstract rights." Id., at 639, 107 S. Ct 3034, 97 L. Ed. 2d 523.

*White*, supra, 137 S. Ct. at 552.

Relatively recently, the United State Supreme Court took a few opportunities to emphasize the "clearly established law" component of qualified immunity. Each of the cases support Trainee Ramos' request for immunity in this case. *See generally District of Columbia v. Wesby*, 138 S. Ct. 577, 199 L. Ed. 453 (2018) (Unless party opposing qualified immunity illustrates a case directly on point, or robust consensus of cases illustrating clearly established law, party requesting qualified immunity is entitled to its protection); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018) (To overcome qualified immunity, the officer's actions must be "obviously" in violation of clearly established law, or the opposing party must present a case directly on point, or robust consensus of cases illustrating said behavior violated clearly established law); *see also Franklin v. Mally*, 2019 U.S. Dist. LEXIS 103602 (N.D. Cal. 2019) (general legal statements not

enough to deny the protections of qualified immunity); *see also Taylor v. Riojas*, 141 S. Ct. 52, 208 L. Ed. 2d 164 (2020); *Sandoval v. Cty. of San Diego*, 985 F.3d 657 (9th Cir. 2021).

Defendant Trainee Ramos maintains that he did not violate Carlos Perez's Eighth Amendment rights. However, should this Court determine otherwise, he is entitled to qualified immunity. As illustrated above, in order to overcome Trainee Ramos's entitlement to qualified immunity, Plaintiffs must present either (1) a case directly on point that places Officer Ramos on notice that at the time of the incident, his actions were in violation of clearly established law, or (2) a robust consensus of cases illustrating the same. Plaintiffs will be unable to meet this standard. Given the totality of the circumstances, other reasonable officers in Trainee Ramos's position would have acted in the same manner. In fact, both Officers Castro and Smith agreed that the inmates were unwilling to comply with the several verbal commands and warnings. Trainee Ramos was confronted by two inmates seemingly intent on causing severe or even mortal injury on one another regardless of what injuries they sustained in the process. As illustrated above, Officer Ramos believed that it was necessary to use the birdshot shotgun as if either inmate lost their footing, the still standing inmate would find it easy to stomp and kick the grounded inmate's head, potentially causing severe or even mortal injury.

Under the totality of the circumstances, and given the facts described above, other reasonable law enforcement officers would have acted in the same manner as Trainee Ramos. Without precedent illustrating that Ramos' actions were in violation of clearly established law, he is entitled to Qualified Immunity.

B. **State Law Causes of Action**

1. **Defendant Ramos is entitled to Discretionary Immunity.**

In addition to the "qualified immunity" defense described above, Trainee Ramos is entitled to discretionary immunity pursuant to Nevada Revised Statute 41.032 for Plaintiffs' claims based upon state tort law. The Nevada statute provides that no action may be brought against an officer or employee of the state or any of its agencies or political subdivisions "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the state or any of its agencies or political subdivisions or any officer or employee of any of these,

whether or not the discretion involved is abused." *Davis v. City of Las Vegas*, 478 F. 3d 1048, 1059 (9th Cir. 2007) quoting *Maturi v. Las Vegas Metro. Police Dep't*, 110 Nev. 307 (1994).

Pursuant to the statute, Nevada has retained sovereign immunity for its political subdivisions and officers where they are sued based upon acting in their governmental and discretionary functions. *Andolino v. State*, 97 Nev. 53, 624 P.2d 7 (1981). Discretionary acts are defined as events requiring personal deliberation, decision and judgment. *Parker v. Mineral County*, 102 Nev. 593, 729 P.2d 491 (1986). Law enforcement officers fall within this penumbra and their actions are, under this law, protected as being discretionary where the act at issue requires "personal deliberation, decision and judgment," rather than "obedience to order, or the performance of a duty in which the officer is left no choice but his own." *Sandoval v. Las Vegas Metro. Police Dep't,* 756 F. 3d 1154, 1168 (9th Cir. 2014); quoting *Davis*, 478 F.3d at 1059; *see also*, *Coty v. Washoe County*, 108 Nev. 757, 839 P.2d 97 (1992). Where an officer's actions are "attributable to bad faith, immunity does not apply whether an act is discretionary or not." *Falline v. GNLV Corp*., 107 Nev. 1004, 1009 (1991).

Here, there is no question that Trainee Ramos utilized his own deliberation, decision and/or personal judgment in his choice to use the birdshot shotgun. As illustrated above, Ramos witnessed two inmates brutally attacking one another, who were unwilling to cease because of officer presence, lawful orders, warnings that they would be shot, the firing of a popper round, or the firing of live rounds. In an effort to protect the two inmates from each other, Trainee Ramos exercised his judgment to sue the birdshot to restore order. Trainee Ramos provided several verbal warnings and commands, which went unanswered and only after it was clear that the inmates could not be swayed from their confrontation, did Ramos fire the first blank round, which was also ineffective. Officer Ramos attempted to utilize every avenue available before resorting to the use of live birdshot, but even then, he continued to provide verbal warnings and commands. Officer Ramos discontinued his use of the shotgun when the inmates stopped fighting. Under these facts, no reasonable juror could conclude that Trainee Ramos' actions constituted deliberate and willful disregard for the law or were motivated by malice or animosity towards Plaintiff. Without additional evidence to the contrary, Trainee Ramos is entitled to Discretionary Immunity.

