# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| VICTOR PEREZ, as Special Administrator of the Estate of Carlos Perez, deceased, and as the Guardian Ad Litem for S.E.P. and A.I.P., | Case No.: 2:15-cv-01572-APG-DJA |
| Plaintiff | **Order** |
| v. | [ECF Nos. 146, 147, 153, 159, 201] |
| JAMES GREG COX, et al., | |
| Defendants | |

This case arises from the death of inmate Carlos Perez, who was shot with birdshot by a correctional officer while in the custody of the Nevada Department of Corrections (NDOC) at High Desert State Prison (HDSP). The plaintiff is Perez's brother, Victor Perez, as special administrator of Perez's estate and as guardian ad litem to minors S.E.P. and A.I.P (collectively, the plaintiffs). Defendants Jeff Castro, Isaiah Smith, and Raynaldo-John Ramos are the three correctional officers involved in the shooting. Defendant Ronald Oliver arrived on the scene after the shooting. At the time of the incident, defendant Greg Cox was NDOC's director, defendant Dwight Neven was HDSP's warden, and defendant Timothy Filson was the assistant warden. Defendant State of Nevada operates NDOC.

The plaintiffs asserted claims against all defendants under 42 U.S.C. § 1983 for excessive force, deliberate indifference, and loss of familial association. They also sued all defendants under Nevada law for wrongful death and intentional infliction of emotional distress (IIED). Finally, they asserted a claim for negligent training, supervision, and retention against Cox and Neven. In four separate motions, the defendants move for summary judgment on all remaining claims on a variety of grounds.

## I. BACKGROUND

Perez was an inmate at HDSP housed in unit 2A/B, which is a two-story unit with showers separating the A and B sides of the cells. ECF No. 146-2 at 3.  Unit 2A/B is a segregation unit, which requires special handling of the inmates. *Id.*  Inmates were supposed to be let out only one at a time and be restrained with handcuffs behind their backs any time they were let out of their cells. *Id.*

Under normal procedure, to escort an inmate to the shower, the correctional officer advises the inmate that it is his turn, and the inmate puts his hands behind his back to be handcuffed through the cell's food flap. *Id.* at 4.  The correctional officer then signals the officer in the control room (or "bubble"[1]) to open that cell door. *Id.*  The correctional officer then escorts the inmate to the shower, where the inmate is locked in and unhandcuffed. *Id.*  When the inmate is done showering, the process is reversed to take him back to his cell, again in handcuffs and individually escorted. *Id.* at 4-5.  Despite this procedure, defendant correctional officer Castro testified that he and other correctional officers regularly failed to individually escort the inmates, instead using a procedure of "pitch and catch," where they would allow the inmate to walk back to his cell alone and then the bubble officer would close the cell door. ECF Nos. 146-2 at 5; 176-5 at 21-23.

On November 12, 2014, Castro let Perez out of the shower to walk back to his cell unescorted. ECF No. 146-2 at 5-6.  While Perez was returning to his cell, Castro handcuffed another inmate, Andrew Arevalo, who was also in a shower. *Id.*  Castro opened the shower door, and Arevalo ran down the hall. *Id.* at 6.  Castro saw that Perez was still in the hall, so he started

---

[1] The bubble is an enclosed control room that allows the officer within to observe the unit. *See* ECF Nos. 147-3 at 12, 16; 146-2.

1   yelling at Arevalo to get on the ground. *Id.*  Arevalo did not comply and ran up to Perez. *Id.*

2   Perez and Arevalo, who were handcuffed behind their backs, started kicking each other.[2] *Id.*

3   According to another inmate, Brandon Castner,[3] Arevalo and Perez were only tentatively kicking

4   at each other because neither one wanted to fall and be vulnerable to further attack. ECF No.

5   175-8 at 4.  Castro continued to order Arevalo and Perez to the ground, but neither complied.

6   ECF No. 146-2 at 7.

7          Defendant correctional officer Smith was on the lower level in unit 2A/B. *Id.* at 16.  He

8   heard inmates yelling and saw the men kicking at each other, although he could not tell if they

9   were making contact. *Id.*  He gave some verbal commands but did not go upstairs immediately

10  because he was securing an inmate on the lower level. *Id.* at 12, 18.  Once he locked that inmate

11  in a cell, he ran upstairs to assist. *Id.* at 18.

12         Defendant Ramos was the correctional officer in the bubble. *Id.* at 7.  Ramos ordered the

13  inmates to get on the ground. *Id.* at 7.  They did not comply so Ramos grabbed a shotgun. *Id.* at

14  7, 31.  Castro heard Ramos rack the shotgun, so he backed up because he did not want to be hit

15  by shotgun pellets. *Id.* at 7, 68.  Ramos ordered the inmates to get on the ground or he would

16  shoot. *Id.* at 31.  The inmates continued to fight, so Ramos fired a blank round (referred to as the

17

18  _____

19  [2] There is some dispute about whether Perez or Arevalo was let out of the shower first and which inmate instigated the fight, but no party argues that these disputes are material to resolution of the pending motions.

20  [3] Defendant Smith objects to Castner's testimony as hearsay because during Castner's

21  deposition, he read his prior written statement into the record rather than giving a firsthand account. ECF No. 194 at 6.  However, "[a]t the summary judgment stage, [I] do not focus on the admissibility of the evidence's form.  [I] instead focus on the admissibility of its contents."

22  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  Castner could testify at trial about what he witnessed.  I therefore overrule Smith's hearsay objection to Castner's testimony.  Smith's

23  arguments about whether Castner is credible are not suitable for me to resolve at summary judgment. *See Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005).

1  "popper" round), but the inmates did not stop fighting. *Id.* at 8, 32.  Smith arrived at the top of

2  the stairs just as the popper round went off. *Id.* at 18.

3         Castro, Ramos, and Smith again ordered the inmates to the ground, but they did not

4  comply. *Id.* at 8, 18, 31-32.  Perez and Arevalo continued to kick at each other, and Arevalo tried

5  to ram Perez with his shoulder. *Id.* at 18-19.  According to inmate Castner, Castro and Smith

6  yelled at Ramos to shoot at the fighting inmates. ECF No. 175-8 at 4-5.  Castro and Smith deny

7  that they told Ramos to shoot or otherwise signaled to him to shoot. ECF Nos. 146-2 at 68; 175-9

8  at 15; 176-5 at 11.  However, they both admit that throughout the incident, they never told or

9  signaled Ramos not to shoot or to stop shooting. ECF Nos. 175-9 at 15; 176-5 at 11; 146-2 at 47

10  (Ramos testifying that he could not hear if anyone told him to stop but no one gave him a visual

11  cue to stop).