**2. Defendant Ramos is not liable for Wrongful Death.**

In Nevada, individuals' wrongful death claims are controlled by Nevada Revised Statute 41.085, which states in relevant part:

> **2.** When the death of a person, whether or not a minor, is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death, or if the wrongdoer is dead, against the wrongdoer's personal representatives, whether the wrongdoer died before or after the death of the person injured by the wrongdoer. If any other person is responsible for the wrongful act or neglect, or if the wrongdoer is employed by another person who is responsible for the wrongdoer's conduct, the action may be maintained against the other person, or if the other person is dead, against the other person's personal representatives.

NRS 41.085.

Here, Plaintiffs' wrongful death claim fails as pursuant to the reasoning described herein, Trainee Ramos *did not* act wrongfully or neglectfully with respect to Inmate Perez's health and safety. Plaintiffs may argue that but for Trainee Ramos' use of the shotgun, Inmate Perez would still be alive, but such assumption is not supported. Plaintiffs may claim, that Trainee Ramos had other force options available to him, but he did not. As illustrated in Dr. Peters' rebuttal report, Trainee Ramos followed well-established procedures, and NDOC policy when he utilized the birdshot shotgun. Plaintiffs may argue that the inmates were less dangerous because their wrists were cuffed behind their backs, but this is not true either. Trainee Ramos believed that because the inmates did not have access to their arms, their sense of balance was precarious, as was their ability to get back up once down. His belief was confirmed by his observations when Inmate Perez went to the ground and Inmate Arevalo began to kick him in the head. Trainee Ramos did not act wrongfully in using force. Rather, he acted with the intent to protect both inmates from severely and/or mortally wounding one another. Without further evidence illustrating that Trainee Ramos acted wrongfully or with neglect, Plaintiffs are not entitled to wrongful death damages.

**3. Officer Ramos is not liable for Intentional Infliction of Emotional Distress.**

Generally, the elements of Intentional Infliction of Emotional Distress are (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional

distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation. *Star v. Rabello*, 97 Nev. 124, 125 (1981) (citing *Cervantes v. J.C. Penney, Inc.,* 595 P.2d 975 (Cal. 1979)).

Here, Plaintiffs' Intentional Infliction of Emotional Distress claim fails at its outset as there is no evidence that Trainee Ramos acted with extreme and outrageous conduct with the intention or reckless disregard for Plaintiffs' emotional distress. Without reiterating all of the facts described herein, Trainee Ramos acted with the intent to protect both inmates from suffering severe or fatal injuries at the hands of one another. Only after the inmates made it clear they were unwilling to comply with any of the officers' orders, warnings or commands, did Trainee Ramos utilize the birdshot shotgun. Without additional evidence illustrating that Trainee Ramos' actions were extreme and/or outrageous, he is not liable for Intentional Infliction of Emotional Distress and is entitled to summary judgment.

V. **CONCLUSION**

Based on the foregoing facts, argument, and legal precedent cited above, Plaintiffs cannot satisfy their burden as to any of their claims and Defendant is entitled to summary judgment.

VI. **EXHIBITS**

A. Diagram Depicting Pod 2B.

B. Segregated Housing Policy.

C. NDoC Use of Force Policy.

D. Investigation Detail Report.

E. Officer Castro's Deposition.

…

…

…

…

…

…

…

F. Officer Smith's Deposition.

G. Corrections Officer Castro's Incident Statement.

H. Corrections Trainee Ramos' Deposition.

I. Corrections Trainee Ramos' Answers to Interrogatories.

DATED this 25th day of October, 2021.

LEWIS BRISBOIS BISGAARD & SMITH LLP

/s/ Robert W. Freeman

Robert W. Freeman
Nevada Bar No. 3062
E. Matthew Freeman
Nevada Bar No. 14198
6385 S. Rainbow Blvd, Suite 600
Las Vegas, Nevada 89118
Attorney for Defendant
Corrections Trainee Officer
Raynaldo-John Ramos

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of October, 2021, I electronically filed the **DEFENDANT CORRECTIONS OFFICER TRAINEE RAYNALDO-JOHN RAMOS'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court through Case Management/Electronic Filing System.

Paola M. Aremeni, Esq.
CLARK HILL PLLC
3800 Howard Hughes Parkway
Suite 500
Las Vegas, Nevada 89169
Attorneys of Plaintiff

Aaron D. Ford, Esq.
Steven G. Shevorski, Esq.
Akke Levin, Esq.
Kiel B. Ireland, Esq.
NEVADA ATTORNEY GENERALS OFFICE
100 N. Carson Street
Carson City, Nevada 89701
Attorneys for Defendants
the State of Nevada
Director James Greg Cox, Warden, Dwight Neven,
Assistant Warden Timothy Filson, Lieutenant Ronald Oliver

Jeffrey F. Barr, Esq.
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway
Suite 200
Las Vegas, Nevada 89169
Attorneys for Defendant
Corrections Officer Isaiah Smith

Craig R. Anderson, Esq.
James A. Beckstrom, Esq.
MARQUIS AURBACH & COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorneys for Defendant
Corrections Officer Castro

/s/ Kristen Freeman
Employee of LEWIS BRISBOIS BISGAARD & SMITH LLP