12         Within five to fifteen seconds of firing the popper round, Ramos fired a round of live

13  birdshot. ECF No. 146-2 at 8, 19, 32, 35.  Ramos stated that he fired the first round "center

14  mass" (meaning at chest height) between the two inmates because he could not do a skip shot off

15  the ground based on his position relative to Perez and Arevalo. *Id.* at 36, 46.  Ramos testified at

16  his deposition that he knew that shooting center mass with a live round constituted deadly force.

17  *Id.* at 37.  Castro testified that Perez and Arevalo continued kicking each other even though one

18  or both must have been hit because Castro saw blood on at least one of the inmates' lower legs.

19  *Id.* at 8.  But according to inmate Castner, whose account differs from the correctional officers'

20  versions, Perez fell down face first after this first live round and did not move again. ECF No.

21  175-8 at 5.

22         According to the correctional officers, Castro and Ramos again ordered the inmates to the

23  ground, but Perez and Arevalo continued kicking, and within another five to twenty seconds,

1   Ramos fired a second live round of birdshot "center mass in between both of the inmates." ECF

2   No. 146-2 at 39; *see also id.* at 8, 19, 32, 38.  Castro saw more blood on the inmates' lower legs,

3   but they nevertheless continued to kick at each other. *Id.* at 8; *see also id.* at 19 (Smith testifying

4   that the inmates continued to fight after the second live round).  After the second live round,

5   Castro went to the office to retrieve gloves because he did not want to be contaminated with

6   anything if he was going to assist in separating the inmates once help arrived. *Id.* at 9.

7          About fifteen to twenty seconds after the second live round, Ramos fired a third live

8   round, again center mass between the two inmates. *Id.* at 39-40, 42.  Castro heard the third shot

9   just as he was approaching the office. *Id.* at 9.  While in the office, Castro called a lieutenant to

10  report that there were shots fired in unit 2A/B. *Id.*

11         According to Ramos, the inmates were still kicking and kneeing each other after the third

12  live round. *Id.* at 32.  Perez then leaned on Arevalo and stated that he could not breathe, to which

13  Arevalo responded that he did not care. *Id.* at 32, 40.  Castro came out of the office and saw both

14  Arevalo and Perez on the ground. *Id.* at 9.  According to Castro, Arevalo was elbowing Perez in

15  the head. *Id.*  Castro yelled at Arevalo to stop. *Id.* at 10.  At this point, Castro saw blood on the

16  inmates' entire bodies. *Id.*  According to Smith, the third live round seemed to have some effect

17  on the inmates because although they were still moving, they "started slowing down," and

18  Arevalo was on his knees while Perez was on the ground. *Id.* at 19.

19         Ramos was out of ammunition, so he retrieved more rounds in the bubble. *Id.* at 32.

20  According to Ramos, at this point, Perez was on his knees slumped forward, while Arevalo was

21  sitting but still kicking Perez. *Id.* at 32, 43.  Ramos again told the inmates to stop or he would

22  shoot. *Id.* at 32.  Ramos testified that Arevalo continued to kick Perez in the face, so he fired the

23  fourth live round between them. *Id.* at 10, 32, 43.  Approximately 30 - 45 seconds passed

1   between the third and fourth live rounds. *Id.* at 42.  After the fourth live shot, Arevalo ceased

2   hitting Perez and yelled out in some fashion to indicate he had been hit. *Id.* at 10-11, 32.  At that

3   point, Ramos saw blood on both inmates. *Id.* at 43.

4       According to Castro, right after the fourth shot, several other correctional officers and

5   medical personnel arrived to help. *Id.* at 11, 68.  Before other personnel arrived, Castro did not

6   provide any medical attention to Arevalo or Perez even though he could see that Perez was badly

7   injured. ECF No. 176-5 at 13.  Correctional officer Dustin Mumpower arrived on the scene and

8   saw that no medical aid was being provided to the inmates. ECF Nos. 176-11 at 4; 176-12.

9   Mumpower noted that Perez was having difficulty breathing and he was gurgling, so Mumpower

10  turned him on his side and monitored his pulse until the medical staff arrived. ECF No. 176-12.

11  Medical staff arrived and performed CPR, but Perez died from his injuries. *Id.*; ECF No. 176-17.

12  His death certificate listed the cause of death as "multiple shotgun wounds of head, neck, chest

13  and arms." ECF No. 146-2 at 47.[4]

14      Following the incident, Castro and Smith were placed on administrative leave pending an

15  investigation and both later resigned. ECF Nos. 146-2 at 12; 176-5 at 26; 175-9 at 18.  Ramos

16  was terminated, charged criminally, and entered a plea agreement to resolve the charges. ECF

17  No. 176-11; *see also* ECF Nos. 147-6 at 17, 115; 159-10.

18  **II.  LEGAL STANDARD**

19      Summary judgment is appropriate if the movant shows "there is no genuine dispute as to

20  any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

21  56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."

22

23

_____

[4] Arevalo lost an eye due to the shooting. ECF No. 146-2 at 46-47.

1  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence

2  is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

3        The party seeking summary judgment bears the initial burden of informing the court of

4  the basis for its motion and identifying those portions of the record that demonstrate the absence

5  of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

6  burden then shifts to the non-moving party to set forth specific facts demonstrating there is a

7  genuine dispute of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

8  Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a

9  genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and

10  reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of

11  Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

12  **III.  SECTION 1983[5]**

13        To establish liability under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a

14  right secured by the Constitution and laws of the United States, and must show that the

15  deprivation was committed by a person acting under color of state law. *Broam v. Bogan*, 320

16  F.3d 1023, 1028 (9th Cir. 2003).  The defendants do not contest that they acted under color of

17  state law.  Thus, the dispute centers on whether they violated Perez's constitutional rights.

18        The parties also dispute whether the defendants are entitled to qualified immunity.  To

19  allay the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit

20  officials in the discharge of their duties," government officials performing discretionary

21  functions may be entitled to qualified immunity for claims made under § 1983. *Anderson v.*

22

23

---

[5] I previously dismissed the § 1983 claims against the State of Nevada, and against Cox, Neven, Filson, and Oliver in their official capacities. ECF No. 107 at 12.

*Creighton*, 483 U.S. 635, 638 (1987).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In ruling on a qualified immunity defense, I consider whether the evidence viewed in the light most favorable to the nonmoving party shows the defendant's conduct violated a constitutional right. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  If the plaintiff has shown the defendant violated a constitutional right, I then must determine whether that right was clearly established. *Id.*  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  To show the right at issue is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, --- U.S. ----, 138 S. Ct. 1148, 1152 (2018) (quotation omitted).  I make this second inquiry "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.  An officer will be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. *Wilkins*, 350 F.3d at 955.

**A.  Excessive Force**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. U.S. Const. amend. VIII.  "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted).  To establish an Eighth Amendment violation based on a use of force, a plaintiff must show the amount of force used was more than de minimis or otherwise involved force "repugnant to the conscience of

mankind." *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (quotation omitted).  Additionally, the plaintiff must show the prison official acted with a culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

When an Eighth Amendment claim is based on an allegation that a prison official used excessive physical force, the culpable state of mind inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," rather than a deliberate indifference standard. *Hudson*, 503 U.S. at 6-7 (citing *Whitley*, 475 U.S. at 320-21).  "[P]rison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as . . . the safety of the inmates themselves." *Whitley*, 475 U.S. at 320 (quotation omitted).  Consequently, the deliberate indifference standard "does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Id.*  The court considers several factors in determining whether force was applied maliciously and sadistically to cause harm, including:

> (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.

*Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).  The question is "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321.

////

1        1.  Ramos

2        Ramos argues that he was justified in using the shotgun because some use of force was

3   necessary to break up the fight and the shotgun was the only means of force available to him

4   given his position relative to the fighting inmates and after lesser means, such as verbal

5   commands and firing the popper round, failed.  Ramos contends that the level of force was

6   appropriate because if either inmate fell, he would be at risk of serious bodily injury or death

7   from the other inmate potentially stomping on him in a vulnerable position.  Alternatively, he

8   contends he is entitled to qualified immunity.

9        The plaintiffs respond that Ramos resorted first to the shotgun instead of using other

10  means of control, such as calling for help or allowing the two floor officers to separate the

11  inmates.  They contend that Ramos shot center mass at the two inmates despite his awareness

12  that this constituted deadly force.  Finally, they contend that Ramos is not entitled to qualified

13  immunity.

14       Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could find

15  Ramos violated Perez's Eighth Amendment rights.  Perez died from his injuries, so he suffered a

16  deprivation serious enough to constitute cruel and unusual punishment.  As for whether Ramos

17  acted with a culpable state of mind, the level of force used was substantial.  Perez sustained

18  multiple shotgun pellet wounds that caused his death within minutes.  Although there was some

19  need to apply force to stop the fight, the inmates were handcuffed behind their backs wearing

20  only their underwear.  A reasonable jury could conclude they could do little damage to each

21  other or to correctional officers if the officers tried to break up the fight.  If the jury believes

22  Castner's version, the inmates were only tentatively kicking at each other's shins to avoid falling.

23  A reasonable jury could conclude in light of these circumstances that the need to resort to deadly

force was grossly excessive compared to the threat posed by two handcuffed inmates kicking at each other's shins, and that no responsible correctional officer could have perceived a need to shoot center mass between the two inmates four times.  Indeed, if the jury believes Castner's version, Perez was on the ground after the first live round, yet Ramos shot three more live rounds in the chest area between the two inmates.  Finally, although the correctional officers used verbal commands and Ramos fired a popper round, a reasonable jury could find that Ramos resorted almost immediately and repeatedly to deadly force with little time between each shot.

Ramos is not entitled to qualified immunity.  The plaintiffs have pointed to case law that existed before this incident that indicated that using deadly force in the form of a shotgun with live rounds to restore prison order in a situation that does not call for the use of deadly force may violate a prisoner's Eighth Amendment rights. *See Est. of Adams*, No. 96-16423, 133 F.3d 926, 1998 WL 4079 at *3 (9th Cir. Jan. 7, 1998) (finding no qualified immunity where the correctional officer shot the inmate in the head and killed him in response to a fistfight between prisoners where a reasonable jury could have concluded the fight "did not pose a significant danger to either prisoner"); *Robins v. Meecham*, 60 F.3d 1436, 1438, 1441-42 (9th Cir. 1995) (holding a reasonable jury could find an Eighth Amendment violation where the correctional officer used a shotgun on an inmate refusing to lockdown as ordered and the plaintiff was injured by the pellets).  I therefore deny Ramos's motion for summary judgment on the Eighth Amendment claim against him.

### 2.  Castro and Smith

Castro and Smith argue that they did not use any force on Perez, so they cannot be liable for excessive force.  They contend that they intervened by shouting commands, but they did not have to intervene physically because that would have subjected them to the risks of the inmates

attacking them or being hit by birdshot.  Smith argues he could not have intervened before the shooting because he was not upstairs at that time.  Both defendants assert that they had no time to intervene because Ramos started shooting within seconds of the fight beginning.  They also argue that Ramos's unforeseeable, intentional conduct of shooting at the inmates center mass cuts off the chain of causation for their acts or omissions.  Alternatively, they contend that they are entitled to qualified immunity.

The plaintiffs respond that Castro and Smith could have physically intervened before Ramos fired the first round or between the third and fourth live rounds when there was a delay because Ramos had to reload.  They also contend that Castro and Smith could have intervened by telling or signaling Ramos to stop shooting.  And they dispute that either defendant is entitled to qualified immunity.

Correctional officers "can be held liable for failing to intercede in situations where excessive force is claimed to be employed by other officers only if 'they had an opportunity to intercede.'" *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000)).

Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could find Castro and Smith liable for failure to intervene.  A reasonable jury could conclude that they could have intervened by separating the handcuffed inmates before the first shot was fired, but instead they told Ramos to shoot in a situation that did not call for deadly force.  A reasonable jury also could find that Castro and Smith could have intervened between the third and fourth shots when Ramos paused to reload.  And a reasonable jury could conclude that the officers

1   could have intervened by signaling Ramos to stop shooting, particularly if a jury believes

2   Castner's testimony that Perez was on the ground after the first live round.[6]

3          As to whether Ramos's conduct was an intervening cause that cuts off liability, Castner

4   testified that Castro and Smith shouted at Ramos to shoot at the inmates.  A reasonable jury

5   could conclude that these defendants knew that a skip shot was not an option based on the

6   inmates' positioning and that by telling Ramos to shoot, they were encouraging the use of deadly

7   force.  Whether Ramos's decision to shoot center mass under these facts was so unforeseeable

8   and abnormal as to be an intervening cause relieving Castro and Smith of liability is a question

9   for the jury. *See White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990) (stating that determining

10  whether an intervening act was unforeseeable and abnormal are issues of fact for the jury "[i]f

11  reasonable persons could differ").

---

14  [6] In reply, Smith argues that the plaintiffs are newly raising at summary judgment the theory that
    he failed to intervene by not signaling Ramos to stop shooting.  He also contends that, in any

15  event, there is no evidence that Perez would have survived if he had told Ramos to stop shooting
    because it is unknown which shot killed Perez and there is no evidence that Ramos would have

16  heeded a direction to stop.

17         Under Federal Rule of Civil Procedure 8, the complaint's allegations must "give the
    defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Pac.*

18  *Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1086 (9th Cir. 2019) (quotation
    omitted).  "A party need not plead specific legal theories in the complaint, so long as the other

19  side receives notice as to what is at issue in the case." *Id.* (quotation omitted).

20         The amended complaint alleges that Castro and Smith failed to intervene or call for
    medical help, and instead yelled at Ramos to shoot the inmates. ECF No. 75 at 5, 7, 12-13, 16-

21  17.  Castro and Smith were questioned at their depositions regarding whether they told Ramos to
    stop shooting. ECF Nos. 175-5 at 9-10; 175-9 at 15-16; *see also* ECF No. 178-30 at 29 (expert

22  report opining that Smith and Castro were senior officers to Ramos and should have directed
    Ramos to cease fire).  Smith and Castro had fair notice of the alleged basis for their liability.  A

23  reasonable jury could conclude that Ramos would have obeyed cease fire commands from a
    more senior officer.  Finally, what harm Perez suffered as a result of officer inaction or particular
    shots is a matter for the jury to resolve, as even nominal damages are an option. *See Guy v. City
    of San Diego*, 608 F.3d 582, 587-88 (9th Cir. 2010).

Finally, Castro and Smith are not entitled to qualified immunity for the same reasons as Ramos, and because an officer's potential liability based on a failure to intervene was clearly established long before this incident. *See Cunningham*, 229 F.3d at 1289-90; *Robins*, 60 F.3d at 1442. Consequently, I deny Castro's and Smith's motions for summary judgment on the Eighth Amendment claim.

### 3.  Supervisory Defendants

I previously dismissed the excessive force claim against Cox, Neven, Filson, and Oliver in their individual capacities to the extent that claim is based on either a ratification theory or on the "pitch and catch" custom in HDSP. ECF No. 107 at 12. But I allowed this claim to proceed against these defendants[7] based on allegations that they encouraged the unnecessary use of shotguns loaded with birdshot to control inmates even when lesser means of force were available. *Id.* at 6-8.

The supervisory defendants argue that HDSP's written policies allowing the use of shotgun skip-shots are not unconstitutional as written. They also argue there was no alleged policy of skip-shooting birdshot as a primary means to control inmates and, even if there was, that was not the moving force behind Perez's death because Ramos admitted he did not use the shotgun in the manner he was trained to and instead shot center mass at the inmates. The supervisory defendants argue there is no evidence they subjectively knew that the use-of-force policies posed an excessive risk to inmates. They contend that a single incident cannot support a deliberate indifference claim. Finally, they argue that they are entitled to qualified immunity.

---

[7] The plaintiffs do not present argument or point to evidence that Oliver is liable on this or any other claim. Indeed, they concede dismissal of their deliberate indifference claim against Oliver. ECF No. 178 at 22. I therefore grant summary judgment in Oliver's favor on all claims.

The plaintiffs respond that the de facto policy that encouraged resorting to a shotgun even in nondeadly force situations was a moving force behind the violation. They note that a report on NDOC's policies and practices found those policies did not meet best practices, and the report concluded correctional staff often went from verbal warnings to using a shotgun without lesser means of intervention. The plaintiffs argue that the supervisory defendants agreed that a lack of staff resources and safety equipment necessitated the use of a shotgun as the default means of controlling inmates, and they were aware that birdshot caused injuries. They argue that given the lack of other available options to control inmates (such as batons or stun guns), the staff defaults to using birdshot even in situations that do not call for that level of force. They also note that NDOC policy defined birdshot as nondeadly force even though the defendants knew it could and did cause substantial bodily injury in other instances, and the policy did not define using birdshot as deadly force when it could not be skipped.

A supervisory official may be liable under § 1983 if either he is personally involved in the constitutional deprivation or there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quotation omitted). As to this second means of holding a supervisor liable, the "causal connection can be established by setting in motion a series of acts by others or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (simplified). A supervisor thus may "be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the

1  rights of others." *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 798 (9th Cir. 2018) (quotation

2  omitted).

3          Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could

4  find that Cox, Neven, and Filson knew about a custom and practice of using shotguns loaded

5  with birdshot as the primary means of controlling inmates regardless of the level of the threat due

6  to low-level staffing at the prison, and that they were subjectively aware of the risk of substantial

7  injury to inmates as a result.[8]  A reasonable jury could conclude that this custom and practice of

---

9  [8] *See, e.g.*, ECF Nos. 178-24 at 6-8 (Filson testifying that correctional officers at HDSP did not
10 have access to other means of control such as pepper spray or tasers); *id.* at 14-15 (Filson
   testifying that he knew birdshot caused injuries and was aware that birdshot was often used at
11 HDSP to control inmates); *id.* at 16 (Filson agreeing with the Association of State Correctional
   Administrators (ASCA) report that HDSP operates at very low staffing levels, so it relies heavily
12 on the use of shotguns); 178-25 at 13-14 (Neven and associate warden engage in firearms review
   to determine whether any discharge was within policy); 178-26 at 9 (ASCA report showing
13 HDSP had 48 incidents of birdshot being fired between 2012 and 2014, nearly five times the
   number of the next highest facility); *id.* at 13 (stating that NDOC "operates at very low staffing
14 levels" so "it relies heavily on the use of shotguns to protect inmates and staff from harm"); *id.* at
   14 (stating that the lack of staff has "placed the Department in the position of relying heavily and
15 almost exclusively [on] the use of weapons to maintain order"); *id.* at 15 (describing staff as
   "confirm[ing] that controlling inmates went from verbal to the shotgun with little or no physical
16 intervention by floor staff"); *id.* at 20 (noting that because the shotgun is the only control device
   readily available, "staff rely on the shotgun to control inmates and to break up fights between
17 inmates"); 178-27 at 5 (Cox testifying that the only nondeadly force equipment readily available
   to a correctional officer in the bubble is the shotgun); 178-28 (NDOC Administrative Regulation
18 405 defining as nondeadly force a shotgun loaded with birdshot "designed to skip shoot the
   birdshot into the offender(s) and striking the offender(s) in their lower extremities to temporarily
19 incapacitate or immobile the offender(s)"); 147-3 at 35-36 (Castro testifying that because officers
   had no intermediate equipment, officers would go from verbal commands and handcuffs to
20 birdshot); 157 at 154 (Neven testifying that he reviewed all incidents at HDSP); *id.* at 158
   (Neven agreeing with the ASCA report that due to low staffing levels, HDSP relies heavily on
21 the use of shotguns); 193-5 at 4 (Cox testifying that he was aware of a prior incident where an
   inmate sustained substantial bodily injury from birdshot); 178-30 at 13 (recounting Cox's
22 testimony agreeing that low staffing made resorting to the shotgun the default means of
   controlling inmates); *id.* (stating that Filson believed birdshot was not the best practice and he
23 tried to avoid sitting on review committees so as not to disagree with the use); 193-5 at 3 (Cox
   testifying that the Inspector General's office had recommended in one instance that the use of
   birdshot was outside policy).

using birdshot against unarmed inmates set in motion Ramos's resorting to the shotgun where

deadly force was not justified.[9]  The defendants are not entitled to qualified immunity because

the law prior to this incident clearly established both supervisory liability, and an inmate's

Eighth Amendment right to not be subjected to deadly force with live shotgun rounds to restore

prison order in situations that do not call for the use of deadly force. *See Starr*, 652 F.3d at 1207;

*Est. of Adams*, 1998 WL 4079, at *3; *Robins*, 60 F.3d at 1438, 1441-42; *see also Perez v. Cox*,

788 F. App'x 438, 444 (9th Cir. 2019) (rejecting these defendants' request for qualified

immunity at the dismissal stage of this case).  I therefore deny the supervisory defendants'

motion for summary judgment on this claim.

## B.  Deliberate Indifference to Serious Medical Needs[10]

To "prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must

show deliberate indifference to his serious medical needs." *Colwell v. Bannister*, 763 F.3d 1060,

1066 (9th Cir. 2014) (quotation omitted).  A plaintiff must show that (1) "the deprivation

was serious enough to constitute cruel and unusual punishment" and (2) the defendant was

deliberately indifferent. *Id.* (quotation omitted).  A prison official is deliberately indifferent "only

if the official knows of and disregards an excessive risk to inmate health and safety." *Id.*

(quotation omitted).  "[T]he official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

---

[9] *See, e.g.*, ECF Nos. 178-24 at 10 (Filson testifying that birdshot was listed as nondeadly force); *id.* at 13 (Filson testifying that there is no direction in the policy for firing birdshot when it cannot be skipped); 178-25 (Neven testifying that birdshot was listed as nondeadly force because it is designed to be skip shot but acknowledging it could constitute deadly force); 178-6 at 8-9 (report by ASCA stating that officers were unsure about what was appropriate when birdshot could not be skip shot); 178-26 at 14 (ASCA report stating that officers were reluctant to physically intervene in a fight between inmates because they were afraid of being hit by birdshot).

[10] I previously dismissed this claim against Cox, Neven, and Filson. ECF No. 107 at 12.

1  (quotation omitted).  Deliberate indifference "may appear when prison officials deny, delay or

2  intentionally interfere with medical treatment, or it may be shown by the way in which prison

3  physicians provide medical care." *Id.* (quotation omitted).

4         1.  Ramos

5       There is no genuine dispute that Ramos was not physically close to the inmates.  The

6  plaintiffs do not identify what aid he could have rendered before medical personnel arrived and

7  do not argue that he was deliberately indifferent to Perez's medical needs following the shooting.

8  I therefore grant summary judgment in Ramos's favor on this claim.

9         2.  Castro and Smith

10       Castro argues that he believed medical assistance had already been summoned and would

11  arrive soon.  Smith argues that he summoned aid and needed to do no more than that.  Both

12  contend that there is no evidence that they could have provided any assistance that would have

13  saved Perez or reduced his pain.  Finally, they assert that they are entitled to qualified immunity.

14       The plaintiffs respond that Perez was bleeding and gurgling, yet Castro and Smith did

15  nothing to assist him.  They contend that a reasonable jury could find that failing to provide

16  medical attention to someone who had sustained numerous shotgun wounds would cause the

17  injured person to suffer the unnecessary and wanton infliction of pain.  Finally, they argue that

18  Castro and Smith are not entitled to qualified immunity.

19       A reasonable jury could find Castro and Smith were deliberately indifferent to Perez's

20  serious medical needs.  There is no dispute that Perez was bloody and nonresponsive after the

21  shooting, that he stopped breathing shortly after medical personnel arrived, and that he

22  subsequently died from his injuries.  The deprivation thus was serious enough to constitute cruel

23  and unusual punishment.  A reasonable jury could find that Castro and Smith, who were trained

in CPR and observed Perez covered in blood, were deliberately indifferent because they knew of

and disregarded an excessive risk to inmate health and safety when they took no action to assist

Perez. *See* ECF Nos. 147-3 at 26 (Castro testifying that he was trained in CPR but did not render

aid); 147-4 at 29-30 (Smith testifying that he was trained in CPR but did not take any action to

assist Perez); *id.* at 45 (Smith testifying that he asked Perez if he was okay and Perez did not

respond).   Another correctional officer, Dustin Mumpower, arrived on the scene and saw Perez

was receiving no assistance. ECF No. 176-11 at 3-4.  Mumpower noted that Perez was short of

breath and gurgling. ECF No. 176-12.  In contrast to Castro and Smith's actions, Mumpower

turned Perez on his side to open Perez's airway and monitored Perez's breathing and pulse until

medical personnel arrived. *Id.*  What harm Perez suffered as a result of Castro and Smith doing

nothing to assist him before Mumpower and the medical personnel arrived is a matter for the jury

to resolve, as even nominal damages are available. *See Guy v. City of San Diego*, 608 F.3d 582,

587-88 (9th Cir. 2010).

Castro and Smith are not entitled to qualified immunity.  The Ninth Circuit already ruled

with respect to Oliver that a reasonable official would have known that he would violate an

inmate's Eighth Amendment rights if he observed an inmate bleeding from shotgun wounds and

did nothing to assess the inmate's needs or attempt to stop the bleeding. *Perez*, 788 F. App'x at

445.  Consequently, I deny Castro's and Smith's motions for summary judgment on the claim for

deliberate indifference to medical needs.

/ / / /

/ / / /

/ / / /

/ / / /

## C. Familial Association

The defendants argue that S.E.P. and A.I.P. lack standing to assert their claims for loss of familial association because they are not Perez's children or heirs.[11]  The defendants argue that a paternity test shows that S.E.P. is not Perez's biological child, there is no evidence that A.I.P. is Perez's biological child, and there is no evidence Perez welcomed the children into his home and supported them prior to his death.

The plaintiffs respond that the defendants do not have standing to challenge the children's paternity.  They argue that parentage is not determined solely by biology and that several other factors show Perez held out the children as his own and intended to maintain a parent-child relationship with them upon his release from custody.  They note that A.I.P.'s last name is Perez, an application to add A.I.P.'s father's name identified Perez as the father, and the children's mother identified Perez as the father in an affidavit in support of the children being placed with Victor and Michele Perez as guardians.  The plaintiffs contend that Perez would have signed the same affidavit, but he did not have his identification with him so the notary would not notarize his signature.

"A plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).  To establish standing at the summary judgment stage, the plaintiff "must set forth by

---

[11] Castro challenges only S.E.P.'s standing. ECF No. 146 at 3, 16-19, 25.  Ramos does not challenge standing. ECF No. 147.  Smith and the supervisory defendants challenge both children's standing. ECF Nos. 153 at 4-7; 159 at 8-9.  Standing is an Article III jurisdictional requirement. *Renee v. Duncan*, 686 F.3d 1002, 1012 (9th Cir. 2012).  Consequently, I must address each minor child's standing for each of their claims against the defendants, even if a particular defendant did not challenge standing.  For this same reason, it does not matter that the defendants raised the standing issue late in the case.  "Lack of Article III standing is a non-waivable jurisdictional defect that may be raised at any time, even on appeal after failing to raise it in the district court." *Id.*

affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (simplified).

"A decedent's parents and children generally have the right to assert substantive due process claims under the Fourteenth Amendment." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057-58 (9th Cir. 2018). "Judicially enforceable Fourteenth Amendment interests require enduring relationships reflecting an assumption of parental responsibility and stem from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children." *Id.* (simplified). Consequently, "even biological parents must maintain consistent involvement in a child's life and participation in child-rearing activities for their relationship to be entitled to the Fourteenth Amendment protections" for loss of familial relationships. *Id.* (holding that a child who was legally adopted as an infant had no standing to assert a loss of familial relationship claim under the Fourteenth Amendment for the death of his biological mother); *see also Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 789 (9th Cir. 2016) (stating that "parental rights do not spring full-blown from the biological connection between parent and child" (simplified)).

Based on S.E.P.'s date of birth and Perez's dates of incarceration, Perez could not be S.E.P.'s biological father. ECF No. 157 at 37, 66-67, 104. And DNA testing confirmed that another individual was S.E.P.'s biological father. *Id.* at 66-67, 104. When A.I.P. was born, his mother was married to another man. *Id.* Approximately a month before A.I.P. was born, Perez filled out a form for government benefits in which he denied, under penalty of perjury, that he lived with anyone else, including any unborn children. *Id.* at 70-71, 134. There is no evidence of a genetic test showing who is A.I.P.'s biological father.

21

1     Prior to Perez's incarceration, the children lived at Perez's mother's house. ECF No. 159-

2  9 at 45.  Before Perez went to prison, he asked his brother Victor Perez and Victor's wife

3  Michele to pick up the children and care for them. *Id.* at 46.  A few months after Perez went to

4  HDSP, Victor and Michele applied for temporary guardianship over A.I.P. and S.E.P. ECF No.

5  146-2 at 91.  They subsequently petitioned to terminate Perez's and the mother's parental rights.

6  *Id.* at 95, 98-105.  In that petition, Victor and Michele stated under oath that Perez "has displayed

7  conduct evincing a settled purpose to forego all custody and relinquish all claims as evidenced

8  by" him signing a consent to terminate his parental rights. *Id.* at 100; *see also id.* at 93, 105.  The

9  petition further stated that Perez had "abandoned the minor children by leaving [them] in the care

10 and custody of [Victor and Michele] without provision for the children's support and without

11 communication with the minor children for a period of more than 6 months." *Id.* at 100.  And

12 Victor and Michele averred that Perez was "unfit" as a parent because he "failed to provide the

13 minor children with proper care, guidance and support," and Perez had not made "even token

14 efforts" to "support or communicate with the children." *Id.*  Victor confirmed at his deposition

15 that the statements in the petition were true at the time the petition was filed. *Id.* at 95.  Perez

16 died before the court ruled on the termination of his parental rights, so that court found that

17 issues related to his parental rights were moot. ECF No. 178-15 at 4.

18     Under these facts, the children lack a familial relationship with Perez that is entitled to

19 Fourteenth Amendment protections as a matter of law.  Perez is not S.E.P.'s biological parent

20 and there is no evidence he is A.I.P.'s biological parent either.  More importantly, there is no

21 evidence that Perez maintained consistent involvement in the children's lives or participated in

22 child-rearing activities.  To the contrary, he consented to the termination of the parent-child

23 relationship.  The children thus have no standing to assert a loss of familial relationship claim

1  under the Fourteenth Amendment.  I grant the defendants' summary judgment motions on the

2  loss of familial relationship claim.

3  **IV.  STATE LAW CLAIMS**

4      **A.  Wrongful Death**

5      The defendants argue S.E.P. and A.I.P. lack standing to assert a wrongful death claim.

6  The defendants also argue they did not wrongfully cause Perez's death.  Alternatively, they

7  assert that they are entitled to discretionary immunity.

8      <u>1.  Standing</u>

9      The defendants argue that S.E.P. and A.I.P. lack standing to assert a wrongful death claim

10  because they are not Perez's children or heirs for the same reasons discussed with respect to the

11  familial association claim.  The plaintiffs oppose on the same grounds.  They also argue Nevada

12  law determines parentage and testamentary intent based on more than biology.  Finally, the

13  plaintiffs contend that the defendants lack standing to challenge their status as Perez's children

14  under Nevada's parentage laws.

15      Nevada provides that a wrongful death claim may be brought by both the decedent's

16  personal representative and the decedent's heirs. Nev. Rev. Stat. § 41.085(2).  The statute defines

17  "heirs" as "a person who, under the laws of this State, would be entitled to succeed to the

18  separate property of the decedent if the decedent had died intestate." Nev. Rev. Stat. § 41.085(1).

19  Under Nevada's intestacy laws, if the decedent has children but no surviving spouse, then the

20  estate goes to the children. Nev. Rev. Stat. § 134.090.  A child "includes a person entitled to take

21  as a child by intestate succession from the parent whose relationship is involved and excludes a

22  person who is a stepchild, a foster child, a grandchild or any more remote descendant." Nev.

23  Rev. Stat. § 132.055.

Nevada looks to its Parentage Act to determine a child's "right to an inheritance." *In re Est. of Murray*, 344 P.3d 419, 422-24 (Nev. 2015) (stating that "paternity contests in intestacy proceedings are governed by the Nevada Parentage Act," including that Act's standing and time limitation requirements).  The Parentage Act defines the parent-child relationship as "the legal relationship existing between a child and his or her natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations." Nev. Rev. Stat. § 126.021. Nevada law does not "preclude a determination by a court that a child has such a legal relationship with more than two persons."[12] *Id.*

Consistent with the "principle [sic] goal of intestacy law" to "effectuate the decedent's likely intent in the distribution of his property," "a determination of parentage rests upon a wide array of considerations rather than genetics alone." *In re Est. of Murray*, 344 P.3d 419, 422, 424 (quotation omitted).  For example, a man is presumed to be a child's father if he receives the minor child "into his home and openly holds out the child as his natural child." Nev. Rev. Stat. § 126.051(1)(d).

---

[12] The supervisory defendants move for leave to file supplemental authority because the Supreme Court of Nevada recently addressed the Parentage Act and the conclusive presumption of parentage that comes from a DNA test. *See Rosie M. v. Ignacio A.*, No. 83023, 138 Nev. Adv. Op. 49, 2022 WL 2375738 (Nev. 2022) (en banc).  However, *Rosie M.* decided only that a putative father could conclusively establish the parent-child relationship with a DNA test. *See id.* at *3-4.  It specifically did not address whether another man could also be deemed the child's father. *See id.* at *3 n.3 ("As of June 2021, Nevada law recognizes that a child may have a legal 'parent and child relationship' with more than two persons. *See* 2021 Nev. Stat., ch. 512, § 3, at 3404 (amending NRS 126.021(3) to include the following language: 'This subsection does not preclude a determination by a court that a child has such a legal relationship with more than two persons.').  The district court rendered its decision before this statute's effective date, and the parties do not address it on appeal.").  Consequently, *Rosie M.* does not preclude the possibility that Perez could be deemed S.E.P.'s father under the Parentage Act even though DNA testing shows another man was her biological father.

The Parentage Act limits who may challenge paternity.  Under § 126.071(1), a "child, his or her natural mother, a man presumed or alleged to be his or her father or an interested third party may bring an action pursuant to this chapter to declare the existence or nonexistence of the father and child relationship."  The Supreme Court of Nevada has interpreted "an interested third party" to exclude relatives who sought to establish the nonexistence of a parent-child relationship to disinherit the decedent's presumptive child in a probate proceeding. *In re Estate of Murray*, 344 P.3d at 423-24.  The court relied on cases from other states "for the proposition that third parties should not be allowed to challenge presumptive legitimacy, at least when established by acknowledgment, agreement, or decree." *Id.* at 424.

Although Article III standing is a matter of federal law, in this instance, Nevada state law defines who has standing as an heir to bring a wrongful death claim.  Under Nevada law, that question is resolved through the Parentage Act and its presumptions.  And once a parent-child relationship presumptively exists, only certain individuals have standing to challenge it, which would not include these defendants.  Thus, the question is whether either child is presumptively Perez's.

Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could find that S.E.P. and A.I.P. are presumptively Perez's children because he received them into his home and openly held them out as his own.  The plaintiffs have presented evidence that Perez held both children out as his own. *See* ECF Nos. 176-22; 176-23; 178-3 at 6-8, 10; 178-4 at 3-4; 178-11; 178-12 at 2-3.[13]  And there is at least some evidence that Perez and the children lived

---

[13] In their reply, the supervisory defendants contend the plaintiffs cannot rely on some of this evidence because the plaintiffs did not identify these exhibits in response to requests for admissions and production regarding the factual basis for the assertion that A.I.P. is Perez's natural child. ECF No. 193 at 9-10.  The defendants did not move for relief under Federal Rule of Civil Procedure 37.  I decline to resolve the issue in the absence of a properly filed motion to

together before his incarceration, that he contributed to the children's upbringing, and that he hoped to do so again upon his release from prison. *See* ECF Nos. 157 at 76-77; 175-3 at 3; 175-20 at 4; 178-9 at 5, 7; 178-10 at 5.  A reasonable jury could find that Perez was homeless and then incarcerated, and thus was unable to significantly contribute financially or live with S.E.P. and A.I.P. for long before his incarceration, but that he considered them his children and would have wanted them to inherit from him.  Although a reasonable jury also could find otherwise, given his lack of support and his consent to the children's adoption, these are issues for the jury to resolve.  I therefore deny the defendants' motion for summary judgment on standing grounds.

### 2.  Merits

Nevada Revised Statutes § 41.085(2) provides a cause of action "[w]hen the death of any person . . . is caused by the wrongful act or neglect of another . . . ."  The defendants raise the same arguments about why their conduct was not wrongful or did not cause Perez's death.  As discussed above with respect to the Eighth Amendment claim, genuine disputes remain about the wrongfulness of each defendant's conduct and whether it caused Perez's death.

Ramos, Smith, and Castro are not entitled to discretionary immunity for their actions because their decisions about what force to use and whether to intervene were not grounded in social, economic, or policy considerations. *See Est. of Brenes v. Las Vegas Metro. Police Dep't*, No. 78272, 468 P.3d 368, 2020 WL 4284335, at *1 (Nev. 2020) (holding that a police officer was not entitled to discretionary immunity for his "on-the-spot decision to use lethal force").

The supervisory defendants also are not entitled to discretionary immunity because they do not have discretion to violate the Constitution. *See Koiro v. Las Vegas Metro. Police Dep't*,

which the plaintiffs would have an opportunity to respond.  But even if I ignored the exhibits to which the defendants object, there is sufficient evidence to raise a triable dispute.

69 F. Supp. 3d 1061, 1074 (D. Nev. 2014) (citing *Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000)).  As discussed above, a reasonable jury could find that the supervisory defendants knew of and were deliberately indifferent to a de facto policy and practice of staff using shotguns as the primary means of controlling unarmed inmates, resulting in the use of deadly force in nondeadly force situations in violation of the Eighth Amendment.  The supervisory defendants therefore are not entitled to discretionary immunity for this claim. *See Nurse*, 226 F.3d at 1002 (denying immunity on a Federal Tort Claims Act claim[14] where the complaint alleged that "the policy-making defendants promulgated discriminatory, unconstitutional policies which they had no discretion to create").

### B.  Negligent Training and Supervision[15]

In Nevada, an employer "has a duty to use reasonable care in the training, supervision, and retention of his or her employees to make sure that the employees are fit for their positions." *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996).  This claim against Cox and Neven is based on the "pitch and catch" custom or practice at HDSP, as well as the policy regarding the use of shotguns discussed above. ECF No. 107 at 10.

Cox and Neven argue, among other things, that they are entitled to discretionary immunity.  Decisions about how to properly train and supervise officers are entitled to discretionary immunity because they involve individual judgment on the part of the policymakers or supervisors and are based on considerations of social, economic, or political

---

[14] The Supreme Court of Nevada looks to federal law under the Federal Tort Claims Act for guidance on discretionary immunity. *See Martinez v. Maruszczak*, 168 P.3d 720, 727-28 (Nev. 2007) (en banc).

[15] I previously dismissed the negligent retention claim. ECF No. 107 at 12.

1   policy. *Paulos v. FCH1, LLC*, 456 P.3d 589, 595 (Nev. 2020) (en banc) (holding that a police

2   department's hiring and training decisions are subject to discretionary immunity).  The plaintiffs

3   respond that I should follow *Scott v. Las Vegas Metropolitan Police Department*, which held that

4   a police department was not entitled to discretionary immunity for its alleged failure to train its

5   officers with respect to unlawful seizures and the use of excessive force. Case No. 2:10-cv-

6   01900-ECR-PAL, 2011 WL 2295178, at *10-11 (D. Nev. June 8, 2011).  I decline to do so

7   because that decision predates *Paulos*, and because "the great weight of authority in this district

8   holds that discretionary immunity applies to decisions relating to the hiring, training, and

9   supervision of employees." *Gardner v. City of Las Vegas*, No. 2:16-cv-01384-GMN-CWH, 2017

10  WL 3087276, at *4 (D. Nev. July 20, 2017).  Cox and Neven are entitled to summary judgment

11  on this claim.

12      **C.  IIED[16]**

13      The defendants generally argue that their conduct was not extreme and outrageous or

14  done with intent to cause emotional distress; there is no evidence the children or Perez suffered

15  extreme emotional distress; the children lack standing; and the defendants are entitled to

16  discretionary immunity.

17      Under Nevada law, an intentional infliction of emotional distress (IIED) claim requires

18  three elements: "(1) extreme and outrageous conduct with either the intention of, or reckless

19  disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme

20  emotional distress and (3) actual or proximate causation." *Dillard Dep't Stores, Inc. v. Beckwith*,

21  989 P.2d 882, 886 (Nev. 1999) (en banc) (quotation omitted).  "[E]xtreme and outrageous

22

23  ---

[16] I previously dismissed this claim to the extent it was based on the "pitch and catch" practice.
ECF No. 107 at 12.

1  conduct is that which is outside all possible bounds of decency and is regarded as utterly

2  intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev.

3  1998) (quotation omitted).  However, "persons must necessarily be expected and required to be

4  hardened to occasional acts that are definitely inconsiderate and unkind." *Id.* (omission and

5  quotation omitted); *see also* Restatement (Second) of Torts § 46 cmt. d ("The liability clearly

6  does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other

7  trivialities.").

8       The Supreme Court of Nevada has referred to the Restatement (Second) of Torts § 46 as

9  relevant authority for IIED claims under Nevada law. *See, e.g.*, *Olivero v. Lowe*, 995 P.2d 1023,

10  1026-27 (Nev. 2000); *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980).  That section does

11  not refer specifically to prison officials, but the comments state that a police officer's conduct

12  may rise to the level of extreme and outrageous when he engages in an "extreme abuse" of his

13  position. Restatement (Second) of Torts § 46, cmts.  The comments offer examples of when a

14  police officer's conduct may be so outrageous as to support an IIED claim, such as when the

15  officer attempts to extort money by a threat of arrest or attempts to extort a confession by falsely

16  telling the accused her child has been injured in an accident and she cannot go to the hospital

17  until she confesses. *Id.*  "The Court determines whether the defendant's conduct may be regarded

18  as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the

19  jury determines whether the conduct was extreme and outrageous enough to result in liability."

20  *Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).

21       None of the defendants is entitled to discretionary immunity for this claim because

22  discretionary immunity is not available for intentional torts. *See Franchise Tax Bd. of State of*

23  *Cal. v. Hyatt*, 407 P.3d 717, 733 (Nev. 2017), *rev'd and remanded on other grounds sub nom.*

1   *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485 (2019).  Viewing the facts in the light most

2   favorable to the plaintiffs, a reasonable jury could find that Ramos's decision to shoot center

3   mass at two handcuffed inmates was extreme and outrageous, particularly if a jury believes

4   Castner's version of events.  A reasonable jury likewise could find that Castro and Smith telling

5   Ramos to shoot two unarmed, handcuffed inmates and then not intervening to stop the shooting

6   was extreme and outrageous.  And a reasonable jury could find that the de facto policy of using

7   shotguns as the primary means of controlling inmates was extreme and outrageous.  As discussed

8   in relation to the requisite culpable mental state for the Eighth Amendment claim, a reasonable

9   jury could also find the defendants acted either intentionally or with reckless disregard for

10  causing emotional distress.

11       However, even assuming the children could bring an IIED claim in their own right, the

12  plaintiffs point to no evidence of the children's extreme emotional distress.  Attorney argument

13  does not raise a genuine dispute. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912,

14  923 (9th Cir. 2001) (stating that "arguments of counsel are not evidence and do not create issues

15  of fact capable of defeating an otherwise valid summary judgment" (simplified)).  I therefore

16  grant summary judgment in the defendants' favor on this claim to the extent it is meant to be

17  based on the children's extreme emotional distress.

18       To the extent this claim is brought by Victor Perez as special administrator of Perez's

19  estate, a reasonable jury could find that Perez suffered extreme emotional distress from being

20  shot multiple times, particularly if the jury believes the officers' version that Perez was

21  conscious through at least the third live round.  The defendants argue that a decedent's estate

22  cannot recover emotional distress damages on an IIED claim under Nevada's survival-of-action

23  statute because those damages are statutorily assigned to the heirs under the wrongful death

statute. *See* Nev. Rev. Stat. § 41.100(1) ("Except as otherwise provided in this section, no cause of action is lost by reason of the death of any person, but may be maintained by or against the person's executor or administrator."); Nev. Rev. Stat. § 41.085(5) (providing that heirs who bring a wrongful death claim may recover "damages for pain, suffering or disfigurement of the decedent"). But the Supreme Court of Nevada and the Nevada Court of Appeals have held that the survival and wrongful death statutes "are not mutually exclusive, and claims under Nevada's survival of action statute are separate and distinct from wrongful death claims." *Schmutz v. Bradford*, No. 58612, 129 Nev. 1150, 2013 WL 7156301 (Nev. Dec. 19, 2013) (holding that a medical malpractice claim and a wrongful death claim could be pleaded in the alternative); *Est. of Faranesh v. Eighth Jud. Dist. Ct. In & For Clark*, No. 73267, 134 Nev. 935, 2018 WL 3217994, at *2 (Nev. Ct. App. 2018) (holding that the decedent's special administrator could pursue both negligence and wrongful death claims because the claims are "separate and distinct"). Thus, the special administrator may seek to recover for Perez's emotional distress under the separate and distinct common law IIED tort.[17] I therefore deny the defendants' motions for summary judgment on the estate's IIED claim for Perez's emotional distress.

## V.  SEALING

Some of the parties' filings violate Local Rule IC 6-1 by including, among other things, the minor children's names and dates of birth. *See, e.g.*, ECF Nos. 146-2; 153; 157. I direct the parties to review all the filings to identify what needs to be sealed with a redacted version publicly filed. By August 1, 2022, the parties shall file a joint statement identifying by docket

---

[17] I do not need to address at this point issues related to a potential double recovery for Perez's emotional distress.

number the filings that need to be sealed.  For any document I order sealed, the filing party must file a redacted version within ten days of my order sealing it.

## VI.  CONCLUSION

I THEREFORE ORDER that defendant Jeff Castro's motion for summary judgment **(ECF No. 146) is GRANTED in part** as set forth in this order.

I FURTHER ORDER that defendant Raynaldo-John Ramos's motion for summary judgment **(ECF No. 147) is GRANTED in part** as set forth in this order.

I FURTHER ORDER that defendants Ronald Oliver, Greg Cox, Dwight Neven, Timothy Filson, and the State of Nevada's motion for summary judgment **(ECF No. 153) is GRANTED in part** as set forth in this order.  Because no claims remain against Ronald Oliver, the clerk of court is instructed to terminate him as a defendant in this action.

I FURTHER ORDER that defendant Isaiah Smith's motion for summary judgment **(ECF No. 159) is GRANTED in part** as set forth in this order.

I FURTHER ORDER that the defendants' motion for leave to file supplemental authority **(ECF No. 201) is GRANTED**.

I FURTHER ORDER that, by **August 1, 2022**, the parties shall file a joint statement identifying by docket number the filings that need to be sealed.

DATED this 11th day of July, 2022.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

32